**REDACTED OPINION**

# In the United States Court of Federal Claims

**No. 22-633C**
**Filed: February 19, 2023**
**Redacted Version Issued for Publication: March 14, 2023[1]**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **VECTRUS SERVICES A/S,** | \* |
| | \* |
| Protestor, | \* |
| | \* |
| v. | \* |
| | \* |
| **THE UNITED STATES,** | \* |
| | \* |
| Defendant. | \* |
| | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

        **J. Scott Hommer, III**, Venable LLP, Tysons, VA, for protestor. **Rebecca E. Pearson**, **Christopher G. Griesedieck**, **Lindsay M. Reed**, and **Alexander W. Koff**, Venable LLP, of counsel.

        **Elizabeth M.D. Pullin**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **William J. Grimaldi**, Assistant Director, Commercial Litigation Branch, **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brian M. Boynton**, Principal Deputy Assistant Attorney General, Civil Division. **Michael J. Farr** and **Katherine A. Illingworth**, United States Air Force Judge Advocate General's Corps, of counsel.

**O P I N I O N**

**HORN, J.**

        Protestor, Vectrus Services A/S (Vectrus), filed its pre-award bid protest complaint in the above-captioned bid protest challenging the offeror eligibility requirements included in Request for Proposals No. FA2523-21-R-0001 (the Solicitation), issued by the United

_____

[1] This Opinion was issued under seal on February 19, 2023. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

States Space Force, 21st Contracting Squadron, Detachment 1 (Space Force), organizationally located within the United States Department of the Air Force (Air Force), after filing a protest at the United States Government Accountability Office (GAO), Vectrus Services A-S, B-420527 et al., 2022 WL 1639491 (Comp. Gen. May 18, 2022), discussed below. The Solicitation at issue in the above captioned bid protest was issued by the Space Force located in Copenhagen, Denmark.[2] The Solicitation was for a Base Maintenance Contract to be performed at Thule Air Base which protestor describes as the "northernmost installation" operated by the Department of Defense. Thule Air Base is located in Greenland, within the Kingdom of Denmark (Denmark).[3]

In its bid protest complaint, protestor stated that it is "challenging improprieties in Request for Proposals [RFP] No. FA2523-21-R-0001," (alteration added), as well as challenging "the Agency's determination that Vectrus, the awardee on the incumbent contract, is ineligible to compete for award of the BMC [Base Maintenance Contract] under the RFP's unlawful terms because, although it is incorporated in the Kingdom of Denmark ('KoD'), it is a wholly owned subsidiary of a U.S. company." (alteration added). According to protestor, the Space Force "has restricted competition under the current RFP to offerors more than 50 percent owned by, and subject to the decisive influence of, Danish or Greenlandic individuals or entities," and those "eligibility criteria prevent any U.S.-owned or -controlled company—or indeed, any company that is owned or controlled by a citizen of any country other than Denmark or Greenland—from competing for award." Protestor further alleged that the Space Force "determined Vectrus ineligible to participate in the re-competition of its incumbent contract," and that the Space Force "attempts to justify excluding Vectrus from competing for the BMC by reinterpreting the terms of an international agreement based solely on a nonbinding political commitment made by the United States in recent diplomatic correspondence for the sake of comity with the KoD." Protestor's bid protest complaint alleged that the Solicitation's "restrictive eligibility criteria," limiting competition to Danish- or Greenlandic-owned and controlled companies, violate "the Competition in Contracting Act of 1984 ('CICA') and its implementing regulations" which, according to protestor, provide that "agencies may not restrict competition for federal contracts unless a statutory exception applies." (alteration added)

---

[2] Protestor and defendant both inconsistently referred to the contracting agency as the Air Force and the Space Force. The court refers to the contracting agency in the above captioned bid protest as the Space Force, and the contracting activity for the earlier contract, which was awarded before the formation of the Space Force, as the Air Force. Moreover, certain individuals are identified by their affiliation with the Department of the Air Force, not the Space Force, such as members of the Air Force Office of the General Counsel.

[3] The Market Research Report prepared by the Space Force in anticipation of the Solicitation at issue in the above captioned bid protest, which was included in the Administrative Record, describes Greenland as "a self-governing entity of the Kingdom of Denmark."

(citing 10 U.S.C.A. § 3201(a)(1) (2022);[4] FAR 6.101(a) (2022), FAR 6.301(d) (2022)). Protestor's complaint cited to one statutory exception to the Competition in Contracting Act's competition requirements, "where 'the terms of an international agreement or a treaty between the United States and a foreign government . . . have the effect of requiring' the restriction." (ellipsis in original) (quoting 10 U.S.C.A. § 3204(a)(4)).

Protestor's complaint asserted two counts. Count One alleged that the Space Force's restriction of competition to Danish or Greenlandic companies was "arbitrary, capricious, an abuse of discretion, and contrary to law." Count Two alleged that the Space Force's "decision to exclude Vectrus from competition" pursuant to the Solicitation's requirements was "arbitrary, capricious, an abuse of discretion, and contrary to law." Protestor requested a declaratory judgment and an injunction "to immediately reinstate Vectrus in the competition" as well as "to remove restrictions on competition not required by the terms of any international agreement" from the Solicitation. Defendant filed a motion to dismiss protestor's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) (2021). The parties also filed cross-motions for judgment on the Administrative Record pursuant to RCFC 52.1 (2021). All the motions have been fully briefed and the court held oral argument. Due to the urgency of the Solicitation and award process for the Base Maintenance Contract, as represented by the United States to the court and the protestor's intention for a speedy resolution of the case, the court issued an oral decision on the motion to dismiss and cross-motions for judgment on the Administrative Record. This Opinion memorializes the oral decision provided to the parties.

## BACKGROUND

Protestor Vectrus described itself as "incorporated under the laws of the KoD" and as "a subsidiary of Vectrus Systems Corporation ('VSC'), which is incorporated under the laws of the state of Delaware,"[5] (alteration added), but alleged that its "physical address"

---

[4] The statue at 10 U.S.C. § 2304 (2018) was moved to 10 U.S.C.A. §§ 3201, 3203 (2022), and 3204 (2022) by the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021. See Pub. L. No. 116-283, § 1811, 134 Stat. 3388, 4164-67 (2021).

[5] The Statement of Facts, prepared by Contracting Officer Patrick R. King for protestor's earlier protest of the Solicitation at the GAO which is included in the Administrative Record in the protest in this court, states that protestor "was established on April 23, 2014 and is 100% owned by Vectrus Systems Corporation of Colorado Springs, Colorado." The Contracting Officer's Statement of Facts further refers to another corporation, Inuksuk A/S (Inuksuk), which also filed a protest at the GAO, and the Statement of Facts indicates that "the basis of the Inuksuk protest is exactly the same as the VS [Vectrus] Protest although the titles of the allegations differ slightly." (capitalization in original; alteration added). Moreover, the Contracting Officer's Statement of Facts states that Inuksuk "was established on February 9, 2022 and is 50-66.66% owned by Permagreen Greenland A/S and 33.33-49.99% owned by Vectrus Services Greenland Aps." As of this Opinion, Inuksuk remained an offeror in the competition for the Thule Base Maintenance Contract.

is in Copenhagen, Denmark. Protestor alleged that as "the successor-in-interest to Exelis Services A/S ('Exelis')," "Vectrus[6] is currently performing under the incumbent Contract" for the Base Maintenance Services at Thule Air Base, which was due to expire on September 30, 2024, "if the Agency exercises all option periods," unless extended. (footnote added).

**The History of the Relationship Between the United States, the Kingdom of Denmark, and the Government of Greenland, Including the Thule Air Base (Pituffik)**

The above captioned bid protest involves the interpretation of a series of formal international agreements and other forms of communications between the United States and Denmark relating to the use of military facilities in Greenland by the United States military. As stated in protestor's complaint, "[o]n April 27, 1951, the United States and the KoD signed an 'Agreement' 'pursuant to the North Atlantic Treaty, concerning the defense of Greenland,' (the '1951 Agreement')." (alterations added). Both protestor and defendant acknowledged the 1951 Agreement as a binding agreement between the United States and Denmark. The 1951 Agreement, which entered into force on June 8, 1951, attached to protestor's complaint and included in the Administrative Record in the above captioned bid protest, provides at Article II, in relevant part:

> In order that the Government of the United States of America as a party to the North Atlantic Treaty may assist the Government of the Kingdom of Denmark by establishing and/or operating such defense areas as the two Governments, on the basis of NATO defense plans, may from time to time agree to be necessary for the development of the defense of Greenland and the rest of the North Atlantic Treaty area, and which the Government of the Kingdom of Denmark is unable to establish and operate single-handed, the two Governments in respect of the defense areas thus selected, agree to the following:
>
> > (1)  The national flags of both countries shall fly over the defense areas.
> > (2)  Division of responsibility for the operation and maintenance of the defense areas shall be determined from time to time by agreement between the two Governments in each case.
> > (3)  In cases where it is agreed that responsibility for the operation and maintenance of any defense area shall fall to the Government of the United States of America, the following provisions shall apply:

---

[6] The entry for protestor Vectrus on the Danish Central Business Register, included in the Administrative Record in the above captioned bid protest, provides that protestor's legal name is Vectrus Services A/S, that its address is in Nuussuaq, Greenland, and that its "**Business type**" is "Aktieselskab." (capitalization and emphasis in original). The Danish Central Business Register entry for protestor does not indicate that protestor is a subsidiary of any corporation.

(a)  The Danish Commander-in-Chief of Greenland may attach Danish military personnel to the staff of the commanding officer of such defense area, under the command of an officer with whom the United States commanding officer shall consult on all important local matters affecting Danish interests.

(b)  Without prejudice to the sovereignty of the Kingdom of Denmark over such defense area and the natural right of the competent Danish authorities to free movement everywhere in Greenland, the Government of the United States of America, without compensation to the Government of the Kingdom of Denmark, shall be entitled within such defense area and the air spaces and waters adjacent thereto:

(i)    to improve and generally to fit the area for military use;

(ii)   to construct, install, maintain, and operate facilities and equipment, including meteorological and communications facilities and equipment, and to store supplies;

(iii)  to station and house personnel and to provide for their health, recreation and welfare;

(iv)   to provide for the protection and internal security of the area;

(v)    to establish and maintain postal facilities and commissary stores;

(vi)   to control landings, takeoffs, anchorages, moorings, movements, and operation of ships, aircraft, and water-borne craft and vehicles, with due respect for the responsibilities of the Government of the Kingdom of Denmark in regard to shipping and aviation;

(vii)  to improve and deepen harbors, channels, entrances, and anchorages.

(c)  The Government of the Kingdom of Denmark reserves the right to use such defense area in cooperation with the Government of the United States of America for the defense of Greenland and the rest of the North Atlantic Treaty area, and to construct such facilities and undertake such activities therein as will not impede the activities of the Government of the United States of America in such area.

Agreement Between the Government of the United States of America and the Government of the Kingdom of Denmark, Pursuant to the North Atlantic Treaty, Concerning the Defense of Greenland, Den.-U.S., art. II, at 2-5, April 27, 1951, T.I.A.S. No. 2,292 [hereinafter 1951 Agreement] (capitalization in original). The 1951 Agreement further provides at Article VI: "The Government of the United States of America agrees to cooperate to the fullest degree with the Government of the Kingdom of Denmark and its authorities in Greenland in carrying out operations under this Agreement." Id. art. VI at 9. The 1951 Agreement also states at Article XIII, at paragraph (2): "Questions of

interpretation which may arise in the application of this Agreement shall be submitted to the Minister for Foreign Affairs for the Kingdom of Denmark and to the United States Ambassador to Denmark." Id. art. XIII at 13. The 1951 Agreement is the foundational document of the United States' military operations in Greenland and provides the framework for the later agreements and the ongoing diplomatic relationship between the United States and Denmark concerning the United States' military presence in Greenland, including at Thule Air Base.

The Administrative Record in the above captioned bid protest includes a letter, dated July 19, 1956, from Frederick Jandrey, Chargé d'Affaires at the United States Embassy in Copenhagen, to Erling Kristiansen, "Assistant Under Secretary of State" of the Danish Ministry of Foreign Affairs. The July 19, 1956 letter states that it was "enclosing a draft of the record of the discussions" between the United States and Denmark, and states that "[o]ur drafts have been compared with your attached draft and with the changes noted thereon the two copies are in complete agreement."[7] (alteration added). Attached to the July 19, 1956 letter is a July 13, 1956 letter from Mr. Kristiansen to Mr. Jandrey which "[r]efer[s] to the discussions which have taken place from the 9th – 11th July between representatives of our two Governments on questions relating to the participation by Danish enterprises and labor in work on defense areas in Greenland" and states, "I hereby enclose a draft to an Agreed Record of the discussions." (capitalization in original; alterations added). The July 13, 1956 letter further states, "[i]f you can agree to the wording of the draft I would propose that the draft should be regarded as an Agreed Record and that it formally constitutes the understanding arrived at in this matter between our two Governments." (capitalization in original; alteration added). Enclosed with the July 13, 1956 letter is an "Agreed Record of Meeting Held Between American and Danish Representatives July 9 and 10[, 1956] in Copenhagen on Contracts and Labor Used in Work on Defense Areas in Greenland," (capitalization and emphasis in original; alteration added), which states, in relevant part, that "Construction, Operation and Maintenance contracts for works in the defense areas in Greenland will in future only be awarded to Danish and American enterprises." Further, "[w]ith regard to the procedure to be followed for the awarding of contracts for work in Greenland," the "Agreed Record" provides that that "if it was felt that the nature of the conditions was such as to place Danish enterprises at a handicap, consultation should take place between the contracting officers and contractors with a view of ensuring that proposals be submitted on an equal basis." (alteration added). Moreover, the 1956 "Agreed Record" states that "Danish enterprises shall in every respect as in the past enjoy treatment no less favorable than that accorded to American concerns," and that "Danish labor" would be employed "to the maximum extent possible." (capitalization in original).

According to protestor's complaint, "[o]n August 29, 1962, the U.S. Department of the Air Force issued a letter entitled 'Danish Participation in U.S. Defense Projects in

---

[7] The 1956 correspondence appears to document an "understanding" reached between the United States and Denmark, however, neither protestor nor defendant refers to the 1956 correspondence in their briefs on the cross-motions for judgment on the Administrative Record.

Greenland,' to which the Agency attached an 'Aide Memoire' from the State Department dated June 6, 1962." (1962 Aide Memoire) (alteration added). The 1962 letter and the 1962 Aide Memoire are attached to protestor's complaint and are also included in the Administrative Record in the above captioned bid protest. The 1962 Aide Memoire refers "to the correspondence between the Ambassador of Denmark and the Assistant Secretary of the Air Force (Materiel) with regard to future Danish participation in work in United States defense projects in Greenland." The 1962 letter and the 1962 Aide Memoire both refer to an agreement between the United States and Denmark in 1962, and the terms of the 1962 agreement appear in the 1962 Aide Memoire.[8] The 1962 letter provides in relevant part:

> 1.      The United States and Denmark agreed in 1951 t at [sic] Danish concerns would participate to the maximum extent possible consistent with other considerations in construction work in Greenland in connection with the Danish-American Agreement of April 27, 1951. The two Governments entered into a subsequent agreement in 1956 whereby the United States is committed to employ Danis [sic] nationals to the maximum extent possible and permit Danish enterprise to participate on an equal competitive basis with U.S. concerns in connection wit [sic] all USAF contract work in support of U.S. defense projects in Greenland.

> 2.      Participation of Danish enterprise and nationals to be accomplished consistent with t e [sic] 1956 Agreement was defined more precisely by farther [sic] agreement between the United States and Denmark in June, 1962. Details of the 1962 Agreement are proposed in the Department of State Aide Memoire, 6 June 1962 (Attachment 1), and accepted at the Government level as set fort [sic] in the approved minutes of the fifteenth meeting of the U.S.-Danis [sic] Committee on Greenland Projects (Attachment 2).[[9]] This letter directs AFLC and ADC implementation of the 1962 Agreement.

---

[8] Although the 1962 letter and the 1962 Aide Memoire indicate that the United States and Denmark had reached an "agreement" in 1962, protestor claimed that the 1962 letter and the 1962 Aide Memoire were not "a treaty or international agreement" between the United States and Denmark, and defendant made no reference to a 1962 agreement. Moreover, neither party asserted that the 1962 letter or the 1962 Aide Memoire was relevant to the above captioned bid protest.

[9] The Committee concept appears in the 1962 documents and, therefore, predates the Permanent Committee established in a Memorandum of Understanding entered into on March 13, 1991 between the United States and the Kingdom of Denmark, discussed below. The Committee on Greenland Projects is the body which considered the 1962 Aide Memoire and at the meeting of which the Danish Government accepted the 1962 Aide Memoire. Whether the Committee on Greenland Projects was involved in the United States-Danish relationship during the gap in documents in the record before the court from 1962 to 1991 is unclear from the Administrative Record before the court.

3.      The 1962 Agreement may be viewed generally as being composed of three principal areas of participation: (a) that wherein U.S. firms and certain U.S. nationals only may participate; (b) that in w ic [sic] Danish concerns and labor only may be employed; and (c) that wherein both U.S. and Danish firms and personnel will be used. Specific detailed procedures to carry out eac [sic] of these areas are prescribed in Attac ments [sic] 3, 4, and 5, respectively.

(alterations and footnote added). The 1962 letter further provides "[o]verall policies and basic functional responsibilities" in relevant part:

a.      The 1962 Agreement is effective as of FY 1963.

b.      Participation of U.S. and Danish firms and personnel will be in keeping with the 1956 Agreement, particularly with respect to base maintenance and repair work (Attachment 5), and as modified by the 1962 Agreement in connection with radar installations (Attachment 3) and overall base support activities (Attachment 4).

(alteration added).

The 1962 Aide Memoire states, "with regard to future Danish participation in work in United States defense projects in Greenland," that "[t]he subject has been thoroughly studied in the Department of the Air Force with the objective of ensuring as great a Danish participation in those projects possible." (alteration added). The 1962 Aide Memoire proposes that Danish participation in United States defense projects in Greenland be evaluated according to "an overall approach," rather than the then-existing procedures under which "a separate review for consistency with pertinent U.S.-Danish Governmental understandings is conducted for each contemplated U.S. defense project in Greenland." The 1962 Aide Memoire states, in relevant part:

Increasing the utilization of Danish contractors in the operation of our vital support bases at Thule and Sondrestrom is anticipated. It is estimated that Danish participation in this field will increase from less than $1 million at the end of Fiscal Year 1962 to approximately $9 million by the end of Fiscal Year 1965. Participation of Danish supplies in the areas of local purchase items and perishable subsistence will also be increased from practically no participation at the end of Fiscal Year 1962 to about a $3 million level by the end of Fiscal Year 1965.

If agreeable to the Danish Government, it is contemplated that the total volume of such purchases for the Greenland Defense Area would be solicited each fiscal year from Danish sources by a purchasing activity located in Copenhagen.

(capitalization in original). The 1962 Aide Memoire further states, in relevant part:

> The Danish Government will also be interested in those areas wherein both Danish and U.S. suppliers compete on equal terms. Opportunities for increased Danish participation in competition with U.S. interests exist principally in base repair and maintenance work. It is possible that Danish participation could increase in this area since these requirements will be solicited, starting in Fiscal Year 1963, by the proposed procurement activity in Copenhagen.

(capitalization in original). The 1962 Aide Memoire continues: "The net effect of the above procurement exclusions and inclusions, together with certain other miscellaneous contractual actions, is an unquestioned appreciable increase in total Danish participation even over the Fiscal Year 1962 level." The 1962 Aide Memoire concludes with the statement that "[i]t is accordingly hoped that the foregoing will meet with approval of the Danish Government, and that discussions regarding pertinent implementing details can take place in Copenhagen as planned by the U.S.-Danish Committee on Greenland Projects." (alteration added).

Also attached to the 1962 letter are the "Minutes of the Meeting of the U.S.-Danish Committee on Greenland Projects," (Minutes), which occurred between June 19 and 22, 1962. According to the Minutes, "[t]he Danish member [of the Committee] stated his Government's acceptance of the programs contained in the Aide-Memoire." (alterations added). The Danish government's acceptance of the 1962 Aide Memoire, as recorded in the Minutes, appears to be the basis for the 1962 letter's assertion, quoted above, that the 1962 Aide Memoire was "accepted at the Government level" at the June 1962 meeting.

The Administrative Record in the above captioned bid protest does not document further diplomatic engagements between the United States and Denmark until 1991.[10] The narrative in protestor's complaint next addressed events in 1991 when "[t]he United States and the KoD executed an MOU [Memorandum of Understanding] which '[c]ame into force on 13 March 1991 by signature' and which was 'in implementation of the United States-Denmark Agreement Concerning the Defense of Greenland, dated April 27, 1951' and 'related agreements,'" (alterations except "[c]ame" added), which was attached to protestor's complaint and also included in the Administrative Record in the case currently before the court and was "enter[ed] into force on the date of signature by both Parties," March 13, 1991. Memorandum of Understanding Between the Government of the Kingdom of Denmark (Including the Home Rule Government of Greenland) and the Government of the United States of America Concerning Use of Sondrestrom Aviation Facility, Kulusuk Airfield and Other Matters Related to United States Military Activities in Greenland, Den.-U.S., art. XVI, Mar. 13, 1991, T.I.A.S. No. 12285 [hereinafter 1991

---

[10] In fact, protestor's complaint and the documents in the Administrative Record in this case also contain other chronological gaps in the relationship between the United States and the Kingdom of Denmark with respect to the United States' military presence in Greenland, most notably between 1991 and 2004.

Memorandum of Understanding] (alteration added). Protestor and defendant agreed that the 1991 Memorandum of Understanding constitutes a binding agreement between the United States and Denmark. The 1991 Memorandum of Understanding, in Article IV, "*Construction and Contracting for Goods and Services*," (emphasis in original), provides:

> 1. In accordance with existing agreements and practices, and with their respective laws and regulations, either Party may award contracts to commercial enterprises for goods and services, including construction projects, in Greenland and may procure directly from any US or Danish/Greenlandic source and may use its own military or civilian personnel to perform services or construction projects.

> 2. When, in the future, the Government of the United States, for the support of US military facilities in Greenland, plans to establish long-haul telecommunication facilities and services in Greenland, the Government of the United States will consider sympathetically the availability of such facilities and services from Greenlandic sources and, to the extent compatible with its requirements and US law, will endeavour to utilize such Greenlandic facilities and services in a manner consistent with Danish/Greenlandic law.

> 3. The United States will, when permissible under US law, offer competitive contracts to Greenlandic airline companies for US military air transportation requirements within Greenland. This undertaking is without prejudice to the right of the United States to use military aircraft within Greenland. Likewise, without prejudice to existing contracts, and when permissible by US law, the United States will offer competitive contracts to Greenlandic companies for US military sealift requirements within Greenland and between Greenland and Denmark. Furthermore, the United States will consider sympathetically other proposals from Danish/Greenlandic authorities concerning use of Greenlandic sources.

Id. art. IV. (capitalization in original). The 1991 Memorandum of Understanding's provision that "either Party may award contracts to commercial enterprises for goods and services, including construction projects, in Greenland and may procure directly from any US or Danish/Greenlandic source," (capitalization in original), is an indication of an intention between the United States and Denmark increasingly to encourage procurements by the United States in Greenland from Danish/Greenlandic sources. This intention was later further agreed to by the United States and Denmark through "diplomatic channels" as also indicated in the 1991 Memorandum of Understanding, ultimately culminating in the eligibility criteria included in the prior 2014 Solicitation for the earlier contract and the eligibility criteria included in the Solicitation under review in this Opinion.

The 1991 Memorandum of Understanding further provides, at Article VII, "*Permanent Committee*:"

1. In order to facilitate consultation and exchange of information on matters relating to the US military presence in Greenland, a United States-Danish Permanent Committee will be established on the date of entry into force of this MOU.

2. The Permanent Committee shall be composed of representatives from the Government of the United States and representatives from the Government of Denmark and from the Home Rule Government of Greenland.

3. The Permanent Committee shall consult and exchange information on all matters pertaining to the US military presence in Greenland in general and to the US military presence in Greenland in particular. The US representative will provide the Danish representative with timely information concerning any plans for significant changes to US military operations or facilities which could have an impact on the economy or environment in Greenland. Matters falling under the scope of the United States-Danish Committee on Greenland Projects will not be dealt with by the Permanent Committee.

4. In the event that disagreement arises over a problem which cannot be resolved by the Permanent Committee, the issue shall be referred for resolution through diplomatic channels.

(capitalization and emphasis in original). Id. art. VII. The 1991 Memorandum of Understanding's provision for consultation in the Permanent Committee or "through diplomatic channels" was established to build on the consultative framework established by the 1951 Agreement for the United States' military presence and operation of defense areas in Greenland.

According to protestor's complaint, on August 6, 2004, "[t]he United States and the KoD executed an 'AGREEMENT . . . TO AMEND AND SUPPLEMENT THE AGREEMENT OF 27 APRIL 1951.'" (2004 Agreement). (capitalization and ellipsis in original; alterations added). The 2004 Agreement was attached to protestor's complaint and included in the Administrative Record in the above captioned bid protest. The 2004 Agreement states that "Thule Air Base is the only defense area in Greenland. The provisions of Article II of the Defense Agreement[11] shall apply to the establishment of new defense areas." Agreement Between the Government of the United States of America and the Government of the Kingdom of Denmark, Including the Home Rule Government of Greenland, to Amend and Supplement the Agreement of 27 April 1951 Pursuant to the North Atlantic Treaty Between the Government of the United States of America and the Government of the Kingdom of Denmark Concerning the Defense of Greenland (Defense Agreement) Including Relevant Subsequent Agreements Related Thereto, Den.-U.S., art. 1, ¶ 1, Aug. 6, 2004, T.I.A.S. No. 04-806 [hereinafter 2004 Agreement] (footnote added). As an amendment to the original 1951 Agreement,

---

[11] The 2004 Agreement refers to the 1951 Agreement as the "Defense Agreement" throughout.

protestor and defendant both considered the 2004 Agreement to constitute a binding agreement between the United States and Denmark. The 2004 Agreement in "**Article 3: Local Cooperation**," at paragraph 1.c., provides:

> Consistent with the Defense Agreement, as amended herein, and the Memorandum of Understanding of March 13, 1991, and without prejudice to other relevant agreements and arrangements between the Parties, the Government of the United States will consult with and inform the Government of the Kingdom of Denmark, including the Home Rule Government of Greenland, prior to the implementation of any significant changes to United States military operations or facilities in Greenland.

Id. art. 3, ¶ 1.c. (capitalization and emphasis in original). The 2004 Agreement, at article 3, paragraph 2.b., provides:

> The Parties note and declare that they shall consult without undue delay regarding any question which one of the Parties may raise concerning matters pertaining to the U.S. military presence in Greenland and covered by the Defense Agreement and this agreement. To the extent that such matters cannot be resolved through local consultation, the Parties shall consult with each other either in the Permanent Committee or through diplomatic channels, as appropriate.

Id. art. 3, ¶ 2.b. (capitalization in original). The 2004 Agreement provides that "the United States will consult and inform the Government of the Kingdom of Denmark" and that when "such matters cannot be resolved through local consultation, the Parties shall consult with each other in the Permanent Committee or through diplomatic channels," building on the cooperative framework established by the prior 1951 Agreement and 1991 Memorandum of Understanding.

According to protestor's complaint, in 2008, the United States sent to the Kingdom of Denmark what protestor refers to as a "'proposal' regarding contracts related to commercial enterprises" in Greenland, "'to replace Article IV, paragraph 1 of the 1991 Memorandum of Understanding,'" which "the KoD 'accept[ed]'" on January 27, 2009. (alteration in original). The "'proposal'" referred to by protestor is included in the Administrative Record in the above captioned bid protest under the designation "Diplomatic Note 053 (July 16, 2008)" (Diplomatic Note No. 053). In Diplomatic Note No. 053, the United States "refer[s] to recent discussions between representatives of the two governments regarding procedures for procurement of services for the U.S. Air Base at Thule, Greenland," (alteration added), and the United States makes the following proposal:

> [T]he Embassy, on behalf of the Government of the United States, hereby proposes to replace Article IV, paragraph 1 of the 1991 Memorandum of Understanding in its entirety with the following:

> "In accordance with their respective laws and regulations, either Party may award contracts to commercial enterprises for goods and services, including construction projects, in Greenland, and shall procure directly from Danish/Greenlandic sources. When procurement from such sources is not feasible, U.S. requirements may be satisfied by procurement from U.S. or other sources. Either Party may use its own military or civilian personnel to perform services or construction projects."

(alteration added). Diplomatic Note No. 053 further states that "[i]f the foregoing is acceptable to the Government of Denmark, the Embassy proposes that this note, together with the Ministry's reply to that effect, shall constitute an agreement between the two governments, which shall enter into force on the date of the Ministry's reply." (alteration added).

According to protestor's complaint, the Danish Ministry of Foreign Affairs accepted the United States' proposal in a note dated January 27, 2009, which protestor's complaint referred to as the "2009 Amendment."[12] (2009 Agreement). The 2009 Agreement was attached to protestor's complaint and included in the Administrative Record in the above captioned bid protest. As an amendment to the 1991 Memorandum of Understanding, protestor and defendant both agreed that the 2009 Agreement is a binding agreement between the United States and Denmark. The 2009 Agreement states that the Danish Ministry of Foreign Affairs is in "receipt of note no. 056 [sic] of July 16, 2008," and quotes the United States' proposal in full. (alteration added). Following the quoted language from the United States' proposal, the 2009 Agreement states that "[t]he Ministry of Foreign Affairs has the honour to accept the proposal and declare that the note and this reply shall constitute an Agreement between our two countries which shall enter into force on the date of this note." (alteration added). The 2009 Agreement's provision that "either Party may award contracts to commercial enterprises for goods and services, including construction projects, in Greenland, and shall procure directly from Danish/Greenlandic sources," is a clear instance of an intention and a requirement to limit eligibility for procurement by the United States in Greenland to only certain nationalities, individuals or companies after the 1991 Memorandum of Understanding. The 2009 Agreement is the most recent binding agreement between the United States and Denmark to set forth such a requirement as reflected in the record before the court in the above captioned bid protest. Moreover, the 2009 Agreement is the first appearance in the Administrative Record of the phrase "Danish/Greenlandic sources" as a limitation on offeror eligibility.

---

[12] Protestor's briefs and defendant's briefs refer to this document as the "2009 amendment to the 1991 MOU." As reflected below, regarding the document, Denmark states: "The Ministry of Foreign Affairs has the honour to accept the proposal and declare that the note and this reply shall constitute an Agreement between our two countries which shall enter into force on the date of this note." The court generally refers to the document as the 2009 Agreement in this Opinion.

With the execution of the 2009 Agreement, the Administrative Record contains four international agreements between the United States and Denmark, which both protestor and defendant agree are binding agreements and which are relevant to the above captioned bid protest: The 1951 Agreement, as the foundational document of the United States' military presence in Greenland, established the cooperative framework for the relationship between the United States and Denmark in Greenland; the 2004 Agreement, which amended the 1951 Agreement and further provided for diplomatic consultation to resolve issues related to the United States' military presence in Greenland; the 1991 Memorandum of Understanding, which also built on the framework of the 1951 Agreement and established the Permanent Committee for consultation between United States and Danish officials, and set forth priorities on the nationalities for awarding contracts by the United States and Denmark with respect to the United States' military operations in Greenland on the Thule Air Base; and the 2009 Agreement, which amended the 1991 Memorandum of Understanding, putting in place the restriction of awarding contracts to "Danish/Greenlandic sources" which is currently at issue in this protest.

According to protestor's complaint, in 2013 "the United States developed eligibility criteria with the Danish Ministry of Foreign Affairs" to be included in Request for Proposals No. FA2523-12-R0006, (the 2014 Solicitation), the predecessor solicitation which resulted in the earlier contract. The Danish Ministry of Foreign Affairs sent a letter to the United States Embassy in Copenhagen, dated December 9, 2013, which reflected an "agreement" that had been reached between American and Danish officials.[13] The December 9, 2013 letter is attached to protestor's complaint and is included in the Administrative Record in the above captioned bid protest. The December 9, 2013 letter to the United States Embassy in Copenhagen is signed by Danish State Secretary for Foreign Policy Kim Jørgensen. The December 9, 2013 letter, which preceded the 2014 Solicitation for the earlier contract, provides in relevant part:

> I refer to the meeting held between the United States Embassy in Copenhagen and the Danish Ministry of Foreign Affairs on December 2nd 2013 and take this opportunity to confirm in writing the agreement reached regarding the Thule Air Base Maintenance Contract criteria.
>
> Firstly, as was decided the Ministry of Foreign Affairs will no longer issue clearances for companies eligible to participate in the procurement. It will hence be for the United States to assess whether a company qualifies as

---

[13] The 2013 diplomatic correspondence refers to an "agreement" between the United States and Denmark, however, protestor asserted that the 2013 diplomatic correspondence does not reflect a binding international agreement between the United States and Denmark, and defendant, adopting the position of protestor, did not argue that the 2013 diplomatic correspondence represents a binding agreement between the United States and Denmark.

Danish or Greenlandic based on predefined criteria.[14]

Secondly, as described the Danish authorities consider that the purpose of restricting participation in the procurement to Danish/Greenlandic companies is to ensure Greenland and Greenlandic society greatest possible benefits from the agreement.

It was in this spirit that it was suggested to narrow the criteria to only Greenlandic companies. However, the strong wish of the United States not to further limit the number of companies eligible to participate in the procurement is acknowledged. On this basis, the proposal from the United States that a company interested in participating in the procurement must provide the following information to prove that they qualify as a Danish or Greenlandic company is accepted:

> 1 Submit corporation certificate (Selskabscertifikat m. oblat) verifying that the company is registered as a business in the Kingdom of Denmark. (Det Centrale Virksomhedsregister (CVR); Det Grønlandske Erhvervsregister (GER); Skráseting Føroya (Skrás Nr))

---

[14] According to the 2015 GAO decision in the protest of the award of the earlier contract, not the protest of the Solicitation currently before the undersigned,

> [t]he parties [the United States and Denmark] concluded that Denmark could not be the country certifying that offerors were eligible Danish or Greenlandic sources, because doing so would trigger obligations under European Union procurement law. . . . [Danish Company Criteria Correspondence]. Additionally, allowing Greenland to determine the eligibility of each source was considered to create a conflict of interest because the incumbent contractor, Greenland Contractors, is partially owned by the government of Greenland.

Per Aarsleff A/S, B-410782 et al., 2015 WL 1004252, at *2 (Comp. Gen. Feb. 18, 2015) (alterations added). The "incumbent contractor" identified by the 2015 GAO decision, Greenland Contractors I/S, appears to have a relationship to an offeror that moved to intervene in the above captioned bid protest, Greenland Contractors JV A/S, and the motion to intervene was opposed by protestor Vectrus. The nature of the relationship between Greenland Contractors I/S and Greenland Contractors JV A/S was not confirmed in any filing submitted to this court, and while protestor Vectrus originally raised a conflict of interest claim in its protest at the GAO in 2022, protestor made no such argument in the above captioned bid protest in this court. The court explained at the June 30, 2022 hearing on the motion to intervene that Greenland Contractors JV A/S lacked standing to intervene in the bid protest currently before the undersigned because, due to the pre-award posture of the current bid protest, the prospective intervenor Greenland Contractors JV A/S could not demonstrate any interest which merited intervention.

> NOTE: THE REGISTERED OFFICE OF THE ENTERPRISE SHALL
> BE IN THE KINGDOM OF DENMARK AND SHALL NOT BE
> REGISTERED AS A SUBSIDIARY OF FOREIGN COMPANY.
>
> 2. Submit signed letter from an officer of a bank within the Kingdom
> of Denmark verifying that the company conducts business with that
> institution.
>
> NOTE: ELECTRONIC FUNDS TRANSFER OF INVOICE
> PAYMENTS WILL ONLY BE MADE TO A BANK IN THE KINGDOM
> OF DENMARK.
>
> I kindly ask you to confirm in writing the understanding as outlined above. I
> firmly believe a solution has been found which makes the assessment of
> what constitutes a company eligible to participate in the procurement more
> manageable, while at the same time maintaining the spirit of the
> agreements underlying the recent procurement procedure.

(capitalization and emphasis in original; footnote added).

According to protestor's complaint, the United States Embassy responded in a letter dated December 13, 2013. The December 13, 2013 letter was attached to protestor's complaint and included in the Administrative Record in the above captioned bid protest. The December 13, 2013 letter is signed by United States Ambassador J. Rufus Gifford and states:

> Thank you for your December 9 letter regarding the Thule Base
> Maintenance Contract and acceptance by Denmark and Greenland of our
> proposed criteria for companies wishing to participate in this U.S. Air Force
> procurement process. As you outlined in your letter, our use of these criteria
> will allow the United States to fulfill our obligations under our bilateral
> agreements related to Thule while streamlining the process for determining
> the eligibility of potential bidders. We appreciate your ministry's
> collaboration on this issue.

The offeror eligibility criteria agreed to by the United States and Denmark in the 2013 diplomatic correspondence appear to be the earliest instance in the Administrative Record of the United States and Denmark agreeing on how to implement restrictions and interpreting the term "Danish/Greenlandic sources" from the 2009 Agreement to do so, as a result of the diplomatic consultative framework provided by the 1951 Agreement and expanded on by the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement.[15]

---

[15] Protestor tried to point out inconsistency on the part of defendant by quoting from a cross-motion for judgment on the Administrative Record filed by the United States in litigation concerning the 2014 Solicitation and incumbent contract for Base Maintenance Services at Thule Air Base. Per Aarsleff A/S v. United States, 121 Fed. Cl. 603 (2015), rev'd, 829 F.3d 1303 (Fed. Cir. 2016). The Per Aarsleff case, however, is not part of the

Protestor further argued that "[i]n 2014, the Agency [Air Force] determined that Exelis," as Vectrus was then named, "was eligible to receive award of Contract No. FA2523-15-C-0001," the Base Maintenance Contract currently being performed by protestor, pursuant to the earlier contract, at Thule Air Base, and "[t]he Agency awarded Exelis Contract No. FA2523-15-C-0001 on or about October 31, 2014," the contract which preceded the current Solicitation. (alterations added). After the earlier contract was awarded to Exelis, three Danish corporations, Per Aarsleff A/S, Copenhagen Arctic A/S, and Greenland Contractors I/S, filed protests of the award of the earlier contract at the GAO. See Per Aarsleff A/S, B-410782 et al., 2015 WL 1004252, at *1. The GAO ultimately denied the protests leading subsequently to the Per Aarsleff cases before the United States Court of Federal Claims, Per Aarsleff A/S v. United States, 121 Fed. Cl. 603, and before the United States Court of Appeals for the Federal Circuit, Per Aarsleff A/S v. United States, 829 F.3d 1303 (Fed. Cir. 2016). See Per Aarsleff A/S, B-410782 et al., 2015 WL 1004252, at *2. As relevant to the above captioned bid protest, the 2015 GAO decision denied the Per Aarsleff protests, stating "[t]he protesters argue that the award to Exelis Services was unreasonable because, they contend, the awardee is not a Danish

---

litigation in the case currently under review other than as part of the part history of the United States' military presence at Thule Air Base. The quote offered by protestor from defendant's motion from the earlier Per Aarsleff litigation is:

"On November 25, 2013, Denmark proposed criteria that would limit eligibility to Greenlandic companies, i.e., the enterprise must be registered in Greenland's business registry (GER) under legislation applying to Greenland, the registered office of the enterprise must be in Greenland, the management of the contract must be performed in Greenland, and the enterprise must follow Greenland's labor laws . . . In response to the United States' concerns that this proposal limited competition to a greater degree than required by the relevant international agreements, an MFA [Ministry of Foreign Affairs] official represented that 'any Danish company easily could meet these criteria by registering in Greenland and maintaining an office there.' . . .

Nevertheless, the United States rejected this proposal and instead proposed its own criteria for a 'Danish/Greenlandic enterprise.' . . . The MFA accepted the criteria proposed by the United States and memorialized them in a December 2013 letter to the United States ambassador, who responded favorably."

(emphasis and ellipses in original; alteration added) (quoting Def.'s Cross-Mot. J. Admin. R. at 8, Per Aarsleff A/S v. United States, 121 Fed. Cl. 603 (Nos. 15-215C, 15-272C,15-330C)). The November 25, 2013 Danish proposal referred to in the above quotation from protestor's complaint was not included in the Administrative Record currently before the court. The Per Aarsleff 2014 Solicitation for the earlier contract, moreover, is not at issue in the case currently before this court.

or Greenlandic company, as required by the RFP, and was instead a wholly-owned subsidiary of a foreign (United States) company." Id. at *1 (alteration added).[16]

Although the 2014 Solicitation is not included in the Administrative Record in the above captioned bid protest, the 2015 GAO decision in Per Aarsleff quotes the eligibility provisions for offerors included in the 2014 Solicitation:

### L–3. OFFEROR ELIGIBILITY

Participation in this acquisition is limited to Danish/Greenlandic enterprises. Enterprises must possess a corporation certificate (Selskabscertifikat m. oblat) verifying the company is registered as a business in the Kingdom of Denmark (Det Central Virksomhedsregister (CVR); Det Grnlandske Erhervsregister (GER); Skráseting Froya (Skrás. Nr.)). NOTE: THE REGISTERED OFFICE OF THE ENTERPRISE SHALL BE IN THE KINGDOM OF DENMARK AND SHALL NOT BE REGISTERED AS A SUBSIDIARY OF [sic] FOREIGN COMPANY. Enterprises must produce a signed letter from an officer of a bank within the Kingdom of Denmark verifying the company conducts business with that institution. NOTE: ELECTRONIC FUNDS TRANSFER OF INVOICE PAYMENTS WILL ONLY BE MADE TO A BANK IN THE KINGDOM OF DENMARK.

Id. at *4 (capitalization and emphasis in original; alteration added). The 2015 GAO decision further states that the 2014 Solicitation included the following requirements:

### L–6. INFORMATION TO OFFERORS (ITO) AND INSTRUCTIONS FOR PROPOSAL PREPARATION INSTRUCTIONS (IPP)

*****

b. **Contract Documents.** As part of the proposal submission, include the following:

*****

2) Corporation certificate (Selskabscertifikat m. oblat) verifying that your company is registered as a business in the Kingdom of Denmark. (Det

---

[16] The government in the 2015 Per Aarsleff bid protest before the United States Court of Federal Claims argued, as it did in the case currently before this court, that the Court of Federal Claims lacks jurisdiction to review the case pursuant to 28 U.S.C. § 1502 (2018). See Per Aarsleff A/S v. United States, 121 Fed. Cl. at 621 (protesting the 2014 Solicitation and subsequent award). The Judge of the Court of Federal Claims considered and rejected the government's section 1502 argument, holding that the Court of Federal Claims had jurisdiction over protestors' claims. See id. at 622. Although the government and Exelis appealed the Court of Federal Claims' decision in Per Aarsleff, the Court of Federal Claims' decision with respect to the issue of jurisdiction was unchallenged on appeal and therefore was not addressed by the Federal Circuit. See generally Per Aarsleff A/S v. United States, 829 F.3d 1303.

Central Virksomhedsregister (CVR); Det Grnlandske Erhervsregister (GER); Skráseting Froya (Skrás. Nr.)) NOTE: THE REGISTERED OFFICE OF THE ENTERPRISE SHALL BE IN THE KINGDOM OF DENMARK AND SHALL NOT BE REGISTERED AS A SUBSIDIARY OF FOREIGN COMPANY.

3)Signed letter from an officer of a bank within the Kingdom of Denmark verifying that your company conducts business with that institution.

NOTE: ELECTRONIC FUNDS TRANSFER OF INVOICE PAYMENTS WILL ONLY BE MADE TO A BANK IN THE KINGDOM OF DENMARK.

Id. (capitalization, emphasis, and alterations in original). Based on the criteria in the 2014 Solicitation, the three protestors in the earlier Per Aarsleff bid protests before the GAO, which would lead to the Per Aarsleff cases before the Court of Federal Claims and the Federal Circuit, argued before the GAO "that the Air Force could not have reasonably relied on the 'registered as a foreign subsidiary' provision of the RFP because, they contend, there was no way for a firm to register in the [Danish] CVR [Central Business Register] as a subsidiary of a foreign company," and, therefore, "that the assessment as to whether an offeror is a 'Danish/Greenlandic enterprise' within the meaning of the RFP should turn on whether the prime contractor had Danish or Greenlandic ownership or control." Id. at *8 (alterations added). The GAO concluded, however, "that the RFP's eligibility analysis addressed whether the offeror was registered" in the Danish CVR "as a subsidiary of a foreign company," and that "there are no other criteria in the RFP that explain how the agency would evaluate whether a firm was a Danish or Greenlandic enterprise." Id. Accordingly, the GAO denied the protests filed by the three protestors and determined that the Air Force "reasonably found that Exelis Services was eligible for award under the terms of the solicitation." Id. at *9.

The three unsuccessful Per Aarsleff protestors at the GAO next filed bid protests of the 2014 Solicitation and subsequent award at the United States Court of Federal Claims, which were consolidated into one case, and the United States and Exelis defended the award of the earlier contract to Exelis. See Per Aarsleff A/S v. United States, 121 Fed. Cl. at 607. Before the Court of Federal Claims, the Per Aarsleff protestors "argue[d] that the award to Exelis Services was improper because Exelis Services is a wholly owned Danish subsidiary of an American company, and therefore, it failed to meet an eligibility requirement set forth in the RFP that limited participation to Danish or Greenlandic businesses." Id. (alteration added).

The Judge of the Court of Federal Claims in Per Aarsleff considered the same 2014 Solicitation provisions relied upon by the GAO in the 2015 GAO decision, but reached a different conclusion on the basis that "it was not possible to register a company in Denmark as a subsidiary of a foreign company during the time of the procurement," and, therefore, indicated that a reading of the 2014 Solicitation to exclude only those offerors registered in the Danish Central Business Register as subsidiaries of a foreign company "eviscerates any significant meaning from the eligibility criterion [in the 2014 Solicitation] and renders the restriction illusory." Id. at 625 (alteration added). The Judge

of the Court of Federal Claims in Per Aarsleff described the 1951 Agreement, the 1962 Aide Memoire, the 1991 Memorandum of Understanding, and 2009 Agreement, as well as the formulation of the 2014 Solicitation's eligibility criteria in diplomatic negotiations as reflected in the 2013 diplomatic correspondence. See id. at 608-11. "Because it was not possible to register a company in Denmark as a subsidiary of a foreign company during the time of the procurement," the Judge of the Court of Federal Claims in Per Aarsleff determined that "[s]ome recasting of the language in the Solicitation is necessary due to the defect in the eligibility criteria," and for that purpose, "the court strongly prefers to excise the mistaken words" limiting eligibility to offerors "registered as a subsidiary of [a] foreign company," and "preserving the remainder of the text and comporting with the evident intent of the procuring agency to implement the pertinent bilateral agreements." Id. at 625 (emphasis and alterations added). The Judge's "excis[ion]" of "the mistaken words" rendered Exelis ineligible for award of the earlier Base Maintenance Contract, and the Judge of the Court of Federal Claims, therefore, held that "the agency's decision to award Exelis Services the Thule Contract was arbitrary and capricious and not in accord with federal procurement law." Id. at 630 (citing 5 U.S.C. § 706(2)(A) (2012)).

Attached to one of the protestors' complaints in the Per Aarsleff bid protest of the earlier contract award was a Declaration, dated in the index of the Administrative Record in the above captioned protest as March 2, 2015, of Ambassador Jonas Bering Liisberg, Under-Secretary for Legal Affairs of the Danish Ministry of Foreign Affairs. The Declaration of Ambassador Liisberg also is attached to protestor's complaint and included in the Administrative Record in the current protest before this court. The Declaration of Ambassador Liisberg provides, in relevant part, that the inclusion of the language "THE REGISTERED OFFICE OF THE ENTERPRISE SHALL BE IN THE KINGDOM OF DENMARK AND SHALL NOT BE REGISTERED AS A SUBSIDIARY OF FOREIGN COMPANY" in the 2014 Solicitation was proposed by the United States "to show the United States' commitment to Greenland and the Greenlandic people benefitting from the U.S. presence at Thule." Decl. of Jonas Bering Liisberg at 6, Per Aarsleff A/S v. United States, 121 Fed. Cl. 603 (2015) (Nos. 15-215C, 15-272C, 15-330C) (capitalization in original). The Declaration of Ambassador Liisberg also states that "[i]n Denmark, a company cannot be listed in the public register, the Danish Business Register, as a 'subsidiary' or 'a subsidiary of a foreign company,'" and that "[n]o such public registration category exists under Danish company law or in the Danish Business Registry. Nor is any other information on foreign ownership of a registered company recorded in the Danish Business Registry." Id. (alterations added). Rather, the Declaration of Ambassador Liisberg explained, "the definition of a 'subsidiary' relates to the ownership and/or the actual control exercised by the parent. Accordingly, a 'subsidiary' in Denmark is a company that is partly or completely owned by another company that has 'decisive influence' (in Danish: 'bestemmende indflydelse') over the subsidiary." Id. at 7.[17] Moreover, according to several paragraphs of the Declaration of Ambassador Liisberg:

---

[17] The phrase "'decisive influence' (in Danish: 'bestemmende indflydelse')," which from the record before the court seems to have first appeared in the Declaration of Ambassador Liisberg, appears identically in later documents as part of U.S.-Danish negotiations relating to Thule Base Maintenance Contract offeror eligibility, including the

31. "Decisive influence" means the power to control a subsidiary's financial and operational decisions. Decisive influence over a subsidiary is exerted if the parent company owns, directly or indirectly through a subsidiary, more than half of the voting rights in an enterprise, unless in special cases such ownership can be clearly demonstrated not to constitute a decisive influence.

32. Where a parent holds half or less than half of the voting rights in an enterprise, decisive influence is exerted if the parent has (i) the power to exercise more than half of the voting rights according to an agreement with other investors, (ii) the power to control the financial and operational decisions of an enterprise under the Articles of Association or an agreement, (iii) the power to appoint or remove a majority of the members of the supreme management body, and this body exerts a decisive influence on the enterprise; or (iv) the power to exercise the de facto majority of votes at general meetings or at the meetings of an equivalent body, thus exerting the de facto decisive influence on the enterprise.

33. The existence and effect of potential voting rights, including rights to subscribe for and purchase shares that are currently exercisable or convertible, must be taken into account in the assessment of whether a company exerts a decisive influence. Any voting rights attaching to the shares owned by the subsidiary itself or its subsidiaries must be disregarded in the calculation of voting rights in the subsidiary.

Id. at 7-8.

As noted above, Exelis and the United States appealed the Court of Federal Claims' decision in the Per Aarsleff bid protest to the United States Court of Appeals for the Federal Circuit. See generally Per Aarsleff A/S v. United States, 829 F.3d 1303. On appeal, both Exelis and the United States argued that the Judge of the Court of Federal Claims had erred by invalidating the award to Exelis which was permitted by the "plain and unambiguous eligibility requirements" of the 2014 Solicitation. See id. at 1308. The Federal Circuit noted that the restriction against awarding the earlier contract to offerors registered as a subsidiary of a foreign company came from the Air Force's "mistaken" belief, based on an apparent mistranslation of Danish terms, that "subsidiary of a foreign company" was a registration option in the Danish Central Business Register. See id. at 1306-07. The Federal Circuit determined that the 2014 Solicitation eligibility requirements were ambiguous. According to the Federal Circuit:

---

proposed criteria by the United States that would ultimately accepted by Denmark, the diplomatic correspondence in which the United States and Denmark reached an agreement, and Solicitation No. FA2523-21-R-0001, the current Solicitation at issue in the bid protest currently before the court.

First, it could mean that bidders are ineligible if the registration in the CVR [Central Business Register] facially indicates that the business is a subsidiary of a foreign company. Under this interpretation, "registered as" indicates the registrant actively indicated, such as by checking a box in the CVR, that it was a subsidiary of a foreign company. Second, a company could be "registered as a subsidiary of a foreign company" if it is registered in the CVR *and also* a subsidiary of a foreign company, whether or not subsidiary status was affirmatively indicated at the time of registration and whether or not that status is apparent from inspecting the CVR after registration.

Id. at 1310 (emphasis in original; alteration added). The Federal Circuit held that a question posed by a potential offeror to the 2014 Solicitation, and the resulting answer from the Air Force, which were "incorporated into the final March 2014 solicitation," had "resolved the ambiguity," such that "the disputed eligibility provision, when properly interpreted, refers to whether the CVR facially indicates the company is a subsidiary of a foreign company." Id. at 1311. The Federal Circuit noted that "[c]ritically, there is nothing in the CVR that facially indicates Exelis is a subsidiary of a foreign company because, as the three unsuccessful bidders concede, it was impossible for the CVR to facially indicate such status." Id. at 1312 (alteration added). Moreover, according to the Federal Circuit, "[w]hile it is true that any company could meet the eligibility criterion by simply registering in Denmark, the record indicates the Danish Ministry of Foreign Affairs was aware of the relative ease of corporate registration." Id. (alteration added).

The Federal Circuit in Per Aarsleff further found that because "the ambiguity in the solicitation was patent, as reflected in the questions received by the Air Force and the two plausible interpretations indicated above," by protesting only after award had been made to Exelis, two of the protestors had "waived any objection that the eligibility provision of the contract was defective." Id. at 1312, 1314. Moreover, the Federal Circuit denied the cross-appeals of two protestors arguing that the Air Force had "act[ed] arbitrarily in declining to evaluate, as a condition of eligibility, whether each bidder would during the course of performance comply with these Danish/Greenlandic sourcing requirements" for purchases and subcontracts under the earlier contract. Id. at 1315 (alteration added). The Federal Circuit, therefore, reversed the holding of the Court of Federal Claims and held that "Exelis met the disputed eligibility criterion," without relying on the 1951 Agreement and the interpretations of the 1951 Agreement and subsequent agreements between the United States and Denmark, but acknowledging the ambiguous words of the 2014 Solicitation and corporate registration requirements.[18] See id. at 1312.

---

[18] The Federal Circuit in Per Aarsleff briefly referred to the 1951 Agreement, 1991 Memorandum of Understanding, and 2009 Agreement, and recounted the history of the 2013 diplomatic correspondence, but the Federal Circuit did not rely on those documents when reversing the Judge of the Court of Federal Claims' decision in Per Aarsleff and the Federal Circuit did not mention the 2004 Agreement. See Per Aarsleff A/S v. United States, 829 F.3d at 1306.

According to protestor's complaint, following the Federal Circuit's 2016 decision in Per Aarsleff, Exelis began performance on the earlier contract, although protestor's complaint did not indicate the date on which Exelis commenced performance. Protestor's complaint stated that, once the Federal Circuit allowed the contract to go forward, over the lifetime of the earlier contract, as of the date of the complaint, 181 modifications have been issued by the government, and the contracting activity has "obligated $259,726,464.77 in federal funds" for the earlier contract, "with an estimated total contract value of $405,811,630.33."

The Administrative Record in the above captioned bid protest includes a Standard Form 30 memorializing a modification to the earlier contract, identified as "Modification P00005," executed on April 10, 2017 by Air Force Contracting Officer Patrick R. King and by Martha Hires on behalf of Vectrus. Modification P00005 states that "[t]he purpose of this Bilateral modification is to change the corporate name from Exelis Services A/S to Vectrus Services A/S." (capitalization in original; alteration added). Modification P00005 details the administrative changes associated with the change of name from Exelis to Vectrus, including an accompanying change of address, throughout the earlier contract documents, but Modification P00005 states that "[t]he total contract amount is unchanged at DKK [Danish Krone] 7,791,508," and that "[t]he number of pages are unchanged at 231." (alterations added).[19]

Protestor's complaint in the current bid protest alleged that "since contract award in 2014, the Agency has consistently found Vectrus's performance of the Thule BMC services exemplary." The complaint quoted from a Declaration of Edward West, identified as "Vice President, Operational Excellence of Vectrus," which was filed in support of protestor's prior protest at the GAO of the current Solicitation and exclusion of Vectrus from the competition, which immediately preceded the above captioned bid protest, and stated that "'***Vectrus has provided performance to the client that has routinely been rated Very Good and Exceptional and never below Satisfactory***.'" (capitalization and emphasis in original) (quoting Decl. of Edward West at 1, Vectrus Servs. A-S, B-420527 et al., 2022 WL 1639491 (Comp. Gen. May 18, 2022)). Protestor further alleged that in the Contracting Officer's Statement of Facts in the protest brought by protestor at the GAO in 2022 regarding the current Solicitation and exclusion of Vectrus from the competition, "the Contracting Officer agreed with the characterization of Vectrus as being an incumbent contractor which has performed to the Agency's satisfaction."

According to protestor's current bid protest complaint filed in this court, protestor alleged that, following the 2014 award of the earlier contract to Exelis, the government of Denmark "expressed that it was displeased with the decision" to award the Base Maintenance Contract to Exelis. In its complaint, protestor alleged that the United States "eventually made a nonbinding political commitment to ensure that the follow-on contract

---

[19] Protestor's complaint in the above captioned bid protest mainly referred to the incumbent contractor as "Vectrus," without distinguishing when Exelis' name was changed to Vectrus during performance of the earlier contract.

would be awarded to a company that was not American-owned." Protestor alleged that as a result of this "political commitment" the United States "reinterpreted the 1991 MOU, as amended in 2009, more restrictively," in order, according to protestor, to claim "that the international agreement no longer permits American-owned corporations to compete to provide the BMC service—***even though none of the terms of the 1991 MOU, as amended in 2009, has changed***." (emphasis in original; alteration added).

In its complaint in this court, protestor stated that "[i]n March 2015, the United States and the KoD released a 'Joint Statement' regarding the 'Resolution of the Thule Base Maintenance Contract Acquisition Matter.'" (alteration added). The 2015 Joint Statement, attached to protestor's complaint, is included in the Administrative Record in the above captioned bid protest. Although the 2015 Joint Statement document itself does not appear to be dated, the 2015 Joint Statement is dated "March 24, 2015" in the Administrative Record index certified for filing by Contracting Officer King. The 2015 Joint Statement is signed by both then-Acting Assistant Secretary of Defense for International Security Affairs Elissa Slotkin and Danish State Secretary for Foreign Policy Kim Jørgensen. The 2015 Joint Statement provides, in relevant part:

> For more than 60 years, the Kingdom of Denmark, including Greenland, and the United States have cooperated to provide for the defense of Europe and North America through mutually beneficial operations at Thule Air Base. Similarly, the partnership between the Kingdom of Denmark and the United States has endured through times of prosperity and times of challenge, and we remain close friends and Allies, working together on a wide range of critical global issues to achieve a better, more secure world for all. The United States has an interest in maintaining a presence at Thule Air Base, and in continuing the mutually beneficial relationship with the Kingdom of Denmark, including Greenland.

> Following the award of the Thule Air Base Maintenance Contract, the Kingdom of Denmark approached the United States to discuss concerns relating to the interpretation of international agreements between the two governments pertaining to the definition of a Danish/Greenlandic enterprise. On March 11, 2015, high-level consultations between the Kingdom of Denmark and the United States began in Washington, DC, regarding the international agreements applicable to the Thule Air Base Maintenance Contract solicitation. The representatives developed a framework intended to resolve, expeditiously and through diplomatic channels, all issues between the two governments relating to the interpretation of those international agreements in accordance with Article XIII(2) of the 1951 Defense of Greenland Agreement (as amended), and are conducting further consultations to this end.

> The United States and the Kingdom of Denmark are endeavoring to address the concerns as follows:

• The United States and the Kingdom of Denmark have established an expert working group to develop a mutually acceptable definition of a Danish/Greenlandic enterprise.

• The U.S. Air Force intends to conduct a new acquisition and issue a new request for proposals for the Thule Air Base Maintenance Contract once there is agreement between the United States and the Kingdom of Denmark regarding what constitutes a Danish/Greenlandic enterprise.

• The U.S. Air Force intends then to competitively award a Thule Air Base Maintenance Contract. The United States and the Kingdom of Denmark will determine to what degree, if any, competition will be limited.

The 2015 Joint Statement indicates that "high-level consultations" in "diplomatic channels" were used to resolve "all issues between the two governments relating to the interpretation of those international agreements in accordance with Article XIII(2) of the 1951 Defense of Greenland Agreement," consistent with the consultative framework established by the 1951 Agreement and expanded by the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement.

The Administrative Record in the above captioned bid protest also includes a "MEMORANDUM FOR AMBASSADOR H.E. LARS GERT LOSE," signed by Robert S. Clarke, the "Deputy, Air Force Program Executive Officer for Combat and Mission Support," dated October 11, 2016. (capitalization in original). In the October 11, 2016 Memorandum, Mr. Clarke states, in relevant part:

The U.S. Air Force ("Air Force") remains committed to working with the Government of the Kingdom of Denmark ("Danish Government") to develop acceptable eligibility criteria for the next Thule base maintenance contract acquisition.

Although the current Thule base maintenance contract has been found by the U.S. courts to be legally valid, the Air Force has offered to conduct a re-competition of the Thule base maintenance contract prior to the expiration of its seven-year term, provided the United States and the Danish Government can agree on the definition of "Danish/Greenlandic sources." As reflected in the March 2015 Joint Statement, the United States agreed to convene Working Group 1 to resolve the scope of the term "Danish/Greenlandic sources," in accordance with our respective laws and regulations for the purpose of the follow-on acquisition of the Thule base maintenance contract. We agreed to suspend Working Group 1 proceedings until the U.S. courts resolved the bid protests filed by three unsuccessful offerors.

The October 11, 2016 Memorandum acknowledges that "[o]n June 23, 2016, the U.S. Court of Appeals for the Federal Circuit ruled in favor of the Air Force" and the earlier Base Maintenance Contract award, but that "following the award of the Thule base

maintenance contract, the Danish Government stated its objection to the eligibility criteria used in the [2014] Thule base maintenance solicitation." (alterations added).

The October 11, 2016 Memorandum further refers to an earlier Danish proposal, rejected by the Air Force, for eligibility criteria to be used for the re-procurement of the Thule Base Maintenance Contract. The Danish proposal had conditioned contractor eligibility on two requirements, unacceptable to the United States: "(1) the Government of Greenland must 'own thirty-three percent (33%) of the contract company'; and (2) the exclusive purpose of the company is to perform Thule base operating services." The October 11, 2016 Memorandum indicates that "[t]he Air Force must comply with U.S. competition laws in the Thule acquisition, and therefore can take no action to unduly restrict competition," and that "the United States will not engage in further discussions concerning the proposal of the Danish Government and Government of Greenland during Working Group 1, or any proposal limiting the competition to government-owned contractors." (alteration added). The October 11, 2016 Memorandum explains that "[i]n 2013, the United States rejected a Danish Government proposal where only Greenlandic companies would be eligible to compete for the contract because it unnecessarily restricted competition," but that the 2016 "subsequent proposal goes even further, containing eligibility criteria that are more restrictive than those rejected by the United States and the Danish Government previously." (alteration added). The October 11, 2016 Memorandum further explains that "[a]pplicable U.S. competition law has not changed since the Danish Government in 2013 accepted the U.S. position that the Thule competition cannot be restricted unnecessarily" and that "[i]t is not clear why a proposal more restrictive of competition than the one rejected in 2013 might be acceptable to the United States today." (alterations added). The October 11, 2016 Memorandum concludes:

> The United States is committed to resolving the Thule contractor eligibility issue in a reasonable fashion, and stands ready to re-convene Working Group 1 within the next 30 days based on the understandings outlined in our response. To this end, attached to this response is the Air Force's proposed eligibility criteria which satisfy our respective obligations under the relevant international agreements and also permit maximum competition among "Danish/Greenlandic sources."

Attached to the October 11, 2016 Memorandum are proposed eligibility criteria from the Air Force which would require offerors to the Thule Base Maintenance Contract to provide "[a] corporation certificate (Selskabscertifikat m. oblat) verifying that the company is registered as a business in the Kingdom of Denmark," and "[a] signed letter from an officer of a bank within the Kingdom of Denmark verifying that the company conducts business with that institution." (alterations added).

Included in the Administrative Record in the above captioned bid protest also is a second memorandum similarly dated October 11, 2016, titled "MEMORANDUM FOR JAMES TOWNSEND, DASD(P) [Deputy Assistant Secretary of Defense (Policy)]," (capitalization in original; alteration added), written by Richard B. Clifford, Jr., Deputy

General Counsel, Acquisition, for the Department of the Air Force, with the subject "Legal Review of the Thule Proposal" (2016 Deputy General Counsel Review). The 2016 Deputy General Counsel Review sets forth the Air Force's legal objections to the same Danish-proposed eligibility criteria rejected in the October 11, 2016 Memorandum. The 2016 Deputy General Counsel Review reflects, in relevant part, the Air Force's position that

> the [Danish] Proposal is inconsistent with U.S. acquisition law. As you are aware the 1991 "Memorandum of Understanding Concerning Use of Sondestrom [sic] Aviation Facility, Kulusuk Airfield, and Other Matters Related to United States Military Activities in Greenland", as amended by a January 27, 2009 Exchange of Notes (hereinafter the "1991 MOU"), provides that "*[i]n accordance with their respective laws and regulations*, either Party may award contracts to commercial enterprises for goods and services . . . and shall procure directly from Danish/Greenlandic sources." (Emphasis added). The 1991 MOU also states that "[w]hen procurement from such sources is not feasible, U.S. requirements may be satisfied by procurement from U.S. or other sources." *See* 1653 U.N.T.S. 389 (quoting the Exchange of Notes).[20] The U.S. Competition in Contracting Act of 1984, 10 U.S.C. § 2304, and its implementing regulations, require federal agencies to procure requirements through full and open competition to the maximum extent practicable, subject to certain exceptions. *See* 10 U.S.C. § 2304(c)(1)-(c)(7); Federal Acquisition Regulation (FAR) § 6.302. Even when these limited statutory exceptions apply, federal agencies are still required to promote competition to the maximum extent practicable given the circumstances. *See e.g,* [sic] FAR § 6.303(b)(6). Here, the Air Force has no statutory basis to require offerors--as a condition to proposal submission or contract award--to surrender a partial ownership interest to a third party, let alone a foreign government. Nor is the Air Force authorized by statute to dictate the business relationships of competing offerors.
>
> The 1991 MOU does not change this result. By its terms, the preference for Danish/Greenlandic sources expressed in the 1991 MOU must be read consistently with prevailing U.S. law, which prohibits the imposition of solicitation terms and conditions that are unduly restrictive of competition. *See* 10 U.S.C. § 2305(a)(1)(B) (solicitations shall include specifications which promote full and open competition and not include "restrictive provisions or conditions" unless "necessary to satisfy the needs of the agency or as authorized by law"); *see also Total Health Res.*, B-403209,

---

[20] The language quoted by the 2016 Deputy General Counsel Review is attributed by the 2016 Deputy General Counsel Review to "1653 U.N.T.S. 389," which is a citation to the 1991 Memorandum of Understanding as it appears in the United Nations Treaty Series. The language quoted, however, is drawn from the 2009 Agreement, not from the original 1991 Memorandum of Understanding. The parenthetical explanation "(quoting the Exchange of Notes)" appears to acknowledge that the language quoted comes from the 2009 Agreement, which was effected by a proposal and acceptance set forth in diplomatic notes.

Oct. 4, 2010, 2010 CPD ¶ 226 at 3 (solicitation requirement for specialized experience on the part of the prime contractor was unduly restrictive of competition since the provision was not reasonably necessary to meet government needs). To be certain, the 1991 MOU requirement to "procure directly from Danish/Greenlandic sources" can be achieved through far less onerous and competitively restrictive means than foreign government ownership of single purpose offerors. Indeed, limiting the competition to companies owned in part by Greenland is inconsistent with the plain language of the 1991 MOU, which addresses "Danish/Greenlandic" sources, not just Greenlandic sources. Simply stated, any contractor eligibility criteria implementing the 1991 MOU must maximize the number of eligible offerors, and not unreasonably restrict or eliminate competition. Because the [Danish] Proposal would unessarily [sic] restrict competition under the 1991 MOU, it cannot be considered feasible.

(capitalization, emphasis, and third alteration in original; footnote added).

Furthermore, the Administrative Record in the above captioned bid protest includes a "DIPLOMATIC NOTE," (capitalization in original), dated July 13, 2017, by which the Danish government, through the Royal Danish Embassy in Washington, D.C., submitted to the United States "an outline of an alternative proposal concerning the Thule Base Maintenance Contract." (July 13, 2017 Diplomatic Note). The July 13, 2017 Diplomatic Note states that "the Tax Authorities in Greenland have drafted the attached memo concerning the economic consequences for Greenland of the Exelis contract," the iteration of the Thule Base Maintenance Contract Solicitation at issue in the above captioned bid protest.[21] The July 13, 2017 Diplomatic Note sets forth the Danish government's "alternative proposal:"

1. The company which wins the tender and is awarded and concludes the Base Maintenance Contract shall accept that a company owned by the Greenland Government shall participate in the Base Maintenance Contract with a share of 33 per cent when the tendering process has been finalised [sic], see section 1.1 below.

---

[21] The Greenland Tax Authorities' memorandum referred to in the July 13, 2017 Diplomatic Note, which addresses the "economic consequences for Greenland of the Exelis contract," appears in the Administrative Record as an attachment to the July 13, 2017 Diplomatic Note. The memorandum in the Administrative Record, however, appears to be incomplete, consisting of only one page and ending mid-sentence. To the extent the document is in the record, the Greenland Tax Authorities' memorandum, in relevant part, states "that Greenland received total revenue of DKK [Danish Krone] 237.8 million from Thule Airbase [sic] contract activities in 2015," that "revenue is expected to be reduced to DKK 109.3 million in 2018 and further reduced to DKK 88.2 million in 2019," and that "[t]he reduction in personal income tax comes from an estimated lower wage sum. Corporate tax is also expected to be affected by the lower bid made by Exelis" when competing for the earlier contract. (alterations added).

2.  The Greenland Government company will participate in the Base Maintenance Contract on commercial terms. This means that the company shall carry its share of 33 per cent of any costs and benefits stemming from the Base Maintenance Contract, see section 1.1 below.

3.  The Greenland Government company's participation in the Base Maintenance Contract shall not be established before the tendering process has been finalised [sic], see section 1.2 below.

4.  All real and genuine Danish/Greenlandic companies are qualified to participate in the tender for the Base Maintenance Contract, see section 1.3 below.

(capitalization in original; alteration added). The July 13, 2017 Diplomatic Note also includes an extended explanation of the Danish government's proposal. Notable in the explanation in the Diplomatic Note is the Danish government's indication that the contract awardee would be required to enter into a "chosen form of cooperation" with a company owned by the Greenlandic government, in which the Greenlandic government-owned company would have "an ownership share of 33 per cent" and "shall participate as a 'silent partner'" during the performance of the contract. The explanation also states that under the Danish government's alternative proposal:

> The Government of Greenland will during the tendering process not have an ownership interest in any potential offeror and no company owned by the Greenland Government will take part in the tendering process.
>
> All real and genuine Danish/Greenlandic companies (other than Government owned companies) may therefore take part in the tendering process, in full and open competition, and in accordance with the Defense Agreement.[22]

(footnote added). The explanation further states that "[t]he company which wins the tender and is awarded the Base Maintenance Contract must be a real and genuine Danish/Greenlandic company. This is in accordance with the requirements and principles of the Defense Agreement," and that "the objective of the Defense Agreement is to ensure that Greenland and the Greenlandic society enjoy the greatest possible benefits from the presence of US forces in Greenland. Terms to ensure this must also be included in the tendering terms." (alteration added). The July 13, 2017 Diplomatic Note also includes the Danish government's "**Brief remarks on the question of free competition**:"

> In the opinion of the Kingdom of Denmark, the proposed alternative model, as outlined above, implies an open and free competition between the entities participating in the tender.

---

[22] The "Defense Agreement" referred to by the Danish government in the July 13, 2017 Diplomatic Note appears to refer to the 1951 Agreement. The 2004 Agreement, quoted above, also refers to the 1951 Agreement as the "Defense Agreement."

However, the Kingdom of Denmark has noted that, according to for example 10 U.S. Code § 2304(c)(4), the US authorities are allowed to use procedures other than competitive procedures when the terms of an international agreement or a treaty between the United States and a foreign government have the effect of requiring the use of procedures other than competitive procedures.

If the US authorities disagree with the Kingdom of Denmark in relation to the matters stated above, it is thus the opinion of the Kingdom of Denmark that the consequence will be that the Defense Agreement requires the use of such other procedures meaning that the US authorities are allowed to use such other procedures.

(emphasis in original).

The Administrative Record in the above captioned bid protest contains another diplomatic note, issued August 17, 2017 by the Royal Danish Embassy in Washington, D.C., requesting to schedule discussions with the United States government later that year regarding the Thule Base Maintenance Contract. (August 17, 2017 Diplomatic Note). The August 17, 2017 Diplomatic Note also encloses a memorandum in response to the Air Force's expressed concerns regarding involving the Greenlandic government during discussions of the Thule Base Maintenance Contract offeror eligibility requirements, on the grounds that the Greenlandic government would have an ownership interest in one of the potential offerors, Greenland Contractors. The Danish government states in the memorandum its belief that "[g]iven the extensive nature of Greenland's autonomy, any negotiations over Thule must include the elected Greenland Government," and that "US procurement law" does not "appl[y] to a negotiation concerning an international agreement." (alterations added). The Danish government further states in the memorandum:

While in the end, there will ultimately be a new contract solicitation with new eligibility criteria, this will be the result of a two-step process. First, the Kingdom of Denmark and the United States will clarify the meaning of 1991 MOU in an agreement between sovereign governments establishing what defines a real and genuine Danish/Greenlandic company. Second, consistent with this international agreement, the US Air Force will draft and then issue a new solicitation that complies with the accepted agreement. While the second step involves the acquisition process that is subject to the FAR, the first step does not.

In the first step, the governments of the US, Denmark, and Greenland will discuss the general and fundamental rules and agreements governing the operation of Thule Air Base, as memorialized in the Memorandum of Understanding of 1991 between the United States and the Kingdom of Denmark. The Thule MOU is not the first time a host country has insisted on a domestic preference for the supply of goods and services to a US military base outside the borders of the United States. The US Government

has negotiated several other international agreements giving priority treatment to the nationals of other countries providing base rights.

(footnote omitted).

The diplomatic note from the Royal Danish Embassy in Washington, D.C., dated September 1, 2017, expressing the Danish government's "deepest concern" at the "awarding of the sea lift contract on the Thule Air base to the American company, Schuyler Line Navigation Company LLC," and stating the "need to consider how we in cooperation can ensure that the sea lift contract will be awarded to a Greenland company," is included in the Administrative Record in this protest. The September 1, 2017 Diplomatic Note further "draw[s] attention to the upcoming renewal of the air transport contract on the Thule Air Base," and "respectfully urges the Department of Defense to award the future air lift contract to a Greenland company if its bid for the contract is competitive." (alteration added).

Subsequently, the Deputy Assistant Secretary of Defense sent a January 3, 2018 letter to Danish Ambassador Lars Gert Lose, a copy of which is included in the Administrative Record, which responds to the Danish government's July 13, 2017 Diplomatic Note, as well as referring to discussions which occurred in September 2017, but it does not appear to reference the August 17, 2017 Diplomatic Note. The January 3, 2018 letter rejects the Danish government's "alternative proposal" from the July 13, 2017 Diplomatic Note, stating:

> We are unable to accept your proposal under our international agreements and U.S. contracting laws, regulations, and policy. The type of arrangement in your proposal would require an exemption for Department of Defense entities contracting in Greenland from free and open competition among "Danish/Greenlandic sources" because it would further limit part of the contract to just one entity without competition. At a minimum, your proposal would require a new international agreement or a substantial amendment to current agreement. Entering into negotiations concerning a new agreement or an amendment to the current bilateral agreement would require the involvement and approval of the Department of State and any a new [sic] agreement or an amendment to the current bilateral agreement would be subject to current U.S. Government-wide policies.

> We recommend working through the previously-agreed-upon workgroup structure and continuing to have open and candid conversations to facilitate resolution of the Thule Air Base Maintenance Contract concerns. Through this structure, we will be able to provide immediate feedback to one another and chart a mutually-beneficial way forward.

(alteration added).

The Administrative Record in the above captioned bid protest also includes a "**Non-paper regarding the definition of a Danish/Greenlandic enterprise**," prepared

31

by the Danish government and dated November 23, 2019. (capitalization and emphasis in original). The "non-paper" provides that "[i]n order to advance the work of Working Group 1 on a mutually agreeable definition of Danish/Greenlandic company, the Kingdom of Denmark invites the US to consider whether a new definition may include the following elements," which is followed by a detailed list of proposals, including "[e]xhaustive and detailed definitions regarding certain terms, including Greenlandic company, Greenlandic owned, Greenlandic party, Greenlandic person, Greenlandic worker, Danish company, Danish owned, Danish party, Danish person and U.S. law;" the requirement that "[a]n offeror shall be, and shall remain in the entire contract period of an awarded contract, a Greenlandic company which is either Greenlandic owned or Danish owned, both directly and indirectly, and which is liable to pay direct and indirect taxes to the Greenland Government;" requiring "an objective legal opinion from a Greenlandic or Danish law firm to certify that the offeror company fulfils the set requirements;" "conduct[ing] new procurement processes until the contract is awarded to an offeror which fulfills the set requirements;" requiring the use of "Greenlandic workers" and "Greenlandic companies which are Greenlandic owned as suppliers to supply the goods and services," "[t]o the maximum extent possible;" the inclusion of "a mandatory right to participate" for "[a] company owned by the Government of Greenland," not to "include any ownership of the company which has been awarded the contract," but under which "the company owned by the Government of Greenland shall pay a share of 33 per cent of the capital investments and costs and earn a share 33 per cent of the income under the contract;" and the provision that the "requirements which an offeror company shall fulfil (as stated above), shall have precedence and prevail over any U.S. law." (alterations added).

Attached to protestor's complaint and included in the Administrative Record currently before the court is a United States Department of State document referred to in the Administrative Record index as the "Embassy Copenhagen Démarche (May 26, 2020)." (2020 Démarche). The 2020 Démarche appears to provide background information and "talking points" for use by United States Embassy officials in discussion with Danish Ministry of Foreign Affairs officials regarding offeror eligibility for the Thule Base Maintenance Contract. The 2020 Démarche states its "Subject" as "Presenting the Definition of a Danish or Greenlandic Source," and provides, in relevant part:

> The 2014 award of the Thule Air Base maintenance contract to a Danish subsidiary of a U.S. company remains an obstacle to strengthening the U.S.-Greenland partnership. The Government of Greenland (GoG) has repeatedly emphasized the contract has "symbolic" and economic importance to the people of Greenland. The current maintenance contract may be extended using one-year options until 2024 and the Department of Defense would have to re-compete it no later than 2023. The U.S. Air Force indicated its willingness to begin the process needed to recompete the contract as early as 2021 if the United States, Denmark, and Greenland could clarify the definition of a "Danish/Greenlandic source" to the satisfaction of the Kingdom of Denmark and the United States. In December 2019, the GoG outlined its priorities for the next contract solicitation via a non-paper from the Danish Ministry of Foreign Affairs. These included: a

requirement for a company to be Greenlandic or Danish owned (both directly and indirectly); liable to pay direct and indirect taxes to the GoG; that local labor be employed to the maximum extent possible; and that the GoG have a mandatory 33 per cent share of the awarded contract.

(capitalization in original). The 2020 Démarche further provides:

Washington remains committed to resolving the definitional issue in a manner consistent with U.S. law and regulation while at the same time satisfying the Kingdom of Denmark, including Greenland. The Washington interagency has drafted a proposal that provides the best starting point for negotiations with our Danish and Greenlandic partners. In order to arrive at a legally workable solution by October, 2020 to satisfy the U.S. Air Force timeline for re-solicitation, the negotiation process with Denmark and Greenland must begin now. Embassy Copenhagen should present this proposal on May 29 with a request for immediate follow-on meetings, convened by Embassy Copenhagen and include appropriate representatives from the Kingdom of Denmark, EUR, L, OSD [Office of the Secretary of Defense], and U.S. Air Force contractual and legal specialists. Simultaneously with the delivery of these points to relevant Kingdom of Denmark authorities, OSD will deliver a copy of the attached non-paper to the Danish Defense Counselor and the head of the Greenlandic representation in Washington. During the teleconference that follows delivery, we should agree to a follow-on meeting, within one week, to discuss initial Danish and Greenlandic reactions and next steps.

(capitalization in original; alteration added). The 2020 Démarche also sets forth the following proposal from the United States for eligibility criteria for the Thule Base Maintenance Contract:

- An offeror shall be registered as a Danish/Greenlandic company in the Central Business Register; shall be more than 50 percent equity owned by Danish or Greenlandic individuals, corporations, or entities; and a non-Danish or Greenlandic individual or company shall not have a decisive influence over the offeror.
- As part of the offer, the offeror must also present a letter from a Danish or Greenlandic bank certifying banking service.

Accompanying the above-quoted proposal, the 2020 Démarche lists a number of "talking points" for the United States Embassy officials, including the "belie[f]" that the United States' proposal "directly addresses the core issue related to the selection of a bidder and this will be the starting point of a mutually beneficial collaboration to a final resolution." (alteration added).

Attached to the 2020 Démarche is a document which is referred to in the Administrative Record index as "Proposed Criteria for the Thule Base Maintenance

Contract (May 7, 2020)." The document states that it contains "**Proposed Criteria for The Thule Base Maintenance Contract**," (capitalization and emphasis in original), but the document itself does not include a date. The document appears to elaborate on the proposal set forth in the 2020 Démarche:

> The U.S. contracting officer would use the criteria below to meet the requirement of "Danish/Greenlandic source":
>
> 1. As part of its offer, an offeror must certify that throughout the term of the contract:
>     a. it shall be registered as a Danish or Greenlandic company in the Danish Central Business Register;
>     b. more than 50 percent of the offeror's equity shall be owned by Danish or Greenlandic individuals, corporations, or entities; and
>     c. a non-Danish or Greenlandic individual, company, shall not have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror.
> 2. As part of its offer, an offeror must present a letter from a Danish or Greenlandic bank certifying banking service.

(footnote omitted).[23] The May 7, 2020 proposed criteria are the earliest-dated occurrence of the fifty-percent Danish or Greenlandic ownership requirement which would eventually be included in the Solicitation currently at issue.

According to protestor's complaint, "on October 27, 2020, the United States Embassy in Copenhagen, Denmark, issued 'Diplomatic Note' 'No. 127' which adopted almost verbatim the United States' proposal from the May 26, 2020 Démarche" (Diplomatic Note No. 127). Diplomatic Note No. 127 was attached to protestor's complaint and included in the Administrative Record in the above captioned bid protest. Diplomatic Note No. 127 provides, in relevant part:

> In order to fulfill the commitments made in the Thule Air Base Joint Statement, and to ensure that the Thule Base Maintenance Contract is awarded to a "Danish/Greenlandic source" as required by the Memorandum of Understanding between the United States of America and the Government of the Kingdom of Denmark (including the Home Rule Government of Greenland) Concerning Use of Sondrestrom Aviation Facility, Kulusuk Airfield, and Other Matters Related to United States Military Activities in Greenland, signed at Copenhagen March 13, 1991, as

---

[23] The "May 7, 2020 Proposed Criteria" document includes a footnote on the phrase "decisive influence," which footnote contains a multiple-paragraph quotation from the Declaration of Ambassador Liisberg, discussed above, addressing the meaning of "decisive influence" under Danish law.

amended July 16, 2008, and January 27, 2009, the U.S. Department of Defense will apply the following eligibility criteria:

1. As part of its offer, an offeror must certify that at the time of offer submission and throughout the term of the contract:

   a. it is, and shall remain, registered as a Danish or Greenlandic company in the Danish Central Business Register;

   b. more than 50 percent of the offeror's equity, defined as the entire capital of the company, is, and shall continue to be, owned by Danish and/or Greenlandic individuals or legal entities; and

   c. a non-Danish or non-Greenlandic individual or legal entity does not, and shall not, have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror.

2. As part of its offer, an offeror must present a letter from a Danish or Greenlandic bank certifying banking service.

Additionally, in order to implement the Thule Base Maintenance Contract in a manner that accords maximum mutual benefit, the U.S. Department of Defense will award the Thule Base Maintenance Contract to the source providing the best overall value, rather than as a Lowest Price Technically Acceptable source selection, thus fully accounting for the benefits of local expertise and knowledge and other non-monetary benefits in the competition.

As part of the best-value analysis, the process for the forthcoming competition will include a non-cost factor competitive enhancement for an offeror that is registered as a Greenlandic source as well as the contractor's physical presence in Greenland, including management presence.

(capitalization in original; footnote omitted).[24] Diplomatic Note No. 127 further states that the Base Maintenance Contract to be awarded

---

[24] Diplomatic Note No. 127 includes a footnote on item 1.c. of its proposed eligibility criteria which states: "*Discussed in the Declaration of March 19, 2015,* [sic] *submitted by the Kingdom of Denmark to the U.S. Court of Federal Claims in Nos. 1:15-cv-00215, 00272 and 00330- CFL*." (emphasis in original; alteration added). The "Declaration" referred to in the footnote to Diplomatic Note No. 127 appears to be the Declaration of Ambassador Liisberg, discussed above, which appears to be the source of the "decisive influence" language which appears in the proposed criteria of Diplomatic Note No. 127. Moreover, as noted above, although Diplomatic Note No. 127 states that the Liisberg Declaration is dated "*March 19, 2015,*" (emphasis in original), the index of the Administrative Record in the current bid protest states that the Liisberg Declaration is dated March 2, 2015, as do the decisions of the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims in the <u>Per Aarsleff</u> litigation.

> will include a combination of requirements, incentives, and/or evaluation factors to fulfill the defense mission, including positive and inclusive relations with the people and business community of Greenland, in the spirit of the Agreement Between the Government of the United States of America and the Government of the Kingdom of Denmark, Including the Home Rule Government of Greenland,

and Diplomatic Note No. 127 lists examples of such "requirements, incentives, and/or evaluation factors," including:

> 1. the contractor's physical presence in Greenland, including management presence, necessary to interface effectively with the Government of Greenland, the business community of Greenland, and other entities in order to meet the contract targets, including the labor targets;
> 2. target metrics for employing Greenlandic residents;
> 3. targets for measurable increases in Greenlandic workers' participation over the contract period;
> 4. contractor outreach efforts to employ Greenlandic workers to the greatest extent possible, including for placement of apprentices and trainees and for older adult placement.

Diplomatic Note No. 127, in its conclusion, states:

> If this proposal is acceptable to the Ministry of Foreign Affairs of the Kingdom of Denmark together with the Ministry of Foreign Affairs and Energy of the Government of Greenland, this note and attachment, together with your affirmative reply, will constitute an understanding between our Governments, recognizing that this understanding does not constitute a treaty under Article 2(1)(a) of the Vienna Convention on the Law of Treaties.

Attached to protestor's complaint and included in the Administrative Record in the above captioned bid protest is a response to Diplomatic Note No. 127, labeled a "NoteVerbale," (emphasis in original), dated October 27, 2020, from the Danish Ministry of Foreign Affairs to the United States Embassy in Copenhagen. The "NoteVerbale" states that "[t]he Ministry of Foreign Affairs of the Kingdom of Denmark together with the Ministry of Foreign Affairs and Energy of the Government of Greenland" has received Diplomatic Note No. 127 and "accept[s] the proposal therein in order to ensure Greenland and the Greenlandic society the greatest possible benefits from the U.S. defense presence at Pituffik (Thule Air Base)." (alterations added). Both protestor and defendant agreed that Diplomatic Note No. 127, while having been "accept[ed]" by the Danish government, does not constitute a binding international agreement between the United States and Denmark, nor does it constitute an amendment to any binding agreement

---

See Per Aarsleff A/S v. United States, 829 F.3d at 1310 n.3; Per Aarsleff A/S v. United States, 121 Fed. Cl. at 611.

between the United States and Denmark. (alteration added). Diplomatic Note No. 127 and the Danish government's reply on October 27, 2020, however, represent the United States and Denmark's continued engagement in the cooperative and interpretive framework established by the 1951 Agreement and expanded on by the 1991 Memorandum of Understanding and the 2004 Agreement. Moreover, Diplomatic Note No. 127 is a demonstration of the United States and Denmark's use of diplomatic consultation to interpret the term "Danish/Greenlandic sources" from the 2009 Agreement in the course of establishing eligibility criteria to be used for contracting at Thule Air Base and to ensure the United States' military presence at the base and the continued diplomatic relationship between the United States and Denmark.

The Administrative Record in the above captioned bid protest also includes a document, titled "**Common Plan for U.S.-Greenland Cooperation in Support of Our Understanding for Pituffik (Thule Air Base)**," and signed by the Ambassador of the United States to the Kingdom of Denmark and the Premier of Greenland. (capitalization and emphasis in original). While the Common Plan is listed in the Administrative Record index as being dated October 28, 2020, the day after Diplomatic Note No. 127 was sent and accepted, no date appears on the Common Plan document included in the Administrative Record. The Common Plan provides, in relevant part:

> This Common Plan for U.S.-Greenland Cooperation ("Common Plan") is intended to contribute to strengthening the partnership and the prosperous relationship between the United States of America and Greenland by building on the close relationship reflected in the exchange of diplomatic notes dated October 27, 2020, regarding the Pituffik (Thule Air Base) base contract and related matters. The United States is committed to working with the Government of Greenland to realize this Common Plan through mutual efforts, exchange of good practices, and close coordination. The Common Plan's objectives are intended to be met through diplomatic engagement and agency and ministry cooperation.

(capitalization in original).

The Administrative Record in the above captioned bid protest further includes a document titled "**Statement on Improved Cooperation in Greenland – Including at Pituffik (Thule Air Base)**," (Statement on Improved Cooperation) which, like the Common Plan, is also dated October 28, 2020. (capitalization and emphasis in original). Although unsigned, the Statement on Improved Cooperation indicates that it is a "Joint Declaration" by "representatives of the Government of the United States of America and the Government of the Kingdom of Denmark together with the Government of Greenland." (capitalization in original). The Statement on Improved Cooperation provides, in relevant part:

> The United States of America, Denmark, and Greenland share a long history of cooperation based on a deep respect for each other and for democracy, human rights, and the rule of law. We recognize that our future

security and prosperity are linked to strong trans-Atlantic cooperation. Pituffik (Thule Air Base) in Northwest Greenland is central to securing this fundamental cooperation now and into the future. In view of Pituffik's and Greenland's key role in Greenlandic, U.S., and transatlantic security, and based on our close dialogue concerning the base maintenance contract at Pituffik, we set out together to increase the benefits to the people of Greenland, through the understanding set forth in the exchange of diplomatic notes, including attachment,[25] dated October 27, 2020, and the Common Plan for U.S.-Greenland Cooperation signed October 28, 2020.

We are committed to strengthening and deepening our cooperation in all areas, including politically, economically, and on peace and security. Accordingly, we acknowledge the relevance of a full-fledged strategic partnership.

We are committed to advancing and monitoring the progress of the initiatives specified in the paragraphs above within the framework of the Permanent Committee, established in 1991, and the Joint Committee, established in 2004, as applicable.

(capitalization in original; footnote added).

### Solicitation No. FA2523-21-R-0001 and the Thule Base Maintenance Contract

The Administrative Record in the above captioned bid protest includes a "**MARKET RESEARCH REPORT FOR THULE BASE MAINTENANCE CONTRACT (BMC)**," which is listed in the Administrative Record index as dated "June 23, 2021."[26] The Market Research Report provides information about the "**Unusual Conditions or Constraints**" of the Base Maintenance Contract at Thule Air Base, including, under the heading "b. International Relations:"

Greenland is a self-governing entity of the Kingdom of Denmark. Exceptions to self-governance include foreign policy and defense. Current agreements allow the USG [United States Government] rent-free use of the land on

---

[25] The Statement on Improved Cooperation, as it appears in the Administrative Record in the protest currently before the court, includes no such attachment, nor have the parties provided one. The description of the attachment as part of an "exchange of diplomatic notes" which is "dated October 27, 2020," suggests that the attachment referred to by the Statement on Improved Cooperation was Diplomatic Note No. 127.

[26] The Market Research Report, however, includes on its cover page the date "**April 2021**." (capitalization and emphasis in original). The signature page of the Market Research Report, however, which is included twice in the Administrative Record, once as part of the Market Research Report document, signed by Contracting Officer Patrick R. King, and again as a standalone document, signed by both Mr. King and Contract Specialist Jesper Nielsen, is dated June 23, 2021 both times it appears.

which the Thule Defense Area is located. [redacted]. Contractual and regulatory requirements are often clouded by international politics of the participating counties. Examples include questions regarding which safety, environmental, fire protection, and food handling regulations apply to the Thule BMC contractor, i.e., should the standard mirror those set at other DAF installations or should it be the standard most applicable to the Greenlandic environment and Danish commercial standards. The base commander must balance the needs of many groups, as commanding Thule is like running a small, culturally diverse city. In addition to considering the needs of the military (US and Canadian) and contractor (US, Danish, and Greenlandic) communities, the commander must interface with the on-site Danish Liaison Officer (DLO), the Danish police inspector (DPI), and the Greenlandic City Council.

(capitalization and emphasis in original; alteration added). The Market Research Report further provides, under the heading "c. International Agreement," certain details about only two of the relevant international agreements:

An International Agreement, dated 27 April 1951, exists between the Kingdom of Denmark and the United States of America. In accordance with a 16 July 2008 Diplomatic Note [Diplomatic Note No. 053][27] response to that agreement, it was clarified that all goods and services, including construction projects, shall be procured directly from Danish/Greenlandic sources. "When procurement from such sources is not feasible, US requirements may be satisfied by procurement from US or other sources. Either party may use its own military or civilian personnel to perform services or construction projects." Contracts involving National Security are an exception to this policy. The agreement does not limit non-Danish or non-Greenlandic subcontracts or joint ventures. Market research (described below) indicates that capable Danish/Greenlandic sources exist for the subject requirement; therefore, this acquisition will be limited to Danish/Greenlandic sources using other than full and open procedures in accordance with Federal Acquisition Regulation (FAR) 6.302-4 -- International Agreement. Other terms related to the International Agreement or Status of Forces Agreement (SOFA) are that only Danish, Greenlandic or US personnel can work at Thule Air Base and the acquisition must be solicited from a contracting office in Denmark to ensure maximum opportunity for Danish and/or Greenlandic sources.

(alteration and footnote added). The Market Research Report further elaborates on the context of the relevant international agreements between the United States and Denmark,

---

[27] The "16 July 2008 Diplomatic Note" referred to by Market Research Report, as described above, together with the Danish government's January 27, 2009 response constitutes the 2009 Agreement between the United States and Denmark.

and elaborates on the concerns of the Greenlandic government regarding the United States government's acquisition strategy for the Base Maintenance Contract:

> On March 24, 2015, a Thule Air Base joint statement was signed by The Kingdom of Denmark, Greenland, and the United States of America. With this statement the three countries made commitments to ensure that the Thule Base Maintenance contract in the future is awarded to a Danish/Greenlandic source as required by the memorandum of understanding between the United States of American and the Government of the kingdom of Denmark. On October 28, 2020, the US National Security Advisor, Greenlandic Premier, Danish Foreign Minister, and US Ambassador to Denmark reached an agreement on the eligibility criterion for the Thule BMC as proposed by US Embassy Copenhagen in a diplomatic note dated 27 October 2020 (attachment 3).

> According to these criteria an offeror shall be registered as a Danish or Greenlandic company in the Danish business register and more than 50% of the offeror's equity shall be owned by Danish or Greenlandic individuals. A renewed focus on increasing Greenlandic labor on the Thule BMC is also stressed in the diplomatic note, as well as ensuring the contractor maintains a physical presence, to include management presence, in Greenland. Additionally, in 2020 the Greenlandic Government passed a new law that makes it mandatory for businesses in Greenland to inform how many interns they have hired. These numbers are released to the general public.

> Even though the Greenlandic Government has mentioned the possibility of increasing the Thule BMC workforce to be 60% Greenlandic, 21 CONS/DET1's market research indicates this is currently unrealistic. Due to other major infrastructure construction in Greenland, including significant upgrades to three airports, the number of unemployed skilled Greenland labor is at a record low. This combined with the secluded location of Thule Air Base with relatively limited opportunities for home leave to visit family, it has proven difficult to increase this percentage beyond the current 10-15%.

(capitalization in original). The Market Research Report additionally provides:

> The Greenlandic home rule holds a high focus on establishing apprenticeships for both young and adults in Greenland. In November 2020 the Greenlandic Government passed a law that will force all companies in Greenland to inform how many apprentices they currently have hired. This information will be made public in order to hopefully have local industry establish more apprenticeships and thus elevate the level of education in Greenland.

> As Thule Air Base is located in the defence [sic] area of Greenland it is unclear if the base maintenance contractor will have to adhere to this law. Greenland Government is currently looking into this.

(alteration added).

The Market Research Report states, in section "**5. Process and Methodology**," under the heading "d. SAM.gov sources sought synopsis," that a "sources sought synopsis was posted on Sam.gov on 20 November 2020," and that "[t]en (10) Danish/Greenlandic companies responded to the sources sought that they are interested." (capitalization and emphasis in original; alteration added). The Market Research Report lists the ten "Danish/Greenlandic companies" that responded to the market research effort, which includes "Vectrus Services A/S" as a "Danish" company on that list. The Market Research Report further includes, in the section "**6. Data Analysis and Evaluation**," under the heading "a. Interchange meetings with potential offerors," a "synopsis" of information relating to each potential offeror for the Base Maintenance Contract, including the following synopsis of protestor Vectrus:

> Vectrus Services is currently the incumbent contractor for the BMC contract at Thule Air Base. The company was established in Denmark in 2015 as a subsidiary to the US company, Vectrus. They have managed the base since 2015, when they took over after Greenland Contractors. Their current corporate structure does however not meet the anticipated eligibility criterion as a Danish/Greenlandic source for the new Base maintenance contract. Vectrus Services A/S has a physical location in Greenland.

(capitalization and emphasis in original).

The Administrative Record in the above captioned bid protest includes Requests for Information issued by the Space Force in anticipation of the issuance of the Solicitation. The last Request for Information issued before the Solicitation, which the Administrative Record identifies as "Request for Information 004," dated May 7, 2021, and which was publicized for potential offerors' comment, included a "Draft Performance Work Statement" and a "Draft Solicitation Criteria," both dated May 6, 2021. Included in the Draft Solicitation Criteria publicized in Request for Information 004 are eligibility criteria which resemble those included in the final Solicitation No. FA2523-21-R-0001, in particular the requirements that each offeror

> [c]ertify that at the time of offer submission and annually throughout the term of the contract:
>
> 1. it is, and shall remain, registered as a Danish or Greenlandic company in the Danish Central Business Register;
> 2. more than 50 percent of the offeror's equity, defined as the entire capital of the company, is, and shall continue to be, owned by Danish and/or Greenlandic individuals or legal entities; and
> 3. a non-Danish or non-Greenlandic individual or legal entity does not, and shall not, have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror.

(alteration added). The requirement that an offeror have "more than 50 percent" Danish or Greenlandic ownership was consistent with the requirement that would be included in the final version of the Solicitation. While the prospective offerors submitted comments and questions in response to Request for Information 004, they did not address the eligibility criteria in the draft Solicitation.

The Administrative Record in the above captioned bid protest also includes a "Thule Base Maintenance Contract Source Selection Plan" which, according to its signature page, was reviewed by Operations Chief Robert Widmann and approved by Program Executive Officer Nancy Andrews on November 17, 2021. The Source Selection Plan provides at "**2.0 ACQUISITION STRATEGY**,"

> [t]his source selection will be conducted using FAR 6.302-4 International Agreement for other than full and open competition. The source selection approach is a Technical/Price Tradeoff (TPT) with one pass/fail Factor. The need-date for the new Thule BMC contract is 1 Oct 2023 as the current contract expires 30 Sept 2023. A 10-month phase-in period is planned from 1 Dec 2022 – 30 Sept 2023.

(capitalization and emphasis in original; alteration added). The Source Selection plan states at "**5.2.2 Past Performance**" that "[p]ast performance will not be evaluated as part of this acquisition" and explains:

> This acquisition is restricted to Danish and/or Greenlandic companies IAW [in accordance with] an agreement between the U.S. and The Kingdom of Denmark. The number of Danish/Greenlandic companies that meet these eligibility criteria and that have actual past performance experience for a base operations and maintenance contract is limited to a single company. The requirements of the Thule Base Maintenance Contract are very mature and explicit when it comes to critical utilities. The functional area experts have indicated that evaluation of the staffing plan from offerors will be sufficient to identify if the offeror can adequately execute the requirements of the contract. The infrastructure at Thule is aging and innovation [sic] to operate and maintain, given the explicit requirements is [sic] minimal. All offerors shall identify in Factor 2, Management, how they plan on retaining the current workforce. Historically, the retention ratio from one contract to the follow-on contract has been in the high 90th percentile. The latest retention ratio was ~98% in 2017 with some individuals working at Thule for decades. The retention of the incumbent workforce minimizes risk of not conducting past performance.

(capitalization and emphasis in original; alterations added).

According to protestor's bid protest complaint, "[o]n November 17, 2021, the Agency issued a 'Solicitation Notification' which 'publicize[d]' the RFP [Request for Proposals]." (second alteration in original). The November 17, 2021 Solicitation

Notification was attached to protestor's complaint.[28] The Solicitation Notification identifies the contracting agency as the Space Force, although the earlier contract was formally issued by the Air Force. The Solicitation Notification describes the forthcoming Solicitation as "a Request for Proposals (RFPs) for the Thule Base Maintenance Contract (BMC)," and provides, in relevant part:

> The planned Thule BMC contains base operations and maintenance support requirements for Thule Air Base, Greenland. Base support consists of the following services: supply and purchasing, fuels management, airfield and airport operations, air traffic and transportation management, water port operations, civil engineering operations, vehicle operations and maintenance, fire protection, environmental management, health services, food services, recreation and community services, and non-sensitive communications management.[[29]]

---

[28] The Administrative Record in the above captioned bid protest indicates that the Solicitation Notification, identified in the Administrative Record index as the Solicitation "Cover Letter (November 17, 2021)" should have been included in the Administrative Record at Tab 144. Tab 144, however, contains only a duplicate copy of Diplomatic Note No. 127. While protestor noted in its motion for judgment on the Administrative Record that the Administrative Record "inadvertently" omits the Solicitation Notification, neither party moved to include the correct document in the Administrative Record. Because neither party objected to the accuracy of the Solicitation Notification as attached to protestor's complaint, and because the Solicitation Notification was intended to be included in the Administrative Record, the court, therefore, relies on the version of the Solicitation Notification attached to protestor's complaint.

[29] The Contracting Officer's Statement of Facts, prepared by Contracting Officer Patrick R. King for protestor's prior protest of the Solicitation at the GAO, was included in the Administrative Record in the above captioned bid protest, and provides a description of the services to be procured by the upcoming Thule Base Maintenance Contract which is nearly identical to the description provided in the Solicitation Notification above:

> The Solicitation sought to acquire non-personal base operations and maintenance services consisting of supply/fuel (AR Tab 10 at 21, 23) (*Id.* at 89, 93), airfield/airport (*Id.* at 24, 30) (*Id.* at 35, 36), transportation/seaport (*Id.* at 37, 42), civil engineering (*Id.* at 53, 88), environmental management (*Id.* at 53, 55), health services (*Id.* at 106, 115), food services (*Id.* at 116, 120), temporary lodging, recreation services (*Id.* at 121, 126), community services (*Id.* at 127, 129), and non-sensitive communication services (*Id.* at 42, 51).

(emphasis in original). The Contracting Officer's Statement of Facts also provides that "Thule BMC services include all required base support services for the Thule AB [Air Base] missions and operations, including sea-launched and intercontinental ballistic missile attack warning and assessment, space surveillance and satellite telemetry,

Participation in this acquisition is restricted to Danish or Greenlandic firms only per the terms of an International Agreement between the United States and The Kingdom of Denmark. The Statutory Authority is: 10 USC 2304(c)(4) as implemented by FAR 6.302-4 International Agreement.

(capitalization in original; footnote added).

The Contracting Officer's Statement of Facts, prepared for protestor's prior protest of the Solicitation at the GAO, characterizes the Solicitation as

a competitive negotiation for a single award, indefinite delivery indefinite quantity contract (IDIQ) consisting of Fixed Price (FP) with Economic Price Adjustment (EPA) and Firm-Fixed-Price (FFP) line items for Operations and Maintenance (O&M) requirements, Cost Reimbursable (CR) line items for subsistence and unit supplies, and Time and Material (T&M) line items. The approved Requirements Approval Document (RAD) and subsequent ceiling of this IDIQ contract is $3.95 Billion, with an initial 5-year ordering period from date of award, with options to potentially extend ordering an additional seven (7) years through 2 separate option periods.

According to protestor's complaint, the Space Force "initially issued the RFP on November 17, 2021, and amended the RFP twice (on January 24, 2022[30] and February 24, 2022)." (footnote added). The Solicitation, as amended through February 24, 2022, was attached to protestor's complaint and included in the Administrative Record.[31] As relevant to the above captioned bid protest, the Solicitation provides, at item 22, "AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION: FAR 6.302-4 International Agreem. [sic]." (capitalization in original; alteration added). The Solicitation provides no further information regarding the statutory or regulatory basis for use of other than full and open competition.

In "**SECTION B – SUPPLIES AND SERVICES AND PRICES/COSTS**," the

_____

tracking, and command for the Peterson-Schriever Garrison (P-S GAR)." (alteration added).

[30] The Solicitation as amended by Amendment 0001, issued January 24, 2022, does not appear to be included in full in the Administrative Record in the above captioned bid protest, however, the Standard Form 30 effecting Amendment 0001 is included in the Administrative Record. The Standard Form 30 for Amendment 0001 indicates that "[t]he purpose of this amendment is to implement administrative changes to Solicitation FA2523-21-R-0001." (alteration added).

[31] The Solicitation included in the Administrative Record indicates that it is the version current after Amendment 0002, which was issued February 24, 2022. The Solicitation is referred to in the index to the Administrative Record as "Solicitation No. FA2523-21-R-0001 Conformed Thule BMC Request for Proposal – Amendment 0002 (February 24, 2022)."

Solicitation provides:

### B-1   CONTRACT MINIMUM/MAXIMUM AMOUNTS

The maximum ceiling amount for this contract is DKK 25,605,085,000 (RAD Approval Threshold is $3,950,000,000.00). The minimum guaranteed amount is DKK 162,058, which will be satisfied at contract award, and is the total Government assigned cost of Task Order 0001, Pre-Performance Conference.

### B-2   CONTRACT TYPE

This is an Indefinite Delivery/Indefinite Quantity (IDIQ) contract vehicle. Task Orders (TOs) may be placed against this contract in accordance with the CLIN structure listed in Section B on a Fixed Price, Cost Type, Time and Material, or a hybrid basis.

(capitalization and emphasis in original). The Solicitation states under the heading "**F-2. Performance Schedule**," that "[t]his IDIQ contract will be for a 5-year ordering period beginning from the date of award. This period may be subsequently extended an additional seven (7) years through options." (capitalization and emphasis in original; alteration added). The Solicitation identifies the "Base Ordering Period" as "17 November 2022 – 30 Sep [sic] 2027," as well as an "Option Ordering Period 1" as "01 October 2027 – 30 September 2032," and an "Option Ordering Period 2" as "01 October 2032 – 16 November 2034." (capitalization in original; alteration added).

Moreover, the Solicitation provides in section "**H-6. STATUTORY RESTRICTIONS ON FOREIGN ACQUISITIONS**," that "[t]he requirements at PWS 3.1.16 to maximize and document contract related purchases and subcontracts from Danish and Greenlandic sources is required by the 1962 International Agreement (Aide Memoire) between the US and Denmark and takes precedence in the performance of this contract."[32] (alteration added). Section H-6 of the Solicitation further incorporates by reference FAR clauses, including FAR 52.223-2, "Hazardous Material Identification and Material Safety Data," in the context of "[p]rocurement of Biobased Products," and DFARS clauses DFARS 252.225-7012, "Preference for Certain Domestic Commodities," and DFARS 252.225-

---

[32] While the Solicitation refers to the 1962 Aide Memoire as constituting an "International Agreement" binding "the U.S. and Denmark," as noted above, neither protestor nor defendant in the above captioned bid protest referred to the 1962 Aide Memoire as a formal treaty or international agreement. Moreover, the Solicitation does not indicate what provisions of the 1962 Aide Memoire require the Base Maintenance Contract "to maximize and document contract related purchases and subcontracts from Danish and Greenlandic sources," however, the 1962 Aide Memoire refers to "[i]ncreasing the utilization of Danish contractors in the operation of our vital support bases at Thule and Sondrestrom," to increasing "[p]articipation of Danish suppliers in the areas of local purchase items and perishable subsistence," and to "increas[ing] Danish participation in competition" for "base repair and maintenance work." (alterations added).

7030, "Restriction on Acquisition of carbon, Alloy, and Armor Steel Plate." (capitalization in original; alteration added).

As relevant to the above captioned bid protest, the Solicitation includes, under "**SECTION L – INSPECTIONS, CONDITIONS, AND NOTICES TO OFFERORS OR RESPONDENTS**," the following requirement:

### L-2. OFFEROR ELIGIBILITY

Participation in this acquisition is limited to Danish or Greenlandic offerors.

Through the submission of a memorandum with company letterhead signed by an individual who can legally bind the company, offerors must certify that at the time of offer submission and throughout the term of the contract:

a) it is, and shall remain, registered as a Danish or Greenlandic company in the Danish Central Business Register; and

b) more than 50 percent of the offeror's equity, defined as the entire capital of the company, is, and shall continue to be, owned by Danish and/or Greenlandic individuals or legal entities; and

c) a non-Danish or non-Greenlandic individual or legal entity does not, and shall not, have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror.

As part of its offer, an offeror must present a letter from a Danish or Greenlandic bank certifying banking service.

(capitalization and emphasis in original). Under another heading in the same section, "**L-5. INFORMATION TO OFFERORS (ITO) AND INSTRUCTIONS FOR PROPOSAL SUBMISSION**," within subdivision "**D. PROPOSAL VOLUME INSTRUCTIONS**," paragraph "3. **Volume III – Price/Contract Documents (Factor 3)**," subparagraph "b. **Contract Documents**," the Solicitation states that offerors should include, in relevant part:

ii. A letter digitally signed or with a wet signature and scanned copy on company letterhead by an individual who can legally bind the company certifying that at the time of offer submission and throughout the term of the contract:
   1. the offeror is, and shall remain, registered as a Danish or Greenlandic company in the Danish Central Business Register; and
   2. more than 50 percent of the offeror's equity, defined as the entire capital of the company, is, and shall continue to be, owned by Danish and/or Greenlandic individuals or legal entities; and
   3. a non-Danish or non-Greenlandic individual or legal entity does not, and shall not, have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror.

     iii.  Signed letter from an officer of a bank within the Kingdom of Denmark certifying that your company conducts business with that institution. NOTE: ELECTRONIC FUNDS TRANSFER OF INVOICE PAYMENTS WILL ONLY BE MADE TO A BANK IN THE KINGDOM OF DENMARK.

(capitalization and emphasis in original). The letters described in Section L-5(D)(3)(b)(ii)-(iii) require the offeror to represent that it meets identical criteria to the eligibility criteria included at Section L-2, quoted above. The "more than 50 percent" Danish or Greenlandic ownership requirement that appears in both the Section L-2 and Section L-5 eligibility criteria in the Solicitation appears exactly as that requirement was set forth in Diplomatic Note No. 127.

     Separate from the offeror eligibility factors described above, the Solicitation also includes evaluation factors to determine contract award among eligible offerors. In "**SECTION M – EVALUATION FACTORS FOR AWARD**," under the heading "**M-2 BASIS FOR CONTRACT AWARD**," the Solicitation states, in relevant part:

In using the best value approach, the Government seeks to award to the offeror who gives the Air Force the greatest confidence that it will best meet or exceed our requirements affordably in a way that will be advantageous to the Government. This may result in an award to a higher rated, higher priced offeror where the decision is consistent with the evaluation Factors and the Source Selection Authority (SSA) reasonably determines that the superiority of the Management Approach of the higher priced offeror and its perceived benefit merits the additional cost. To arrive at a best value decision, the SSA will integrate the source selection team's evaluations of the Factors and Subfactors described in this provision. While the Government will strive for maximum objectivity, the tradeoff process, by its nature, is subjective; therefore, professional judgment is implicit throughout the selection process.

(capitalization and emphasis in original). Under the same heading, the Solicitation further states:

Award will be made to the responsible offeror whose proposal conforms to all required terms and conditions, includes all required representations and certifications, meets all requirements set forth in the RFP, and provides the best value to the Government based on the results of the evaluation as described below. To be eligible for award, the offeror must address all solicitation criteria and be deemed responsible in accordance with FAR 9.104.

(capitalization in original). Also under the M-2 heading, the Solicitation states that "**Factor 2 [Management Approach] is significantly more important than Factor 3, Price. Price remains an important consideration in the evaluation.**" (capitalization and emphasis in original; alteration added). The Solicitation notes three subfactors for Factor

2, of which "**Subfactor 1: Program Management**," evaluates whether the offeror is a "Registered Greenlandic Company," defined as whether the offeror "specifies a valid registration from the Central Business Registry (Det Centrale Virksomhedsregister), as a registered Business in Greenland." Another subfactor of Factor 2, "**Subfactor 2: Greenland Resident Workforce Recruitment and Retention Plan**," evaluates the degree to which an offeror would maintain a "physical presence" and a "management presence" in Greenland and hire Greenlandic residents as workers. (capitalization and emphasis in original). A third subfactor of Factor 2, "**Subfactor 3: Apprenticeship Program**," evaluates an offeror's "approach to recruit and motivate young Greenlandic residents" to work in apprenticeships at Thule Air Base. (capitalization and emphasis in original). Subfactor 2 provides:

> This Subfactor will receive a combined technical/risk rating reflecting the extent to which the Greenland Resident Workforce Recruitment and Retention Plan, that will be attached to Task Order 0003, Steady State BMC, meets or exceeds the following requirements:
>
> > i. Adequately describes physical presence in Greenland, including a management presence necessary to interface effectively with the federal and municipal Governments of Greenland, the Greenland business community, and other entities to maximize recruitment and retention of Greenlandic residents.
> > ii. Defines expansion of Greenlandic resident participation in terms of number of personnel and disciplines covered as well as risks associated.
> > iii. Distinguishable minimum baseline percentage of 10% of overall Greenlandic resident workforce, to be met within one year of Steady State BMC performance start, with measurable annual increases of Greenlandic resident workers.

Subfactor 3 provides:

> This Subfactor will receive a combined technical/risk rating reflecting the extent to which the Apprenticeship Program approach meets or exceeds the following requirements:
>
> > i. Adequately describes how interaction with the federal and municipal Governments of Greenland, the Greenlandic business community, and other entities maximizes contractor outreach.
> > ii. Adequately demonstrates an approach to recruit and motivate young Greenlandic residents to choose Thule Air Base as location for practical training, and describes quarterly recruitment events and retention strategy.
> > iii. Adequately demonstrates a minimum baseline percentage of 2% of overall workforce to be met within one year of Steady

State BMC performance start and measurable annual increases of Greenlandic resident apprentices.

In a "**NOTICE TO INDUSTRY**," signed by Contracting Officer King, dated January 11, 2022, and included in the Administrative Record in the above captioned bid protest, the Contracting Officer stated that "[t]o expedite responses to industry questions, the Space Force Acquisition Team (SFAT) will release Questions and Answers (Q&A) to Solicitation FA2523-21-R-0001, Thule Base Maintenance Contract (BMC), in batches as responses are finalized." (capitalization and emphasis in original; alteration added). The Administrative Record in the above captioned bid protest includes eight sets of "Request for Proposal Questions and Answers," the first of which is dated in the Administrative Record as "November 17, 2021," the same day that the Solicitation was announced. The November 17, 2021 Questions and Answers includes the following question from a prospective offeror:

Previous documents relating to this re-solicitation have indicated there would be a Non-cost factor **competitive enhancement** for offerors registered as a Greenlandic source, physical presence in Greenland, including management presence . . . fully accounting for the benefits of local expertise and knowledge and other non-monetary benefits in the competition.

This draft asks offerors to submit a print of the CBR [Central Business Register] indicating if they are a Greenlandic registered company? Q: Is this a requirement or an enhancement?

(capitalization, emphasis, and ellipsis in original; alteration added). The government responded: "It is not required to be registered as a Greenlandic company. Danish registered companies are allowed. Greenlandic registration would be evaluated as a strength."

In the fifth set of Questions and Answers, dated January 14, 2022, a prospective offeror referred to "Section L-2. OFFEROR ELIGIBILITY" and stated:

Please confirm that there is a competitive enhancement for an offeror that is registered as a Greenlandic source, state the nature and value of the enhancement (strength, significant strength, etc.), and state how the USG will consider the enhancement in the evaluation and best value determination (which factor/subfactor, etc.).

(capitalization in original). The government responded:

The Relevant Text cited deals only with the Eligibility Criteria, whereas the Comment refers to Section M Evaluation criteria. In order to compete as a prime, an offeror has to meet all Eligibility Criteria under Section L-2. Whether an offeror is registered as a Business in Greenland will be considered under the tradeoff process. For Factor 2, Management

> Approach, Subfactor 1, Program Management, the offeror will receive a combined technical/risk rating reflecting the extent to which the program management approach for Steady State BMC meets or exceeds all identified elements, including whether the offeror is registered as a Business in Greenland.

(capitalization in original). Another question was asked by a prospective offeror which also related to Section L-2 of the Solicitation and was identical to the question regarding "a competitive enhancement for an offeror that is registered as a Greenlandic source," with the exception that this question referred to "a competitive enhancement for an offeror's physical presence in Greenland (including management presence)," and the government provided a response that had the same first two sentences as its prior response and continued as follows:

> The Relevant Text cited deals only with the Eligibility Criteria, whereas the Comment refers to Section M Evaluation criteria. In order to compete as a prime, an offeror has to meet all Eligibility Criteria under Section L-2. Whether the proposal adequately describes a physical presence in Greenland, including a management presence, will be considered under the tradeoff process. For Factor 2, Management Approach, Subfactor 2, Greenland Resident Workforce Recruitment and Retention Plan, the offeror will receive a combined technical/risk rating reflecting the extent to which the Greenland Resident Workforce Recruitment and Retention Plan meets or exceeds all identified elements, including whether the plan adequately describes physical presence in Greenland, including a management presence necessary to interface effectively with the federal and municipal Governments of Greenland, the Greenland business community, and other entities to maximize recruitment and retention of Greenlandic residents.

(capitalization in original).

In the seventh set of Questions and Answers, dated January 19, 2022, prospective offerors asked four questions relating to the eligibility criteria at issue in the above captioned bid protest. The first question asked:

> Please confirm that a non-Danish or non-Greenlandic individual or legal entity does not have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror as long as the non- Danish or non-Greenlandic individual or legal entity does not have (1) the power to exercise more than half of the voting rights according to an agreement with other investors; (2) the power to control the financial and operational decisions of the offeror under the Articles of Association or an agreement; (3) the power to appoint or remove a majority of the members of the supreme management body, and this body exerts a decisive influence on the offeror; or (4) the power to exercise the de fact [sic] majority of votes at general meetings or at the

meetings of an equivalent body, thus exerting de facto decisive influence on the enterprise.

(alteration added). The government responded:

> The United States and the Kingdom of Denmark exchanged diplomatic correspondence on this issue. As part of this diplomatic correspondence, the eligibility criteria as written in L-2, was formalized and the Space Force Acquisition Team was directed to use this criteria by OSD [Office of the Secretary of Defense] leadership. There was a footnote included in the diplomatic correspondence that reads: Discussed in the Declaration of March 19, 2015, submitted by the Kingdom of Denmark to the U.S. Court of Federal Claims in Nos. 1:15-cv-00215, 00272 and 00330- CFL. This declaration will be provided in the RFP amendment to address the comment/question.

(alteration added). The second question asked:

> Please confirm that the existence and effect of potential voting rights, including rights to subscribe for and purchase shares that are currently exercisable or convertible, must be taken into account in the assessment of whether a company exerts a decisive influence, and that any voting rights attaching to the shares owned by the offeror itself or its subsidiaries must be disregarded in the calculation of voting rights in the offeror.

The government's response to this second question was identical to the response, quoted above, given to the first question regarding the eligibility criteria.

The third question asked: "Please confirm that an individual or legal entity does not have a 'decisive influence' (in Danish: 'bestemmende indflydelse') over the offeror if that individual or legal entity does not control or have the power to control the offeror under 13 C.F.R. 121.103(c)." The government's response to this third question began, "13 C.F.R 121.103(c) refers to Small Business Administration (SBA) affiliation determinations. FAR Part 19, Small Business Programs, except for subpart FAR 19.6, does not apply to the Thule BMC as per FAR 19.000(b)," followed by paragraph which was identical to the responses given to the first two questions. The fourth question regarding the eligibility criteria asked: "Various provisions in the RFP contemplate teaming arrangements, including joint ventures and subcontracting (e.g., L-5(D)(3)(b)(vi)). Please confirm that the existence of a contractor team arrangement under FAR 9.601 does not create a 'decisive influence' (in Danish: 'bestemmende indflydelse') over the offeror." The government responded to this fourth question with an identical answer as it had given to the first and second questions regarding the eligibility criteria.

A second "**NOTICE TO INDUSTRY**," (capitalization and emphasis in original), signed by Contracting Officer King, dated January 19, 2022, and included in the Administrative Record in the above captioned bid protest, states that, as of January 19,

2022, "the Space Force Acquisition Team (SFAT) has completed its responsibility to provide answers to questions submitted by the required suspense," and that "[q]uestions received after the suspense will be reviewed and answers may be released as determined appropriate by the SFAT." (alteration added).

The eighth and final Questions and Answers, dated January 25, 2022, include the following question submitted by a prospective offeror: "Please confirm that an individual or legal entity does not have a 'decisive influence' (in Danish: 'bestemmende indflydelse') over the offeror if that individual or legal entity does not control or have the power to control the offeror under 13 C.F.R. 121.103(c)." This question regarding the eligibility criteria is identical to the third question regarding the eligibility criteria asked in the seventh set of Questions and Answers, dated January 19, 2022. The January 25, 2022 Questions and Answers released by the Space Force offer the government's "AMENDED RESPONSE" to the prospective offeror's question:

> The United States and the Kingdom of Denmark exchanged diplomatic correspondence on this issue. As part of this diplomatic correspondence, the eligibility criteria as written in L-2, was formalized and the Space Force Acquisition Team was directed to use this criteria by OSD leadership. There was a footnote included in the diplomatic correspondence that reads: Discussed in the Declaration of March 19, 2015, submitted by the Kingdom of Denmark to the U.S. Court of Federal Claims in Nos. 1:15-cv-00215, 00272 and 00330- CFL. This declaration will be provided in the RFP amendment to address the comment/question.

(capitalization in original). This "AMENDED RESPONSE" is identical to the answers given to the first, second, and fourth questions regarding the eligibility criteria asked in the January 19, 2022 Questions and Answers, and to the response given to the third question regarding the eligibility criteria asked in the January 19, 2022 Questions and Answers, except that the government's "AMENDED RESPONSE" omits the portion of the government's answer to the third question, quoted above, discussing "Small Business Administration (SBA) affiliation determinations." (capitalization in original). The omission of the SBA affiliation determinations[33] portion of the third answer from the January 19, 2022 Questions and Answers appears to be the only difference between the January 25, 2022 "AMENDED RESPONSE" and the third answer from the January 19, 2022 Questions and Answers. In the January 25, 2022 Questions and Answers, the government also responded "Yes" to a question submitted by a proposed offeror asking if the government would "provide the legal documents footnoted in the May 2021 US Government Sources Sought document," which appears to be a reference to the Declaration of Ambassador Liisberg, described and discussed above. Protestor alleged in its complaint that the government "confirmed" in its responses in the January 25, 2022

---

[33] As noted above, the question of SBA affiliation determinations was raised by a prospective offeror to the Solicitation in Questions and Answers on January 19, 2022 and January 25, 2022, however, SBA affiliation determinations are not relevant to the issues currently before the court.

Questions and Answers "that the RFP's eligibility restrictions came from Diplomatic Note No. 127," dated October 27, 2020," and protestor alleged in its complaint and throughout the case currently before the court that "mere '*diplomatic correspondence*'" was the basis for the eligibility criteria. (emphasis in original).

The Administrative Record includes a Standard Form 30 memorializing Amendment 0001 of the Solicitation, signed by Contracting Officer King. This Standard Form 30 is dated January 24, 2022 and states, at item "14. DESCRIPTION OF AMENDMENT/MODIFICATION," in relevant part:

> **AMENDMENT 0001:** The offerors [sic] electronic proposal is extended from **2 Feb 2022** at 2**:00** [sic] **p.m. Central European Time (CET)** and now must be received no later than **6:00 p.m. CET** on <u>16 Feb 2022</u> and shall be delivered via Procurement Integrated Enterprise Environment (PIEE) to the Contracting Officer (CO) listed in section 16A.

(capitalization and emphasis in original; alteration added).

The Administrative Record also includes a Standard Form 30 memorializing Amendment 0002 of the Solicitation, signed by Contracting Officer Patrick R. King. This Standard Form 30 is dated February 24, 2022[34] and states, at item "14. DESCRIPTION OF AMENDMENT/MODIFICATION," in relevant part:

> **AMENDMENT 0002** The Government is reopening the acquisition. This amendment updates Clause H-6 Statutory Restrictions on Foreign Acquisitions, amends responses to two questions and includes additional information to the bidder's library. Offerors shall resubmit new electronic proposals no later than **6:00 p.m.** Central European Time (CET) on <u>**07 Mar 2022**</u> and shall be delivered via Procurement Integrated Enterprise Environment (PIEE) to the Contracting Officer (CO) listed in section 16A. Proposals from new offerors will not be accepted or evaluated.

(capitalization and emphasis in original). Moreover, the Administrative Record includes a "MEMORANDUM FOR THE RECORD," dated February 24, 2022, which states its subject as "Purpose for Amend [sic] 0002 RFP FA2523-21-R-0002 [sic]," and clarifies, in relevant part, that the effect of the amendment is that "Danish and Greenlandic sources do not have to comply with [DFARS] clauses 252.225-7012 and 252.225-7030."[35] (capitalization in original; alterations added).

---

[34] The Standard Form 30 memorializing Amendment 0002 to the Solicitation states the "DATE SIGNED" as "24 Feb 2022," and otherwise refers only to dates in the year 2022, but also states the "EFFECTIVE DATE" of the amendment as "**24 Feb 2021** [sic]" at the top of the first page. (capitalization and emphasis in original).

[35] DFARS clauses 252.225-7012, "Preference for Certain Domestic Commodities," and 252.225-7030, "Restriction on Acquisition of Carbon, Alloy, and Armor Steel Plate," are

Three Performance Work Statements for performance of the Thule Base Maintenance Contract, all dated January 24, 2022 are included in the Administrative Record and establish the expectations for the successful offeror once the Thule Base Maintenance Contract is awarded. The first Performance Work Statement, identified as the "Basic Indefinite Delivery Indefinite Quantity (IDIQ)" Performance Work Statement (Basic IDIQ Performance Work Statement), includes a "**Vision Statement**" of "[s]eamless and effective operations, maintenance, and support (OM&S) of the Thule Defense Area in support of the Thule Air Base (AB) missions in Thule, Greenland." (capitalization and emphasis in original; alteration added). The Basic IDIQ Performance Work Statement provides, at section "**1.1. Scope**:"

> The scope of this requirement is base operations and maintenance services consisting of airfield/airport operations, civil engineering, environmental management, food services, health services, logistics - supply/fuel, non-sensitive communication, seaport, transportation, transient quarters, vehicle maintenance, and community/recreation services.

(emphasis in original). The Basic IDIQ Performance Work Statement provides, at "**2.8. Contractor Personnel, Disciplines, and Specialties**," in relevant part:

> The contractor shall use Greenlandic employees to the maximum extent practical for labor at Thule Air Base, and provide a plan (incorporated at contract award) establishing employment targets and methods for maximizing these employment targets. The contractor shall participate in the Greenlandic Apprenticeship Program and execute their plan (incorporated at contract award) to provide outreach to Greenlandic employment sectors applicable to labor required on the contractor.

> Contractor shall establish outreach efforts within the business and educational communities in Greenland designed to encourage Greenlandic employment under the contractor contract to the greatest extent practicable, including for placement of apprentices and trainees.

> The contractor shall conduct quarterly outreach with Greenlandic corporate social responsibility nongovernmental organization(s), focusing on the training and placement of adult trainees age 25 and above (Voksenlærling) to maximize the continuity of the Greenlandic workforce through the life of the contract.

(capitalization and emphasis in original). The Basic IDIQ Performance Work Statement provides, at "**3.16. Purchases and subcontracts from Danish and Greenlandic**

---

incorporated into the Solicitation at issue and place United States domestic preferences on the procurement of goods such as food, clothing, and tents, see DFARS 252.225-7012(b) (2022), and "carbon, alloy, or armor steel plate," see DFARS 252. 225-7030(a) (2022), respectively.

**sources**:" "Maximize and document contract-related purchases and subcontracts from Danish and Greenlandic sources. Required by the 1962 Agreement (Aide Memoire) between the Government of the US and the Government of the Kingdom of Denmark. Document and justify any exceptions." (capitalization and emphasis in original).

The second Performance Work Statement, identified as the "Task Order 0002, Phase-In" Performance Work Statement (Phase-In Performance Work Statement), includes an identical "**Vision Statement**" to that included in the Basic IDIQ Performance Work Statement. (capitalization and emphasis in original). The Phase-In Performance Work Statement, at section "**1.1. Scope**," provides that "[t]he scope of this requirement is to support phase-in activities for the Steady State BMC Task Order 0003," followed by a list of services identical to the list in the "Scope" section of the Basic IDIQ Performance Work Statement. (capitalization and emphasis in original; alteration added). The Phase-In Performance Work Statement provides at "**3.1.2. Prepare and distribute a Phase-In plan**" that the awardee must "[p]rovide detailed plan describing the processes for a smooth phase-in ensuring no degradation or interruption of services from the incumbent contractor to the beginning of performance of Steady State BMC Task Order 3, PWS requirements." (capitalization and emphasis in original; alteration added). The Phase-In Performance Work Statement further provides at "**3.1.3. Perform Phase-In activities**" that the awardee must "[c]oordinate with the out-going service provider, the Government Transition Team and the Procuring Contracting Officer (PCO) before any transition efforts begin. Identify any conflicts to the PCO." (capitalization and emphasis in original; alteration added). The Phase-In Performance Work Statement additionally provides at "**4.1. Maximize and document contract-related purchases and subcontracts from Danish and Greenlandic sources**:" "Required by the 1962 Agreement (Aide Memoire) between the Government of the US and the Government of the Kingdom of Denmark. Document and justify any exceptions." (capitalization and emphasis in original). Moreover, the Phase-In Performance Work Statement provides at "**4.3. Phase-In**" that

> [t]he Contractor shall follow its Phase-In plan and keep the Government fully informed of status throughout the Phase-In period. Throughout the phase-in period, it is essential that attention be given to minimize interruptions or delays to work in progress that would impact the mission. The contractor shall plan for the transfer of work control, delineating the method for processing and assigning tasks during the phase-in period.

(capitalization and emphasis in original; alteration added).

The third Performance Work Statement, identified as the "Task Order 0003, Steady State" Performance Work Statement, (Steady State Performance Work Statement), includes an identical "**Vision Statement**" to that included in the Basic IDIQ and Phase-In Performance Work Statements. (capitalization and emphasis in original). The Steady State Performance Work Statement, at section "**1.1. Scope**," provides that "[t]he scope of this requirement is the Steady State of base operations and maintenance services," followed by a list of services identical to the list in the "Scope" sections of the Basic IDIQ and Phase-In Performance Work Statements. (capitalization and emphasis in original;

alteration added). The Steady State Performance Work Statement provides, in relevant part, at "**2.8. Contractor Personnel, Disciplines, and Specialties**," the same requirements with respect to "us[ing] Greenlandic employees to the maximum extent practical" as provided in the Basic IDIQ Performance Work Statement. (capitalization and emphasis in original; alteration added).

The Administrative Record in the above captioned bid protest includes the proposal submitted by protestor Vectrus in three volumes with numerous attachments. The Administrative Record index reflects the date of protestor's proposal as "February 16, 2022."[36] Additionally, the Administrative Record includes "Representations and Certifications" of protestor,[37] protestor's Danish Central Business Register entry, and protestor's "SAM Registration," all of which are marked "undated" in the Administrative Record. The Administrative Record further reflects that protestor resubmitted its proposal on March 7, 2022, following Amendment 0002 to the Solicitation.

The Administrative Record also includes a "Proposal Receipt Checklist" associated with protestor's February 16, 2022 initial proposal.[38] The Proposal Receipt Checklist provides a spreadsheet indicating whether protestor's proposal complied with a number of Solicitation criteria, which was noted in a column headed "IAW [in accordance with] RFP Yes/No" for each criterion addressed in the spreadsheet. (alteration added). With respect to the criteria currently at issue, the Proposal Receipt Checklist spreadsheet stated "No" under ""IAW RFP Yes/No," and provided the "Comment" that "Vectrus Services A/S is wholly owned subsidiary of Vectrus Services Corporation (VSC), which is an American Company." (capitalization in original). A second Proposal Receipt Checklist is included in the Administrative Record, associated with protestor's resubmission of its proposal following Amendment 0002. The second Proposal Receipt Checklist again states "No" with respect to whether protestor's proposal is "IAW RFP" regarding the challenged eligibility criteria, and includes the following comment:

> Vectrus Services Aktieselskab is, and shall remain, registered as a Greenlandic company in the Danish Central Business Register.

> Vectrus Services is a wholly owned subsidiary of Vectrus Services Corporation (VSC)

> We cherish our Greenlandic community and pledge to continue service to that community. Vectrus Services provides benefits to the Greenlandic society.

---

[36] Because the above captioned bid protest was a pre-award protest, the Administrative Record in this protest does not contain proposals submitted by other proposed offerors.

[37] The Representations and Certifications indicate that protestor is owned by Vectrus Systems Corporation, which is owned by Vectrus, Inc.

[38] The Administrative Record index dates the Proposal Receipt Checklist to February 18, 2022.

(alteration added).

According to protestor's complaint in the above captioned bid protest, protestor filed a protest to what protestor described as the Solicitation's eligibility criteria in "Sections L-2 and L-5(D)(3)(b)(ii)-(iii)" at the GAO on February 11, 2022, alleging that the criteria were "unduly restrictive of competition in violation of CICA [Competition in Contracting Act] and its implementing regulations." See Vectrus Servs. A-S, B-420527 et al., 2022 WL 1639491 (alteration added). Protestor further alleged in its complaint in the bid protest currently before the court that, on February 16, 2022, while protestor's previously-filed protest was pending at the GAO, "the Agency issued an 'International Agreement Competitive Restrictions (IACR)' document."

The IACR was attached to protestor's complaint and included in the Administrative Record in the above captioned bid protest in this court. Although the IACR does not state its date of issuance, the IACR is noted in the Administrative Record index with the date "February 16, 2022." The IACR indicates that it was approved by Procuring Contracting Officer Patrick R. King[39] and Program Manager Jason Parker. The IACR provides that the "STATUTORY AUTHORITY" for the eligibility requirements is "10 USC 2304(c)(4)[40] as implemented by FAR 6.302-4[41], International Agreement." (footnotes added).

---

[39] The IACR identifies Mr. King as both "Procuring Contracting Officer" and as "Contracting Officer" at different points.

[40] As noted above, the statute at 10 U.S.C. § 2304 (2018) was moved to 10 U.S.C.A. §§ 3201, 3203, and 3204. See Pub. L. No. 116-283, § 1811, 134 Stat. at 4164-67. The relevant portion of the former section 2304, paragraph (c), is now located at 10 U.S.C.A. § 3204(a). See id. § 1811(d), 134 Stat. at 4167. The statute at 10 U.S.C.A. § 3204(a) provides, in relevant part:

> **(a) When procedures other than competitive procedures may be used.**--The head of an agency may use procedures other than competitive procedures only when--
>
> . . .
>
>> **(4)** the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures[.]

10 U.S.C.A. § 3204(a)(4) (emphasis in original; alterations added).

[41] The regulation at FAR 6.302-4 provides:

> (a) Authority.

(capitalization and emphasis in original; footnotes added). The IACR further provides:

V.   APPLICABILITY OF AUTHORITY

The cited exception is applicable under the Defense of Greenland Agreement [1951 Agreement]. This primary agreement was entered into force on 8 June, 1951 between the United States of America and the Kingdom of Denmark (attach 1). In addition to the primary agreement, there have been numerous administrative Arrangements and supplemental agreements pertaining to the very specific issues including the 1962 Aide Memoire (Attach 2), 2009 Diplomatic Note [2009 Agreement] (Attach 3) and the 2020 Diplomatic Note [Diplomatic Note No. 127] (Attach 4).

a.   International Agreement. The primary agreement is the 1951 Defense of Greenland Agreement between the US and Denmark. This agreement establishes guidelines for participation of Danish enterprise and nationals for United States Air Force (USAF) contract work supporting defense projects in Greenland. In summary, this BMC and other non-sensitive or unclassified services are reserved for Danish (including Greenlandic) firms using Danish, Greenlandic or US Employees. Danish companies utilizing US employees to meet

---

(1) Citations: 10 U.S.C. 3204(a)(4) or 41 U.S.C. 3304(a)(4).
(2) Full and open competition need not be provided for when precluded by the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the acquisition of the supplies or services for such government.

(b) Application. This authority may be used in circumstances such as—
(1) When a contemplated acquisition is to be reimbursed by a foreign country that requires that the product be obtained from a particular firm as specified in official written direction such as a Letter of Offer and Acceptance; or
(2) When a contemplated acquisition is for services to be performed, or supplies to be used, in the sovereign territory of another country and the terms of a treaty or agreement specify or limit the sources to be solicited.

(c) Limitations. Except for DoD, NASA, and the Coast Guard, contracts awarded using this authority shall be supported by written justifications and approvals described in 6.303 and 6.304.

FAR 6.302-4.

> contract requirements must first get approval from the Danish Ministry of Foreign Affairs to hire US individuals.
>
> b. Aide Memoire. The 1962 Agreement between the US and Denmark is a supplement to the Agreement and established the current protocols for participation of Danish enterprise and nationals in USAF contract work supporting defense projects in Greenland. In summary, the Aid Memoire requires the US to maximize Danish participation in contract work and that the purchases shall be solicited by a purchasing activity in Copenhagen, Denmark. Consequently, this BMC and other non-sensitive/unclassified services are reserved for Danish (including Greenlandic) firms only using Danish (including Greenlandic) or United States employees and are awarded from the Air Force/Space Force contracting office in Copenhagen.
>
> c. Diplomatic Note. The 2008 diplomatic note reiterated the Agreement between the US and Denmark by stating that "either party may award contracts to commercial enterprises for goods and services, including construction projects, in Greenland, and shall procure directly from Danish/Greenlandic sources. When procurement from such sources is not feasible, US requirements may be satisfied by procurement from US or other sources. Either party may use its own military or civilian personnel to perform services or construction projects." Any changes to the agreements may affect acquisition strategy and execution and would have to be addressed if and when they arise.
>
> d. Diplomatic Note. The 2020 diplomatic note clarified the Agreement between the US and Denmark by stating what eligibility criteria will be applied to be eligible for award of the BMC . . . .

(capitalization in original; alterations added).

Protestor's complaint alleged that on March 17, 2022, while protestor's bid protest was pending before the GAO, the Space Force "revealed that it had evaluated Vectrus' proposal as technically unacceptable under the RFP's eligibility criteria." According to protestor, the Space Force "did not share its 'Ineligible to Award Determination' with Vectrus until May 24, 2022," although "Vectrus challenged that determination in a Supplemental Protest to the GAO on March 28, 2022." While protestor alleged that the Space Force "evaluated Vectrus' proposal," the Space Force's evaluation of protestor's proposal was limited to a determination of protestor's eligibility, and the Space Force did not assess protestor's proposal according to the evaluation criteria set forth in Section M of the Solicitation. The "Ineligible to Award Determination," signed by Contacting Officer King on May 24, 2022, attached to protestor's complaint, and included in the Administrative Record in the above captioned bid protest, states that the Space Force's "evaluation revealed your [protestor's] proposal did not comply with solicitation paragraph L-5.D.3.b.ii," and informs protestor of its right to "request a debriefing in accordance with FAR 15.505," with a quotation of paragraph L-5.D.3.b.ii of the Solicitation. (alteration

added). The "Ineligible to Award Determination" was attached to an email sent by Contracting Officer King to Molly Harris, Contracts Manager for protestor, on May 24, 2022. Protestor's protest and supplemental protest at the GAO are both included in the Administrative Record in the above captioned bid protest.

On May 18, 2022, the GAO denied both protestor Vectrus' originally-filed protest and its supplemental protest in full in one decision.[42] See Vectrus Servs. A-S, B-420527, et al., 2022 WL 1639491, at *1. In its decision denying Vectrus' protest of the current Solicitation, the GAO determined that "[t]he 1991 memorandum of understanding requires the Air Force to award contracts at Thule Air Base to Danish or Greenlandic sources," and that "[t]he memorandum of understanding does not define the eligibility criteria a firm must meet to be considered a Danish or Greenlandic source." Id. at *5 (alteration added). The GAO noted that while "Vectrus was eligible to compete for the air base maintenance contract under those criteria" agreed upon by the United States Embassy and Danish Ministry of Foreign Affairs officials for the 2014 Solicitation, "the eligibility criteria defining a Danish or Greenlandic source was revised pursuant to diplomatic note 127, to exclude wholly owned subsidiaries of foreign firms. When the Air Force issued the Solicitation in 2020, it therefore used the revised eligibility criteria agreed to in diplomatic note 127." Id. at *6. The GAO concluded that "[a]s Vectrus cannot meet this eligibility criteria, we find that the agency reasonably concluded that Vectrus is not eligible to compete for this procurement." Id. (alteration added).

On May 26, 2022, in a letter sent by Molly Harris, Contracts Manager for Vectrus, to Contacting Officer King, protestor "request[ed] a preaward debrief pursuant to FAR 15.505 Preaward debriefing of offerors," which Mr. King scheduled for June 7, 2022 in a subsequent email to Ms. Harris. (alteration added). Mr. King offered the following explanation for determining that protestor's submission had been ineligible to compete:

> So basically your proposal was compliant in all of the areas of paragraphs L-5B, C, D, and E, as stated above, except for L-5D(3)(b)(ii), which was a letter digitally signed, or with a wet signature and scanned copy on company letterhead by an individual who can legally bind the company, certifying that at the time of offer submission and throughout the term of the contract, the offeror is and shall remain registered as a Danish/Greenlandic company in the central business registry, and more than 50 percent of the offeror's equity, defined as the entire capital of the company, is, and shall continue to be, owned by Danish and/or Greenlandic individual or legal entities; and, three, a non-Danish or non-Greenlandic individual or legal entity does not, and shall not, have a decisive influence (bestemmende indflydelse) over the offeror.

---

[42] Although it is not bound by GAO decisions, the court typically gives respect and consideration to GAO decisions. See CBY Design Builders v. United States, 105 Fed. Cl. 303, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) (GAO decisions are "not binding" authority, but may be "instructive in the area of bid protests."))).

So, I repeat, all other areas were compliant with the RFP from those three paragraphs except for that one sub-paragraph. For this reason, in accordance with the RFP Paragraph M-3C, the non-compliance of this paragraph, as stated in the letter, your proposal was determined to be not eligible for award.

The Administrative Record in the above captioned bid protest includes a "**COMPETITIVE RANGE DECISION DOCUMENT**" for the Thule Base Maintenance Contract, which is dated June 1, 2022, signed by Procuring Contracting Officer Patrick R. King with the concurrence of Program Manager Jason S. Parker, and approved by Air Force Program Executive Officer Nancy K. Andrews. (capitalization and emphasis in original). The Competitive Range Decision Document indicates that "[f]our offerors submitted proposals in response to the Thule Base Maintenance RFP," of which three were joint ventures. (alteration added). Protestor Vectrus appears twice in the four offerors: once as the 49% owner in the joint venture Inuksuk, discussed above, and once as a standalone offeror.

The Competitive Range Decision Document lists the "**INITIAL EVALUATION RESULTS**" for the four offerors according to three factors, "**Factor 1 - Technical**," "**Factor 2 – Management Approach**," and "**Factor 3 – Price/Contact Documents**," of which Factor 1 includes one subfactor, "**Subfactor 1 Vehicle Equipment &Replacement** [sic]," and Factor 2 includes three subfactors, "**Subfactor 1 Program Management**," "**Subfactor 2 Greenland Resident Workforce Recruitment &Retention** [sic]," and "**Subfactor 3 Apprenticeship Program**," while Factor 3 appears to consider "**Total Evaluated Price**," "**Reasonable and Balanced**," and "**Completeness**," although these phrases, while located under Factor 3, are not denominated subfactors. (capitalization and emphasis in original; alterations added). For the first three offerors, an "Adjectival Rating" is provided for each of the subfactors listed under Factors 1 and 2, and the ratings given include "**Unacceptable**," "**Good**," and "**Outstanding**," while for the fourth offeror, protestor Vectrus, the phrase "**Not assessed**" is listed for every evaluated subfactor. (capitalization and emphasis in original). Below Factor 3, for the first three offerors, the Initial Evaluation Results list the Total Evaluated Price in Danish kroner, note "**TBD**" for the Reasonable and Balanced evaluation, and state that the proposals are "**Complete**," while the Initial Evaluation Results only state that protestor Vectrus' offer, with respect to Total Evaluated Price and Reasonable and Balanced, is "**Not assessed**," and with respect to Completeness, is "**Incomplete**." (capitalization and emphasis in original).

The Competitive Range Decision Document further states:

Based on these initial evaluation results, all proposals received contained findings that did not allow for the award of a contract. Discussions are determined to be necessary in order to correct all findings in proposals that increase the risk of unsuccessful contract performance.

The agency evaluated all proposals in accordance with the solicitation. Discussions are to be conducted, thus the need to establish the competitive

range comprised of the most highly rated proposals in accordance with FAR 15.306(c).

Moreover, the Competitive Range Decision Document addresses the Space Force's determination with respect to protestor:

The following offeror was determined ineligible for award for noncompliance to the terms and conditions of the RFP and was notified on 24 May 2022 by the contracting officer, after approval by the SSA [source selection authority], that the proposal was determined ineligible for award for the reason stated below:

**Vectrus Services A/S (VS)**

VS is not compliant with the following solicitation requirement RFP paragraph L-5.D.3.b.ii:

A letter digitally signed or with a wet signature and scanned copy on company letterhead by an individual who can legally bind the company certifying that at the time of offer submission and throughout the term of the contract:

1. the offeror is, and shall remain, registered as a Danish or Greenlandic company in the Danish Central Business Register; and
2. more than 50 percent of the offeror's equity, defined as the entire capital of the company, is, and shall continue to be, owned by Danish and/or Greenlandic individuals or legal entities; and
3. a non-Danish or non-Greenlandic individual or legal entity does not, and shall not, have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror.

The signed letter received from VS in its proposal stated:

1. Vectrus Services Aktieselskab (A/S) is, and shall remain, registered as a Greenlandic company in the Danish central Business Register.
2. Vectrus Services is a wholly owned subsidiary of Vectrus Services Corporation.
3. We cherish our Greenlandic community and pledge to continue to service that community. Vectrus Services provides benefits to the Greenlandic society.

RFP paragraph M-3.3(c) states that all contract documents requested in section L-5.D.3.b. will be evaluated but not rated to ensure all documents are submitted and completed in their entirety. Failure to submit completed version of all documents may render the offeror ineligible for award. The VS [Vectrus] letter does not comply with the RFP requirements, because the letter does not address whether "more than 50 percent of the offeror's equity, defined as the entire capital of the company, is, and shall continue to be, owned by Danish and/or Greenlandic individuals or legal entities" nor

does the letter address the following criterion: whether "a non-Danish or non-Greenlandic individual or legal entity does not, and shall not, have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror." It is also apparent that as a wholly owned subsidiary of Vectrus Services Corporation, a U.S. company that is headquartered in Colorado Springs, Colorado, VS could not certify that it meets the section L-5.D.3.b criteria of the solicitation. Given this information the contracting officer determined that the offeror was non-compliant to the requirements of the RFP and thus ineligible for award. Because VS's proposal was non-complaint [sic] to the requirements of the RFP, no technical or price evaluation was conducted on the proposal.

(capitalization and emphasis in original; alterations added). The Competitive Range Decision Document goes on to establish the Competitive Range for the Thule Base Maintenance Contract procurement, including all offerors except protestor Vectrus in the Competitive Range. The Inuksuk joint venture offeror, of which protestor is a part, but not majority, owner, however, was determined eligible for award. Moreover, with respect to the "Deficiencies" noted in the Inuksuk proposal, the Competitive Range Decision Document states that "[t]he evaluation team believes the findings in Inuksuk A/S's proposal are correctable through discussions." (capitalization in original; alteration added).

Following denial of the GAO protest, protestor filed the above captioned bid protest in this court on June 7, 2022. Protestor's complaint asserted two causes of action. In Count One, "*Solicitation Provisions Arbitrarily Restricting Competition in Violation of Statute and Regulation*," protestor alleged that the restriction of eligibility to offerors that are "more than 50 percent" in terms of capital "owned by Danish and/or Greenlandic individuals or legal entities" and without "'decisive influence'" by non-Danish, non-Greenlandic individuals or legal entities, are "restrictions on competition" and that "[t]he international agreement exception to CICA [Competition in Contracting Act] did not authorize these restrictions on competition because no international agreement required the Agency to implement the restrictions." (capitalization and emphasis in original; alterations added) (citing 10 U.S.C.A. § 3204(a)(4); FAR 6.302-4(a)(2)). Protestor argued that the inclusion of the challenged eligibility requirements "was arbitrary, capricious, an abuse of discretion, and contrary to law." In Count Two, "*Exclusion from Competition Based on Arbitrary and Unlawful Solicitation Provisions*," protestor alleged that, because the challenged eligibility criteria are unlawful under the Competition in Contracting Act, the Space Force's "decision to exclude Vectrus from competition" pursuant to the eligibility criteria "was therefore arbitrary, capricious, an abuse of discretion, and contrary to law." (capitalization and emphasis in original). For relief, protestor sought a judgment "[d]eclaring the RFP's eligibility criteria and the Agency's application of that criteria to Vectrus's proposal arbitrary, capricious, an abuse of discretion, and contrary to law," as well as "[e]njoining the Agency to immediately reinstate Vectrus in the competition," and "[e]njoining the Agency to amend the RFP to remove restrictions on competition not required by the terms of any international agreement," as well as "any other relief as the Court deems just and proper." (alterations added).

Defendant moved to dismiss protestor's complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), arguing that the court was deprived of jurisdiction by operation of the statute at 28 U.S.C. § 1502 (2018), and, in the alternative, that protestor's complaint presented a non-justiciable political question over which this court lacks jurisdiction. Protestor and defendant also cross-moved for judgment on the Administrative Record. The motions were fully briefed, and the court held oral argument. As noted above, due to the urgency of the issues involved in this protest and the indication by protestor and defendant that a speedy resolution was necessary, the court issued an oral decision on the motion to dismiss and cross-motions for judgment on the Administrative Record, which this written Opinion memorializes.

## DISCUSSION

**Defendant's Motion to Dismiss the Complaint**

In its motion to dismiss protestor's complaint for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), defendant made two arguments. Defendant first argued that "this Court should dismiss the protest pursuant to 28 U.S.C. § 1502, which bars this Court from hearing cases that are dependent upon the Court's interpretation of a treaty or international agreement." The statute at 28 U.S.C. § 1502 provides: "Except as otherwise provided by Act of Congress, the United States Court of Federal Claims shall not have jurisdiction of any claim against the United States growing out of or dependent upon any treaty entered into with foreign nations." 28 U.S.C. § 1502 (2018). Defendant asserted that "Vectrus's protest requires this Court to interpret terms" of the 1991 Memorandum of Understanding amended by the 2009 Agreement, and defendant argued that "[b]ecause Vectrus' claims are directly dependent upon the meaning of its terms and how the United States, Denmark, and Greenland have subsequently interpreted and applied them, dismissal is warranted." (alteration added). In the alternative, defendant argued that

> because the United States Space Force's definition of the eligibility criteria in this RFP stem from international agreements, as well as negotiations and exchanges between the United States and North Atlantic Treaty Organization (NATO) partner nations in furtherance of strategic national defense goals and pursuant to foreign relations objectives, the interpretation of the eligibility criteria in this solicitation present [sic] a non-justiciable political question upon which this Court should not opine.

(alteration added).

"Subject-matter jurisdiction may be challenged at any time by the parties or by the court sua sponte." Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (quoting Fanning, Phillips, & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); see also St. Bernard Parish Gov't v. United States, 916 F.3d 987, 992-93 (Fed. Cir. 2019) ("[T]he court must address jurisdictional issues, even sua sponte, whenever those issues come to the court's

attention, whether raised by a party or not, and even if the parties affirmatively urge the court to exercise jurisdiction over the case." (citing <u>Foster v. Chatman</u>, 578 U.S. 488, 496 (2016))); <u>Int'l Elec. Tech. Corp. v. Hughes Aircraft Co.</u>, 476 F.3d 1329, 1330 (Fed. Cir. 2007); <u>Haddad v. United States</u>, 152 Fed. Cl. 1, 16 (2021); <u>Fanelli v. United States</u>, 146 Fed. Cl. 462, 466 (2020). The Tucker Act, 28 U.S.C. § 1491, grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2018). In addition to the above-stated grounds for jurisdiction, the United States Court of Federal Claims has jurisdiction over pre- and post-award protests to review solicitations and contract awards issued by federal agencies. <u>See</u> 28 U.S.C. § 1491(b)(1). The statute at 28 U.S.C. § 1491(b)(1)-(4) provides:

> (b)(1) Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.
> (2) To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs.
> (3) In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security in the need for expeditious resolution of the action.
> (4) In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.

28 U.S.C. § 1491(b)(1)-(4) (footnote omitted; alteration added).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." <u>Holley v. United States</u>, 124 F.3d 1462, 1465 (Fed. Cir.) (citing <u>Franchise Tax Bd. v. Constr. Laborers Vacation Trust</u>, 463 U.S. 1, 9-10 (1983)), <u>reh'g</u> <u>denied</u> (Fed. Cir. 1997); <u>see also</u> <u>Klamath Tribe Claims Comm. v. United States</u>, 97 Fed. Cl. 203, 208 (2011); <u>Gonzalez-McCaulley Inv. Grp., Inc. v. United States</u>, 93 Fed.

Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2021); Fed. R. Civ. P. 8(a)(1), (2) (2023); see also Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57, 570 (2007)). To properly state a claim for relief, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)); "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014); see also Hale v. United States, 143 Fed. Cl. 180, 190 (2019). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

Defendant first argued that 28 U.S.C. § 1502 deprives this court of jurisdiction over protestor's claim. Protestor, however, alleged that the Solicitation eligibility requirements violate the Competition in Contracting Act, 10 U.S.C.A. § 3201 et seq. (2022), and its implementing regulations. The Competition in Contracting Act provides, at 10 U.S.C.A. § 3201(a):

> **(a) In general.**--Except as provided in sections 3203, 3204(a), and 3205 of this title and except in the case of procurement procedures otherwise expressly authorized by statute, the head of an agency in conducting a procurement for property or services--
>
> > **(1)** shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this section and sections 3069, 3203, 3204, 3205, 3403, 3405, 3406, 3901, 4501, and 4502 of this title and the Federal Acquisition Regulation; and
> >
> > **(2)** shall use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

10 U.S.C.A. § 3201(a) (emphasis in original). As relevant to the above captioned bid protest, the Competition in Contracting Act further provides at 10 U.S.C.A. § 3204(a)(4):

> **(a)  When procedures other than competitive procedures may be used.**--The head of an agency may use procedures other than competitive procedures only when--
>
> > . . .

(4) the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures[.]

10 U.S.C.A. § 3204(a)(4) (emphasis in original; alterations added).[43]

Similarly, the FAR, at Part 6, implements the language of the Competition in Contracting Act, and the regulation at FAR 6.101, "Policy," provides:

(a) 10 U.S.C. 3201 and 41 U.S.C. 3301 require, with certain limited exceptions (see subparts 6.2 and 6.3), that contracting officers shall promote and provide for full and open competition in soliciting offers and awarding Government contracts.

(b) Contracting officers shall provide for full and open competition through the use of the competitive procedure(s) contained in this subpart that are best suited to the circumstances of the contract action and consistent with the need to fulfill the Government's requirements efficiently (10 U.S.C. 3201

---

[43] Both the Competition in Contracting Act and the FAR refer to "an international agreement or a treaty between the United States and a foreign government" which may affect the requirement for full and open competition. See 10 U.S.C.A. § 3204(a)(4); FAR 6.302-4(a)(2), (b)(2). While the words "international agreement" appear to be susceptible to interpretation as including informal agreements between the United States and foreign governments as well as more formal executive agreements with the force of treaties, the Competition in Contracting Act, the FAR, and decisions of this circuit do not define "international agreement" as that phrase is used in the international agreement exception to the Competition in Contracting's full and open competition requirement. Moreover, the Case-Zablocki Act, 1 U.S.C. § 112a et seq. (2018), requires that the United States Department of State maintain "a compilation entitled 'United States Treaties and Other International Agreements,'" know as T.I.A.S., which "shall be legal evidence of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and agreements, therein contained, in all the courts of the United States, the several States, and the Territories and insular possessions of the United States." 1 U.S.C. § 112a(a). Both the 1951 Agreement and 2004 Agreement between the United States and Denmark are included in T.I.A.S., at T.I.A.S. No. 2,292 and T.I.A.S. No. 04-806, respectively. The 1991 Memorandum of Understanding appears at T.I.A.S. No. 12285, with the dates of July 16, 2008 and January 27, 2009, the dates of the diplomatic notes which constitute the 2009 Agreement, listed as the dates of an amendment to the 1991 Memorandum of Understanding. The 2013 diplomatic correspondence and Diplomatic Note No. 127, however, do not appear in T.I.A.S.

and 41 U.S.C. 3301).

FAR 6.101 (capitalization in original). The regulation at FAR 6.301, "Policy," further provides:

> (a) 41 U.S.C. 3304 and 10 U.S.C. 3204 each authorize, under certain conditions, contracting without providing for full and open competition. The Department of Defense, Coast Guard, and National Aeronautics and Space Administration are subject to 10 U.S.C. 3204. Other executive agencies are subject to 41 U.S.C. 3304. Contracting without providing for full and open competition or full and open competition after exclusion of sources is a violation of statute, unless permitted by one of the exceptions in [FAR] 6.302.
>
> (b) Each contract awarded without providing for full and open competition shall contain a reference to the specific authority under which it was so awarded. Contracting officers shall use the U.S. Code citation applicable to their agency. (See 6.302.)
>
> (c) Contracting without providing for full and open competition shall not be justified on the basis of-
>
> > (1) A lack of advance planning by the requiring activity; or
> >
> > (2) Concerns related to the amount of funds available (e.g., funds will expire) to the agency or activity for the acquisition of supplies or services.
>
> (d) When not providing for full and open competition, the contracting officer shall solicit offers from as many potential sources as is practicable under the circumstances.
>
> (e) For contracts under this subpart, the contracting officer shall use the contracting procedures prescribed in 6.102(a) or (b), if appropriate, or any other procedures authorized by this regulation.

FAR 6.301 (alteration added). The regulation at FAR 6.302, "Circumstances permitting other than full and open competition," states: "The following statutory authorities (including applications and limitations) permit contracting without providing for full and open competition. Requirements for justifications to support the use of these authorities are in 6.303." FAR 6.302. As relevant to the above captioned bid protest, the regulation at FAR 6.302-4, "International agreement," provides:

> (a) Authority.
>
> > (1) Citations: 10 U.S.C. 3204(a)(4) or 41 U.S.C. 3304(a)(4).
> >
> > (2) Full and open competition need not be provided for when precluded by the terms of an international agreement or a treaty between the United States and a foreign government or international

organization, or the written directions of a foreign government reimbursing the agency for the cost of the acquisition of the supplies or services for such government.

(b) Application. This authority may be used in circumstances such as—

(1) When a contemplated acquisition is to be reimbursed by a foreign country that requires that the product be obtained from a particular firm as specified in official written direction such as a Letter of Offer and Acceptance; or

(2) When a contemplated acquisition is for services to be performed, or supplies to be used, in the sovereign territory of another country and the terms of a treaty or agreement specify or limit the sources to be solicited.

(c) Limitations. Except for DoD, NASA, and the Coast Guard, contracts awarded using this authority shall be supported by written justifications and approvals described in 6.303 and 6.304.

FAR 6.302-4 (capitalization in original).

Defendant argued that 28 U.S.C. § 1502 precludes this court from considering protestor's complaint "because it grows out of or is dependent upon the terms of the 1991 MOU's definition of Greenlandic/Danish source," and that, in order to decide the above captioned bid protest, "this Court would be required to construe whether the term 'Danish/Greenlandic sources' in the [2009] amendment to the 1991 MOU includes offerors that are subsidiaries of foreign companies." (alteration added). Defendant argued that if protestor's complaint were not barred by section 1502, "a bid protest could scarcely be conceived that would be implicated by Section 1502," and that "Vectrus's claim is that it was improperly excluded from the competition *because of* the MOU. In short, the MOU is the target, the sum and substance of Vectrus's complaint." (emphasis in original). Defendant also argued that the Solicitation eligibility criteria "merely reflect the United States' obligation under the agreement."

Protestor, in its response to defendant's motion to dismiss, argued that 28 U.S.C. § 1502, by its text, does not exclude from this court's jurisdiction those "claims 'otherwise provided by Act of Congress[.]'" (alteration in original) (quoting 28 U.S.C. § 1502). Protestor stated that Vectrus "seeks to vindicate its rights in two such Acts, namely, the Tucker Act (28 U.S.C. § 1491(b)(1))," and the Competition in Contracting Act, 10 U.S.C.A. § 3204(a)(4). Protestor further argued that "it is only the United States' *defense*—and not any right of Vectrus—that grows out of an international agreement," and that "the plain language of the statutory bar is limited strictly to a '***claim against*** the United States' and does not reasonably include claims that have independent jurisdictional bases, even if the United States' *defense* may require interpretation of an international agreement." (emphasis in original). Moreover, protestor stated that it "does not challenge the terms of the 1991 MOU, as amended [by the 2009 Agreement]," but rather "[i]t challenges the Agency's insertion and subsequent application of unduly restrictive terms in the

Solicitation." (alterations added). Protestor claimed that "Section 1502 and case law construing it [section 1502], including binding precedent, establishes *the exact opposite* of what the United States argues: the mere fact that adjudicating a claim requires interpretation of a treaty or international agreement does *not* deprive the Court of jurisdiction." (emphasis in original; alterations added). Protestor, citing Wood v. United States, 961 F.2d 195, 199 (Fed. Cir. 1992), argued that "what matters is whether the claimed right derives its life and existence from the terms of an international agreement, or some other legal authority such as federal statute." Further, protestor, citing Hughes Aircraft Co. v. United States, 534 F.2d 889, 903-04, 209 Ct. Cl. 446 (1976), argued that "28 U.S.C. § 1502 does not mean that any claim requiring the Court to interpret an international agreement falls outside the Court's jurisdiction." According to protestor, "the relevant question is whether the *plaintiff's* claimed right—*not* 'the defendant's position'—springs from the terms of an international agreement." (emphasis in original).

The Supreme Court in United States v. Weld, 127 U.S. 51 (1888), interpreted a predecessor to the modern version of 28 U.S.C. § 1502, identified as "section 1066, Rev. St. U. S.," which deprived the United States Court of Claims of jurisdiction over any "case growing out of, and dependent upon," a treaty of the United States. See United States v. Weld, 127 U.S. at 54. The Supreme Court explained that the Weld claimant "does not seek to recover upon any supposed obligation created by" a treaty, "but upon the specific appropriation made in" an act of Congress. Id. at 56-57. Because the claim in Weld was "'founded upon a law of congress,'" although a treaty was the background of the legislation at issue, "such a dependency upon, or growing out of [the treaty], is too remote" to be barred by section 1066 of the Revised Statutes. United States v. Weld, 127 U.S. at 57 (capitalization in original; alteration added). The Supreme Court further stated that jurisdiction was barred only in the case of "a direct and proximate connection between the treaty and the claim," such that "the right itself, which the petition makes to be the foundation of the claim, must have its origin—derive its life and existence—from some treaty stipulation." Id. The Supreme Court analogized this requirement to the "rule relating to damages in common-law actions; namely, that a wrong-doer shall be held responsible only for the proximate, and not for the remote, consequences of his actions." Id.

Subsequently, the Supreme Court elaborated on the interpretation of section 1066 of the Revised Statutes, the same statute at issue in United States v. Weld, 127 U.S. 51, in Eastern Extension, Australasia & China Telegraph Co. v. United States, 231 U.S. 326 (1913), in which the plaintiff sought to enforce an agreement it previously had made with Spain against the United States following the United States' acquisition of the Philippines after the Spanish-American war. The Supreme Court held that insofar "as the petition may be viewed as one seeking to assert a claim growing out of the treaty with Spain, we are of the opinion that it was not within the jurisdiction of the court of claims." Id. at 332. The Supreme Court, however, determined that section 1066 of the Revised Statutes did not bar the plaintiff's claim, because the plaintiff's allegations could be construed as asserting a claim of implied contract alleging that the United States had enjoyed benefits of the plaintiff's cable and telegraph lines which had previously been reserved to the Spanish government. See E. Extension, Australasia & China Tel. Co. v. United States, 231 U.S. at 334-35.

The United States Court of Claims, in the decision of <u>Falcon Dam Constructors v. United States</u>, 136 Ct. Cl. 358, 142 F. Supp. 902 (1956), relied on the Supreme Court's interpretation of section 1066 of the Revised Statutes to interpret 28 U.S.C. § 1502, which at the time of <u>Falcon Dam Constructors</u> applied to the Court of Claims, but otherwise was similar and is relevant to the 28 U.S.C. § 1502 at issue in the current bid protest.[44] In <u>Falcon Dam Constructors</u>, the Court of Claims dismissed the claim of a Mexican corporation which had been awarded a contract for the Mexican portion of the work to build a dam on the Rio Grande pursuant to an agreement between the United States and Mexico. <u>See Falcon Dam Constructors v. United States</u>, 136 Ct. Cl. at 361. The Court of Claims held that, because the Mexican corporation did not have a contract with the United States, but only with Mexico, the Mexican corporation's claim "grew out of the treaty with Mexico" providing for the allocation of costs between the United States and Mexico, and the Mexican corporation's claim was barred by section 1502. <u>See Falcon Dam Constructors v. United States</u>, 136 Ct. Cl. at 364.

The Court of Claims in another case, <u>Societe Anonyme Des Ateliers Brillie Freres v. United States</u>, 160 Ct. Cl. 192 (1963), elaborated on the relationship between a modern version of 28 U.S.C. § 1502 and the Supreme Court's interpretation of section 1066 of the Revised Statutes. The Court of Claims in <u>Societe Anonyme</u> explained that "[t]he Supreme Court of the United States provided us with an objective standard" with regard to "the meaning of section 1502" in the Supreme Court's decision in <u>United States v. Weld</u>, emphasizing that "'the statute contemplates a *direct* and *proximate* connection between the treaty and the claim,'" that "'the *right itself*, which the petition makes to be the foundation of the claim, must have its origin-derive its life and existence-from some treaty stipulation,'" and that the rule is analogous to the rule "'that a wrongdoer shall be held responsible only for the *proximate* and not for the *remote*, consequences of his action.'" <u>Societe Anonyme Des Ateliers Brillie Freres v. United States</u>, 160 Ct. Cl. at 197 (emphasis in original; alteration added) (quoting <u>United States v. Weld</u>, 127 U.S. at 57). The Court of Claims further stated "that a case *growing out of* a treaty is one involving rights given or protected by a treaty, and is analogous to a case arising under the Constitution or laws of the United States." <u>Id.</u> (emphasis in original) (citing <u>United States v. Old Settlers</u>, 148 U.S. 427, 468-69 (1893)). The Court of Claims held that, because the claim at issue was based on an entitlement to patent royalties related to World War II, the court was not deprived of jurisdiction by 28 U.S.C. § 1502. <u>See Societe Anonyme Des Ateliers Brillie Freres v. United States</u>, 160 Ct. Cl. at 197-99.

The Court of Claims applied the interpretation of 28 U.S.C. § 1502 articulated in <u>Societe Anonyme</u> in two later cases which have informed subsequent applications of that statute: <u>S.N.T. Fratelli Gondrand v. United States</u>, 166 Ct. Cl. 473 (1964), and <u>Hughes Aircraft Co. v. United States</u>, 209 Ct. Cl. 446. The first case, <u>S.N.T. Fratelli Gondrand</u>, was a congressional reference case in which the United States Court of Claims held that

---

[44] The statute at 28 U.S.C. § 1502 was amended to refer to the United States Court of Federal Claims in the Federal Courts Administration Act of 1992, Pub. L. No. 101-572, § 902(a)(1), 106 Stat. 4506.

when the claim is based "on the Constitution, the principles governing government contracts under the Tucker Act, and the Rules of Land Warfare," and "[i]t is the Government which brings the Treaty to the fore as a defense," section 1502 "permits the court to pass upon a treaty issue raised as a defense to a claim which is independent of the treaty. The prohibition is not framed, nor has it been applied, as forbidding this court to construe or apply a treaty." S.N.T. Fratelli Gondrand v. United States, 166 Ct. Cl. at 478 (capitalization in original; alteration added; footnote omitted).[45]

In the second case, Hughes Aircraft Co., the United States Court of Claims explained:

> The test under s [section] 1502 is whether plaintiff's claim could conceivably exist independently of, or separate and apart from, the subject treaty, or whether, on the contrary, it derives its existence so exclusively and substantially from certain express terms or provisions thereof, that consideration of the claim would necessitate our construction of the treaty itself.

Hughes Aircraft Co. v. United States, 534 F.2d at 903 (alteration added). The Court of Claims further stated "that the claim involved must not merely be related to or connected with the subject matter of the treaty, but that, absent certain express terms or provisions thereof, there could be no claim at all." Id. at 904. The Court of Claims referred to this interpretation of section 28 U.S.C. § 1502 as a "narrow construction" and stated that "[i]n accord" was the Court of Claims' decision in Societe Anonyme. See Hughes Aircraft Co. v. United States, 534 F.2d at 905 (alteration added) (citing Societe Anonyme Des Ateliers Brillie Freres v. United States, 160 Ct. Cl. at 196-99). The Court of Claims in Hughes Aircraft Co. further held that section 1502 does not bar jurisdiction when the international agreement was "only a 'backdrop' against which the Government's allegedly infringing activities may be more broadly measured." Hughes Aircraft Co. v. United States, 534 F.2d at 905-06.

In the current protest, however, relying on Hughes Aircraft Co. v. United States, 534 F.2d at 903, defendant argued that "Vectrus' challenge to the eligibility criteria necessarily involves analyzing the terms of the agreement as the parties have come to interpret it over time," and, therefore, "Vectrus' bid protest rises and falls on the parties' interpretation of Danish/Greenlandic source in the 1991 MOU." For this reason, defendant

---

[45] The Court of Claims Judge suggested in a footnote in S.N.T. Fratelli Gondrand that "[i]n enacting the predecessor of Section 1502, Congress seems to have been concerned to prevent United States citizens from suing directly in the Court of Claims to collect monies paid by foreign governments to the United States, under a treaty, in discharge of a class of individual claims." S.N.T. Fratelli Gondrand v. United States, 166 Ct. Cl. at 478 n.3 (alteration added) (citing Great W. Ins. Co. v. United States, 112 U.S. 193. 199-200 (1884)).

argued, quoting <u>Hughes Aircraft Co. v. United States</u>, 534 F.2d at 904, "Vectrus's claim derives its 'life and existence' from the MOU's terms."[46]

In its response to the motion to dismiss, protestor, citing <u>Hughes Aircraft Co. v. United States</u>, 534 F.2d at 903, urged that this court should apply a test which Vectrus characterizes as "whether the plaintiff's claim would cease to exist absent the international agreement because the right sought to be enforced by the claim is derived from that international agreement and not some other source." Protestor argued that its "claim focuses on the unduly restrictive provisions contained in the Solicitation" and that its claim is "independent of the 2009 amendment to the 1991 MOU," because "had the Solicitation included the restrictions which Vectrus now challenges in the absence of the 2009 amendment to the 1991 MOU, the United States would not be able to cite the language of that amendment as its defense for restricting competition at all."

Subsequent to the Court of Claims' decision in <u>Hughes Aircraft Co.</u>, the United States Supreme Court briefly considered the question of the interpretation of 28 U.S.C. § 1502 in the conclusion of its opinion in <u>Dames & Moore v. Regan</u>, 453 U.S. 654, 688-90 (1981). In <u>Dames & Moore</u>, the Supreme Court held, as relevant to the above captioned bid protest, that the President possessed the power to settle claims held by American individuals and corporations "against foreign governmental entities," but the Supreme Court left open the possibility that such a settlement of a claim could "make ripe for adjudication the question whether petitioner will have a remedy at law in the Court of Claims under the Tucker Act." <u>Id.</u> at 688-89. The Supreme Court concluded:

> It has been contended that the "treaty exception" to the jurisdiction of the Court of Claims, 28 U.S.C. § 1502, might preclude the Court of Claims from exercising jurisdiction over any takings claim the petitioner might bring. At oral argument, however, the Government conceded that § 1502 would not act as a bar to petitioner's action in the Court of Claims. Tr. of Oral Arg. 39–42, 47. We agree. <u>See</u> <u>United States v. Weld</u>, 127 U.S. 51, 8 S. Ct. 1000, 32 L. Ed. 62 (1888); <u>United States v. Old Settlers</u>, 148 U.S. 427, 13 S. Ct. 650, 37 L. Ed. 509 (1893); <u>Hughes Aircraft Co. v. United States</u>, 534 F.2d 889, 209 Ct. Cl. 446 (1976). Accordingly, to the extent petitioner believes it has suffered an unconstitutional taking by the suspension of the claims, we see no jurisdictional obstacle to an appropriate action in the United States Court of Claims under the Tucker Act.

<u>Dames & Moore v. Regan</u>, 453 U.S. at 689-90.

---

[46] The language of the Court of Claims in <u>Hughes Aircraft Co.</u> which is quoted by defendant is itself a quotation of the Supreme Court's decision in <u>Weld</u>: "for a claim to 'grow out of' or be 'dependent upon' a treaty, 'the right itself, * * * the foundation of the claim, must have its origin—derive its life and existence—from some treaty stipulation.'" <u>Hughes Aircraft Co. v. United States</u>, 534 F.2d at 903 (ellipsis in original) (quoting <u>United States v. Weld</u>, 127 U.S. at 57).

The Court of Claims' interpretation of 28 U.S.C. § 1502 in S.N.T. Fratelli Gondrand and Hughes Aircraft Co. has been applied in subsequent cases brought in the United States Court of Claims, the Federal Circuit, and the United States Claims Court, all to the effect that if there is a statute, contract, or other basis for the cause of action asserted against the United States, the claim will be considered "independent" of a treaty which must be interpreted to decide the case or which otherwise forms the background of the claim. See Wood v. United States, 961 F.2d at 200 (holding that although "the Brazilian-American Treaty may help to determine whether or not the FAA was obligated to grant a certificate of airworthiness on the airplanes," under the "narrow interpretation" of 28 U.S.C. § 1502 the court had jurisdiction, because "the focus of the claim is that he [plaintiff] was not able to purchase them with certificates of airworthiness" and "[t]he treaty does not create that right" (alterations added)); see also Brown & Williamson, Ltd. v. United States, 231 Ct. Cl. 413, 421, 688 F.2d 747, 752 (1982) (holding that "[a]lthough the 1980 treaty created the right to a retroactive refund of taxes, it is section 6611 of the [Internal Revenue] Code that creates the right to interest upon the refunded taxes" and, therefore, a claim for interest on refunded taxes "derives its 'life and existence' not from the treaty but from section 6611" (alterations added)); Nitol v. United States, 7 Cl. Ct. 405, 417 (1985) (holding that claims based on breach by the United States of a Trusteeship Agreement with the United Nations are barred by 28 U.S.C. § 1502 because such claims "have no existence that is separate and apart from the Trusteeship Agreement"); Anderson v. United States, 7 Cl. Ct. 341, 343 (1985) (holding that 28 U.S.C. § 1502 barred plaintiffs' claims to the extent they alleged "a taking due to the release of substantially more water than authorized by the Treaty," but the court retained jurisdiction "insofar as they allege a taking by inundation apart from the Treaty, because their claims can conceivably exist independently of, or separate and apart from, the Treaty"); Peter v. United States, 6 Cl. Ct. 768, 778-79 (1984) (holding that 28 U.S.C. § 1502 barred plaintiffs' claims which were "based upon an alleged failure of the United States to comply with obligations assumed in the Trusteeship Agreement" with the United Nations, because such a claim "clearly grows out of and is dependent upon that treaty," and such claims "have no existence that is separate and apart from the Trusteeship Agreement"); Juda v. United States, 6 Cl. Ct. 441, 453-54 (1984) (holding that 28 U.S.C. § 1502 did not bar plaintiffs' claims against the United States because, while the United States had a Trusteeship Agreement with the United Nations which established its fiduciary obligations at issue, plaintiffs also alleged the existence of an implied contract with the United States which was "distinct" from the Trusteeship Agreement).

Thereafter, Judges of the United States Court of Federal Claims also have interpreted 28 U.S.C. § 1502 consistent with Hughes Aircraft Co. and S.N.T. Fratelli Gondrand to the same effect. For example, in Kandel v. United States, 133 Fed. Cl. 300 (2017), a Judge of the Court of Federal Claims held that section 1502 barred the claims of Panama Canal Commission employees employed pursuant to a statute which made their employment "'subject to the provisions of the Panama Canal Treaty,'" (quoting 22 U.S.C. § 3652(a)(1)), but section 1502 did not bar the claims of employees whose employment was subject to a later statute that made other employment provisions of the United States Code applicable. See Kandel v. United States, 133 Fed. Cl. at 303-06; see also Dwen v. United States, 62 Fed. Cl. 76, 83-84 (2004) (holding that section 1502 barred

plaintiffs' "'claim regarding title or possession of real property *granted pursuant to a treaty*,'" (emphasis in original), in which plaintiffs' entitlement "would originate and dwell entirely within the provisions of the treaty"); Adarbe v. United States, 58 Fed. Cl. 707, 719-20 (2003) (holding that so long as "a right stems also from a source that is not a treaty, then § 1502 does not prohibit its consideration in this court," however, "insofar as plaintiffs are actually relying on" an international agreement "as the basis for the rights," then "§ 1502 squarely prohibits this court from taking jurisdiction to hear those claims"); De Archibold v. United States, 57 Fed. Cl. 29, 32 (2003) (holding that "because plaintiffs' express contract claim is based solely on" an international agreement, "this court does not have jurisdiction").

In three recent cases cited by the parties, Per Aarsleff A/S v. United States, Kuwait Pearls Catering Co., WLL v. United States, and Newimar S.A. v. United States, Judges of the Court of Federal Claims have interpreted section 1502 consistent with the Court of Claims' decisions in Hughes Aircraft Co. and S.N.T. Fratelli Gondrand and the other cases identified above. As indicated above, a Judge of the Court of Federal Claims addressed the issue of section 1502's application in the Per Aarsleff bid protest litigation which involved the predecessor contract to the one at issue in the current litigation, which concerned the award of that predecessor contract to Exelis (now protestor Vectrus), and in which at the trial court level, the United States in Per Aarsleff argued that the protestors' claims in that case were barred by 28 U.S.C. § 1502 as "dependent on an international executive agreement." The Judge of the Court of Federal Claims, however, held that "these claims neither directly nor proximately stem from an international agreement." Per Aarsleff A/S v. United States, 121 Fed. Cl. at 622 (citing United States v. Weld, 127 U.S. at 57). The Judge of the Court of Federal Claims in Per Aarsleff explained that the court "exercises its juridical power to construe the provisions in the Solicitation that were explicitly drafted to satisfy and incorporate the international understanding," and that the court would "look to the underlying agreements as a guide to interpreting the text of the Solicitation," but that it would not "be directly enforcing the terms of the bilateral agreement between the United States and Denmark." Id. Therefore, the Judge concluded that section 1502 did not bar the protestor's claims. While the Federal Circuit ultimately reversed the holding of the Court of Federal Claims in Per Aarsleff, the Federal Circuit did not reverse the Court of Federal Claims' holding with respect to section 1502, nor did the Federal Circuit address that issue in its decision on appeal. See generally Per Aarsleff A/S v. United States, 829 F.3d 1303.

A different Judge of the United States Court of Federal Claims in Kuwait Pearls Catering Co., WLL v. United States, 145 Fed. Cl. 357 (2019), interpreted 28 U.S.C. § 1502 in the context of a Fifth Amendment taking claim which the government argued "grows out of or depends on the terms of the SOFA [Status of Forces Agreement]" between the United States and Iraq. See Kuwait Pearls Catering Co., WLL v. United States, 145 Fed. Cl. at 369. The Judge in Kuwait Pearls Catering held that "[a] case grows out of or depends upon the terms of a treaty or executive agreement when it involves rights 'given or protected by' the treaty or executive agreement," id. (quoting United States v. Old Settlers, 148 U.S. at 468) (alteration added), and that "the treaty must create or protect the right at issue." Id. (citing Wood v. United States, 961 F.2d at 200; Hughes

Aircraft Co. v. United States, 534 F.2d at 906). Therefore, the Judge in Kuwait Pearls Catering interpreted the SOFA and determined that the property which the plaintiff alleged had been taken was not covered by the SOFA, see id. at 370, concluding that plaintiff's "taking claim does not grow out of or depend upon the SOFA," and section 1502 did not deprive the court of jurisdiction. Id. at 369-70.

In a more recent bid protest decision by yet another Judge of the Court of Federal Claims, Newimar S.A. v. United States, 160 Fed. Cl. 97 (2022), appeal filed, No. 22-1949 (Fed. Cir. June 28, 2022), the Judge addressed section 1502's jurisdictional bar. See Newimar S.A. v. United States, 160 Fed. Cl. at 127-28. The discussion of section 1502 in Newimar is brief and indicates that the issue was "argued for the first time" in one party's reply brief. See Newimar S.A. v. United States, 160 Fed. Cl. at 127. The Judge in Newimar held that the Court of Federal Claims had no jurisdiction over the claim that the awardee of the contract "was ineligible for award under the Agreement on Defense Cooperation between the United States and the Kingdom of Spain of December 1, 1988 (ADC)." See id. at 127. The Judge in Newimar explained that such argument "hinges on an allegation" that requirements of the international agreement were not fulfilled, and, therefore, "this argument 'derives its life and existence' from the Agreement." Id. at 128. (quoting Hughes Aircraft Co. v. United States, 534 F.2d at 904).

Relying on Newimar S.A. v. United States, 160 Fed. Cl. at 127-28, defendant argued that the criteria in the Solicitation currently at issue "were derived from the terms of the 1991 MOU" including "during diplomatic exchanges culminating in Diplomatic Note No. 127," and that, therefore, "the complaint necessarily calls upon this Court to interpret a treaty or international agreement." Protestor, however, distinguished the above captioned bid protest from the discussion of the application of 28 U.S.C. § 1502 in the Newimar bid protest, which protestor also characterizes as "*dicta*." (emphasis in original). Protestor argued that Vectrus, unlike the Newimar claimant, "does not seek to enforce the terms of any international agreement," but "challenges the terms of the Solicitation under CICA's and the FAR's competition requirements," under which the Court of Federal Claims may review relevant international agreements. This court agrees that the Court of Federal Claims' holding in Newimar may be distinguished from the protest currently under review on the grounds that the protestor in this protest did not cite to a treaty or international agreement as the basis for its claims, but rather based its claims for relief on the Competition in Contracting Act and its implementing regulations. While protestor referred to international agreements and treaties between the United States and Denmark, it did so to adjudicate whether the requirements of the Competition in Contracting Act have been violated by the eligibility requirements included in the Solicitation, not to enforce the international agreements and treaties as the claimant in Newimar did. See Newimar S.A. v. United States, 160 Fed. Cl. at 127-28.

As noted above, 10 U.S.C.A. § 3204(a)(4) allows the government to "use procedures other than competitive procedures" when "the terms of an international agreement or treaty . . . have the effect of requiring the use of procedures other than competitive procedures." Protestor, in its references to, and quotations from, the treaties and international agreements between the United States and Denmark, sought to

adjudicate the United States' compliance with the requirements of 10 U.S.C.A. § 3204(a)(4) in connection with the Solicitation at issue in the above captioned bid protest. Defendant, in its reply brief, even seemed to acknowledge this, stating, "the complaint asks the Court to interpret the 1991 MOU's terms in analyzing whether the Space Force's request for proposal's [sic] (RFP) eligibility criteria are authorized under the Competition in Contracting Act" and its implementing regulations. (alteration added). The court, based on the above-discussed cases interpreting the application of 28 U.S.C. § 1502, concludes that protestor's claims "have their origin" and "derive their life and existence" from the Competition in Contracting Act at 10 U.S.C.A. § 3204(a)(4) and its implementing regulation at FAR 6.302-4. See United States v. Weld, 127 U.S. at 57; Societe Anonyme Des Ateliers Brillie Freres v. United States, 160 Ct. Cl. at 197. Protestor's claims invoked the terms of the United States' treaties and international agreements with Denmark as "only a 'backdrop'" to protestor's claims based on statutory and regulatory government contract requirements. See Hughes Aircraft Co. v. United States, 534 F.2d at 905-06. Accordingly, this court finds that in the above captioned bid protest, the court is not deprived of jurisdiction by 28 U.S.C. § 1502.

As noted above, defendant argued, in the alternative, that the court should dismiss protestor's complaint because protestor's claims presented a political question which is non-justiciable and outside the jurisdiction of this court. Defendant argued that "the adjudication of the case necessarily invokes second guessing the agreements and the diplomatic arrangements between the United States and the Kingdom of Denmark," and that the "agreements and arrangements" between the United States and Denmark with respect to Thule Air Base "are decisions that are reserved to the Executive Branch in conducting foreign relations and ensuring for the national defense of the United States." Defendant repeated throughout its motion to dismiss and reply brief in support thereof that protestor's complaint "second-guess[es]" the Executive Branch's negotiations with Denmark. (alteration added). According to defendant, foreign relations and national defense "decisions are beyond the purview of this Court." (citing Boumediene v. Bush, 553 U.S. 723, 753-54 (2008), Baker v. Carr, 369 U.S. 186, 211 (1962), and Belk v. United States, 858 F.2d 706, 710 (Fed. Cir. 1988)).

Protestor argued that "[e]ven assuming a national defense concern existed here," such consideration "relates to injunctive relief, not justiciability," (alteration added), and, therefore, protestor claimed that defendant's invocation of a national defense concern did not create a political question. Protestor also argued that "'when considering national security interests in procurement cases, the Court has typically done so in determining whether to provide injunctive relief after exercising jurisdiction and adjudicating the merits.'" (quoting Iron Bow Techs., LLC v. United States, 136 Fed. Cl. 519, 532-33 (2018) (internal quotations omitted)). Moreover, according to protestor, defendant "cites no evidence or materials" to be included in the administrative record which show "that the Court's decision in this case will have any impact on the national defense." Protestor further argued that, in the October 11, 2016 Memorandum and the 2016 Deputy General Counsel Review, "the United States' own internal legal analysis admits that competitive restrictions are rightfully subject to the requirements of CICA, even when they relate to international agreements." According to protestor, citing Defense Technology, Inc. v.

United States, 99 Fed. Cl. 103, 116 (2011), "'where executive conduct is regulated by federal statute or regulation,'" judicial review is not precluded by the political question doctrine. Protestor argued that "a ruling in its [protestor's] favor would not preclude the United States and the KoD from restricting competition to companies owned by Danish or Greenlandic corporate parents in the future," provided that the United States and Denmark sign "a new international agreement that explicitly provides for such." (alteration added).

The United States Supreme Court in Baker v. Carr, 369 U.S. 186, stated that a nonjusticiable political question "has one or more elements which identify it as essentially a function of the separation of powers." Id. at 217. The Supreme Court explained:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

> Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.'

Id. (alteration added). Further, the Supreme Court in Baker stated, with respect to foreign affairs, that

> it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance. Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action. For example, though a court will not ordinarily inquire whether a treaty has been terminated, since on that question 'governmental action * * * must be regarded as of controlling importance,' if there has been no conclusive 'governmental action' then a court can construe a treaty and may find it provides the answer. Compare Terlinden v. Ames, 184 U.S. 270, 285, 22 S. Ct. 484, 490, 46 L. Ed. 534 [(1902)], with Society for the Propagation of the Gospel in Foreign Parts v. New Haven, [21 U.S. (]8 Wheat.[)] 464, 492—495, 5 L. Ed. 662 [(1823)].

Baker v. Carr, 369 U.S. at 211-12 (ellipsis in original; alterations added).

Defendant, in its motion to dismiss protestor's complaint, argued that protestor's claims present a political question according to the first two "elements" identified by the Supreme Court in Baker v. Carr. The first two elements of Baker are whether "a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it" exist, at least one of which must be "inextricable from the case at bar" to dismiss the case on the basis of the political question doctrine. See id. at 217. The United States Supreme Court in Nixon v. United States, 506 US. 224 (1993), explained with respect to the first two elements of Baker that

> the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch.

Id. at 228-29 (quoting Baker v. Carr, 369 U.S. at 217).

Defendant argued "that the Constitution grants the Executive Branch the power to conduct foreign relations," and cited to the United States Supreme Court's decision in United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936), to define the scope of the Executive Branch's role in foreign relations.[47] The Supreme Court stated in Curtiss-Wright, in the portion relied upon by defendant:

> It is important to bear in mind that we are here dealing not alone with an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress, but which, of course, like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution. It is quite apparent that if, in the maintenance

---

[47] Defendant's motion to dismiss also argued that "recognizing the sovereignty of other countries is textually committed to the political branches," and for this proposition defendant cited to the United States Supreme Court's decision in Boumediene v. Bush, 553 U.S. 723. In the portion of Boumediene v. Bush to which defendant appeared to refer, however, the Supreme Court's decision focused on the question of sovereignty over, and the availability of the writ of habeas corpus in, Guantanamo Bay. See id. at 753-54. Defendant did not elaborate on its argument with respect to Boumediene v. Bush at any point in its reply brief, and nothing in defendant's arguments indicated that protestor's claims, if successful, would deprive the political branches of authority to "recogniz[e] the sovereignty of other countries," as defendant appeared to argue by its citation to Boumediene v. Bush. (alteration added). The Supreme Court's decision in Boumediene v. Bush does not resolve the issues in the above captioned bid protest.

of our international relations, embarrassment—perhaps serious embarrassment—is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved.

United States v. Curtiss-Wright Export Corp., 299 U.S. at 319-20. Defendant also cited to the United States Court of Appeals for the Federal Circuit's decision in Belk v. United States, 858 F.2d 706, in which the Federal Circuit upheld the United States Claims Court's dismissal of claims alleging the United States had taken the claimants' "right to sue Iran for injuries sustained while held hostage" by settling those claims to secure the hostages' release. See id. at 707. As relevant to the above captioned bid protest, the Federal Circuit in Belk relied on the Supreme Court's holding in Curtiss-Wright that "[t]he President is 'the sole organ of the federal government in the field of international relations.'" Belk v. United States, 858 F.2d at 710 (alteration added) (quoting United States v. Curtiss-Wright Export Corp., 299 U.S. at 320). The Federal Circuit in Belk stated:

The appellants apparently contend that the President should not have entered into the Algiers Accords because he could have obtained better terms, and that the Accords themselves were illegal because the President was coerced into agreeing to them. The determination whether and upon what terms to settle the dispute with Iran over its holding of the hostages and obtain their release, necessarily was for the President to make in his foreign relations role. That determination was "of a kind clearly for nonjudicial discretion," and there are no "judicially discoverable and manageable standards" for reviewing such a Presidential decision. A judicial inquiry into whether the President could have extracted a more favorable settlement would seriously interfere with the President's ability to conduct foreign relations.

Id. (quoting United States v. Curtiss-Wright Export Corp., 299 U.S. at 320). For this reason, the Federal Circuit held that the claims in Belk v. United States presented a nonjusticiable political question. See id.

Vectrus argued that a pair of Supreme Court decisions, Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189 (2012), and Zivotofsky ex rel. Zivotofsky v. Kerry, 576 U.S. 1 (2015), "require[] rejecting application of the political question doctrine" in protestor's case as articulated in Curtiss-Wright and Belk v. United States, because in the above captioned bid protest, the court need only "determine whether the interpretation and application of the statute (CICA) is correct, not supplant any foreign policy decision by the United States." (alteration added). Protestor asserted that "[i]t is the judiciary's sole role to determine whether the Executive's restrictive Solicitation provisions conform to the CICA." (alteration added). Moreover, protestor, citing Zivotofsky v. Kerry, 576 U.S. at 21-22, argued that "the 'sole organ' or 'Curtiss-Wright' doctrine" of presidential authority in international relations was "rejected" by the Supreme Court in Zivotofsky v. Kerry.

In <u>Zivotofsky v. Clinton</u>, the United States Supreme Court rejected the argument that a plaintiff's suit to "vindicate" a "statutory right" created by Congress, "to choose to have Israel recorded on his passport as his place of birth," instead of simply "Jerusalem," presented a nonjusticiable political question. <u>See</u> <u>Zivotofsky v. Clinton</u>, 566 U.S. at 195. The Supreme Court stated:

> The existence of a statutory right, however, is certainly relevant to the Judiciary's power to decide Zivotofsky's claim. The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be. Instead, Zivotofsky requests that the courts enforce a specific statutory right. To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise.

<u>Id.</u> at 196. The Supreme Court in <u>Zivotofsky v. Clinton</u> considered the first two elements of the political question formulation identified in <u>Baker v. Carr</u> in the context of "determining the constitutionality of" section 214(d) of the Foreign Relations Authorization Act, Fiscal Year 2003, 116 Stat. 1350, 1366. <u>See</u> <u>Zivotofsky v. Clinton</u>, 566 U.S. at 196. When holding that the claim did not present a nonjusticiable political question, the Supreme Court explained:

> Resolution of Zivotofsky's claim demands careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers. This is what courts do. The political question doctrine poses no bar to judicial review of this case.

<u>Id.</u> at 201.

The second case, <u>Zivotofsky v. Kerry</u>, concerned the constitutionality of the same statute also at issue in <u>Zivotofsky v. Clinton</u>. The United States Supreme Court in <u>Zivotofsky v. Kerry</u> did not further address the political question doctrine discussion from its prior decision, however, the Supreme Court did specifically address the significance of the <u>Curtiss-Wright</u> decision upon which, as noted above, defendant relies in the cases currently before this court. <u>See</u> <u>Zivotofsky v. Kerry</u>, 576 U.S. at 13, 20. While the Supreme Court acknowledged that, under <u>Curtiss-Wright</u>, "[t]he President has the sole power to negotiate treaties," <u>id.</u> at 13, 19-20 (alteration added), the Supreme Court limited the expansive language of <u>Curtiss-Wright</u>, explaining:

> In support of his submission that the President has broad, undefined powers over foreign affairs, the Secretary quotes <u>United States v. Curtiss–Wright Export Corp.</u>, which described the President as "the sole organ of the federal government in the field of international relations." 299 U.S., at 320, 57 S. Ct. 216. This Court declines to acknowledge that unbounded power.

> A formulation broader than the rule that the President alone determines what nations to formally recognize as legitimate—and that he consequently controls his statements on matters of recognition—presents different issues and is unnecessary to the resolution of this case.

Zivotofsky v. Kerry, 576 U.S. at 20. Moreover, according to the Supreme Court in Zivotofsky v. Kerry,

> Curtiss–Wright did not hold that the President is free from Congress' lawmaking power in the field of international relations. The President does have a unique role in communicating with foreign governments, as then-Congressman John Marshall acknowledged. See 10 Annals of Cong. 613 (1800) (cited in Curtiss–Wright, supra, at 319, 57 S. Ct. 216). But whether the realm is foreign or domestic, it is still the Legislative Branch, not the Executive Branch, that makes the law.

> In a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected. For it is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course. The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue.

Zivotofsky v. Kerry, 576 U.S. at 21. Although the Supreme Court ultimately struck down the statute in question in Zivotofsky v. Kerry as unconstitutionally intruding upon the President's power to recognize foreign governments, the Supreme Court stated that its decision did "not question the substantial powers of Congress over foreign affairs in general or passports in particular," and that its decision was "confined solely to the exclusive power of the President to control recognition determinations, including formal statements by the Executive Branch acknowledging the legitimacy of a state or government and its territorial bounds." Id. at 32.

Defendant attempted to distinguish the above captioned bid protest from Zivotofsky v. Clinton and Zivotofsky v. Kerry by arguing that protestor's "claim here is an attack on a matter well within the power of the Executive Branch to manage foreign and security affairs. To suggest that Congress, *sub silentio*[48] meant to or could have limited the powers of the Executive Branch in passing such laws is unimaginable." (emphasis in original; footnote added). According to defendant, the President's "'power to speak or listen as a representative of the nation,'" "is the very power at issue in this case and precisely how the 1991 MOU and its subsequent agreements came into being. They should not be disturbed." (footnote omitted) (quoting Zivotofsky v. Kerry, 576 U.S. at 20).

---

[48] "Sub silentio" is a Latin phrase meaning "under or in silence" or "without notice being taken or without making a particular point of the matter in question." Sub silentio, MERRIAM-WEBSTER (last visited March 14, 2023), https://www.merriam-webster.com/legal/sub%20silentio.

Protestor, however, relies on the Supreme Court's decision in Japan Whaling Association v. American Cetacean Society, 478 U.S. 221 (1986), to argue that because "the Court need only interpret the plain language" of the relevant international agreements, protestor's claims do not present a political question. In Japan Whaling Association v. American Cetacean Society, the United States Supreme Court reversed an order of the United States District Court for the District of Columbia, which had been upheld by the United States Court of Appeals for the District of Columbia Circuit, requiring the Secretary of Commerce to certify Japan, under 16 U.S.C. § 1821(e), as a foreign nation whose nationals "'are conducting fishing operations or engaging in trade or taking which diminishes the effectiveness of the International Convention for the Regulation of Whaling,'" which order had been entered shortly before an agreement was made between the United States and Japan not to certify Japan under that statute. See Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. at 226-29 (quoting 16 U.S.C. § 1821(e)(2)(A)(i)). The Supreme Court rejected the argument that the case presented a political question because it "involve[d] foreign relations" and that the federal courts could not "command the Secretary of Commerce, an Executive Branch official, to dishonor and repudiate an international agreement." Id. at 229 (alteration added). The Supreme Court stated that while "[t]he political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch," the doctrine did not preclude the courts from interpreting treaties and statutes which have impact upon foreign relations. See id. at 230 (alteration added). The Supreme Court explained that

> the courts have the authority to construe treaties and executive agreements, and it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts. It is also evident that the challenge to the Secretary's decision not to certify Japan for harvesting whales in excess of IWC [International Whaling Commission] quotas presents a purely legal question of statutory interpretation. The Court must first determine the nature and scope of the duty imposed upon the Secretary by the Amendments, a decision which calls for applying no more than the traditional rules of statutory construction, and then applying this analysis to the particular set of facts presented below. We are cognizant of the interplay between these Amendments and the conduct of this Nation's foreign relations, and we recognize the premier role which both Congress and the Executive play in this field. But under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones.

Id. (alteration added). In its reply, defendant appeared to acknowledge that Japan Whaling Association stands, as defendant claims, "for the point that courts can interpret treaties," which defendant calls "a general point which with [sic] we do not disagree." (alteration added). At the same time, defendant stated that "Section 1502 precludes" interpretation in this protest, and argued that protestor's argument that "the Court need

only interpret the plain language of the MOU presents the very problem Section 1502 was designed to avoid."

Both parties cited to the Federal Circuit's decision in <u>Aviation & General Insurance Co., Ltd. v. United States</u>, 882 F.3d 1088 (Fed. Cir. 2018), as supportive of their respective positions on the application of the political question doctrine to the case currently under review. The <u>Aviation & General Insurance Co., Ltd.</u> case concerned "whether the [United States] Government's termination of Appellants' lawsuits [against Libya] pursuant to the [Libya] Claims Settlement Agreement between the United States and Libya and its subsequent legislation and executive order constituted a compensable taking under the Fifth Amendment." <u>Aviation & Gen. Ins. Co., Ltd. v. United States</u>, 882 F.3d at 1090 (alterations added). Recognizing that the claims could be expressed in two ways, the Federal Circuit held "that the question of whether a Fifth Amendment taking of Appellants' alleged property right in their lawsuits occurred presents a justiciable claim, but the question of whether Appellants were entitled to proceeds from the Libya Claims Settlement Agreement presents a nonjusticiable political question." <u>Id.</u> at 1094. The Federal Circuit reasoned that the claimants' Fifth Amendment taking claims

> do not cause us to question the terms of the Libya Claims Settlement Agreement itself, whether the President had authority to enter the settlement, or whether the President should have made provision for Appellants in the distribution of its proceeds. Rather, these claims require us to examine whether, under the Fifth Amendment, a taking occurred by the Government's espousal of Appellants' claims and termination of their lawsuits by reinstating Libya's sovereign immunity. This is a *legal* question for which we have judicially discoverable and manageable standards for resolution.

<u>Id.</u> at 1095 (emphasis in original) (citing <u>Baker v. Carr</u>, 369 U.S. at 217). The Federal Circuit held, "however, that to the extent Appellants seek judicial review of the President's decision to exclude them from the settlement's proceeds, Appellants raise a nonjusticiable political question." <u>Id.</u> The Federal Circuit reasoned that "foreign relations and settlements to resolve foreign conflicts are soundly committed to the President's discretion," and "the President had complete discretion and authority to implement the settlement with Libya and to decide to whom the settlement funds would be distributed. Appellants' argument that they should have been included in the distribution of settlement funds questions the President's policy decision to exclude them." <u>Id.</u> Therefore, according to the Federal Circuit, any claims to entitlement to the settlement proceeds from the international agreement, but not the Fifth Amendment taking claims, presented a nonjusticiable political question. <u>See</u> <u>id.</u> at 1096.

Protestor argued that the <u>Aviation & General Insurance Co., Ltd.</u> decision indicates that protestor's claim is not a political question, because just as the Federal Circuit held that the international agreement at issue in that case "did **not** bar the Court of Federal Claims from hearing the insurers' Fifth Amendment takings claims," (emphasis in original), protestor's arguments also "present a legal question for which this Court has

judicially discoverable and manageable standards for resolution," in the Competition in Contracting Act and its implementing regulations. Protestor argued that it is not "questioning whether the United States 'should have sought better terms' when negotiating," but rather that "[i]t is asking this Court to determine whether the Agency's actions comport with the terms of a valid Congressional statute and implementing regulations." (capitalization in original; alteration added).

In its reply brief, defendant alleged that "Vectrus is claiming that the Executive Branch could have gotten a better deal in the negotiations" with Denmark, "or that it would have achieved a better deal under the Competition in Contracting Act." According to defendant, the Federal Circuit in Aviation & General Insurance Co., Ltd. v. United States, 882 F.3d at 1095, held that "second-guessing the deal [between the United States and a foreign nation] is not permitted," and that was the basis for the Federal Circuit's holding with respect to the application of the political question doctrine in that case. (alteration added). References to "second-guessing" appear only twice in the published decision of the Federal Circuit in Aviation & General Insurance Co., Ltd.: first to describe the government's argument for the application of the political question doctrine, see id. at 1094 ("The Government argues that both of these arguments present a nonjusticiable political question as Appellants 'attempt to second-guess the President's authority to settle [their] claims . . . .'" (capitalization, alteration, and ellipsis in original)), and second in the partial concurrence and partial dissent of Judge Reyna, dissenting on the application of the political question doctrine on the basis that "permit[ting] suits against the U.S. Government that are based on the termination of lawsuits against Libya," according to the partial dissent, "would necessarily involve second guessing the acts of the President and Congress, and undermine their negotiating authority to resolve conflicts with foreign nations." Id. at 1106 (Reyna, J., concurring in part, dissenting in part) (alteration added). Moreover, as noted above, the Federal Circuit in Aviation & General Insurance Co., Ltd. did not bar claimants' entire suit on the basis of the political question doctrine, but only any claim to entitlement to proceeds from the United States' settlement agreement with Libya, as the Federal Circuit explicitly held that the claimants' Fifth Amendment taking claims were justiciable. See id. at 1095-96. Therefore, defendant's argument that the Federal Circuit's holding in Aviation & General Insurance Co., Ltd. generally prohibits suits related to international agreements as "second-guessing" the government mischaracterizes that decision and the law regarding the political question doctrine.

Protestor additionally relied on two United States Court of Federal Claims cases to argue that its claims do not present a nonjusticiable political question. In the first case, Kuwait Pearls Catering Co., WLL v. United States, also discussed above, the Judge of the Court of Federal Claims considered whether the plaintiff's Fifth Amendment taking claim presented a nonjusticiable political question by "attempting to 'second-guess the SOFA [Status of Forces Agreement] that the President entered into with the Iraqi Government.'" Kuwait Pearls Catering Co., WLL v. United States, 145 Fed. Cl. at 370 (alteration added). The Judge in Kuwait Pearls Catering held that a political question was not presented, explaining that "[a]t issue in this case is whether the Government effected a taking of KPCC's [Kuwait Pearls Catering Co.'s] property, entitling KPCC to just

compensation. What is not at issue is the wisdom of the SOFA itself, nor the executive branch's decision-making regarding foreign relations." Id. (capitalization in original; alterations added). Moreover, because the Kuwait Pearls Catering case concerned a claim for a Fifth Amendment taking, the Judge determined that "there are judicially manageable standards governing resolution of KPCC's claim." Id. at 371.

In the second case cited by protestor, Defense Technology, Inc. v. United States, 99 Fed. Cl. 103, a Judge of the Court of Federal Claims considered at length whether all six of the Baker v. Carr elements applied to a bid protest of a sole-source contract awarded to a Russian state-owned company for the purchase of helicopters. Id. at 116. The United States in Defense Technology cited "the 'longstanding doctrine that decisions grounded in defense and foreign policy are responsibilities of the executive branch and . . . not subject to judicial review,'" and "argue[d] that the political question doctrine bars this Court from reviewing plaintiff's claims in this case." Id. at 115 (ellipsis in original; alteration added). The Judge of the Court of Federal Claims in Defense Technology rejected the application of the political question doctrine, explaining that "[w]hile the political question doctrine renders many executive decisions over defense and foreign policy outside the province of the courts," the government's argument "that the foreign and defense spheres are 'textually committed by the Constitution to the political branches,'" was "overstated at best," and that "where executive conduct is regulated by federal statute or regulation—in any sphere—and the courts are presented with an appropriate controversy, the Constitution requires the courts to take jurisdiction and apply the law." Id. at 116. (alteration added) (citing Clinton v. Jones, 520 U.S. 681, 703 (1997)). According to the Judge in Defense Technology, "merely invoking foreign policy or national defense is insufficient to place an issue beyond judicial review," id. at 117, and explained that "it is well established that the Administrative Procedure Act, 5 U.S.C. § 706 and the FAR apply to and govern bid protests against Department of Defense procurements," and that "no court has questioned the constitutionality of judicial oversight of federal defense procurements." Def. Tech., Inc. v. United States, 99 Fed. Cl. at 117.

In sum, the United States Supreme Court in Baker v. Carr explained that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." Baker v. Carr, 369 U.S. at 211-12. When a claim is based on "[t]he existence of a statutory right," as protestor in the above captioned protest claimed its asserted right is based on the Competition in Contracting Act, that right "is certainly relevant to the Judiciary's power to decide [the] claim." Zivotofsky v. Clinton, 566 U.S. at 196 (alterations added). When a claim is based on a statutory right, "[t]he federal courts are not being asked to supplant a foreign policy decision of the political branches," but rather to "enforce a specific statutory right," which "is a familiar judicial exercise." Id. (alteration added). Moreover, "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue." Zivotofsky v. Kerry, 576 U.S. at 21 (alteration added). Among these "ordinary controls" is the Competition in Contracting Act, including the Competition in Contracting Act's requirement that "an agency may use procedures other than competitive procedures" when "the terms of an international agreement or a treaty between the United States and a foreign government . . . have the effect of requiring the use of procedures other than competitive procedures,"

10 U.S.C.A. § 3204(a)(4) (ellipsis added). Defendant's invocation of foreign policy concerns in the context of the political question doctrine does not avoid the application of the Competition in Contracting Act to the Solicitation currently at issue, as the statutory language at 10 U.S.C.A. § 3204(a)(4) expressly applies to the application of treaties and international agreements to public procurement. See Def. Tech., Inc. v. United States, 99 Fed. Cl. at 117. The application of 10 U.S.C.A. § 3204(a)(4) "do[es] not cause us to question" the result of the United States' negotiations with Denmark. See Aviation & Gen. Ins. Co., Ltd. v. United States, 882 F.3d at 1090 (alteration added). With "the authority to construe treaties and executive agreements," in the appropriate circumstances, this court may interpret the international agreements between the United States and Denmark to determine the application of the treaties or agreements which impact the United States' procurement for goods and services at Thule Air Base, see Japan Whaling Ass'n v. American Cetacean Soc'y, 478 U.S. at 230, and the nature and impact of the included language "is a *legal* question for which" section 3204(a)(4) provides "judicially discoverable and manageable standards for resolution." Aviation & Gen. Ins. Co., Ltd. v. United States, 882 F.3d at 1090 (emphasis in original); see also Baker v. Carr, 369 U.S. at 217; Kuwait Pearls Catering Co., WLL v. United States, 145 Fed. Cl. at 371. Accordingly, the court holds that protestor's raised claims do not present a nonjusticiable political question. Therefore, the court concludes that defendant's motion to dismiss the protest for lack of subject matter jurisdiction is denied in its entirety.

**The Parties' Cross-Motions for Judgment on the Administrative Record**

As noted above, both parties cross-moved for judgment on the Administrative Record. RCFC 52.1 governs motions for judgment on the Administrative Record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)); see also PGLS, LLC v. United States, 152 Fed. Cl. 59, 67 (2020); Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005)); AAR Manufacturing, Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356–57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the Administrative Record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353–54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)),

amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See SEKRI, Inc. v. United States, 34 F.4th 1063, 1071 (Fed. Cir. 2022) (citing Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1344 (Fed. Cir. 2008); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Lab'ys., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d at 1309 ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Lab'ys., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Lab'ys., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004). In Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); see also Harmonia Holdings Grp., LLC v. United States, 999 F.3d 1397, 1403 (Fed. Cir. 2021); Palantir USG, Inc. v. United States, 904 F.3d 980, 990 (Fed. Cir. 2018); AgustaWestland North Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original)

(quoting <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d at 1350-51 (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057-58 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000)))), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[49] <u>see also</u> <u>Mitchco Int'l, Inc. v. United States</u>, 26 F.4th 1373, 1384 (Fed. Cir. 2022) (applying the "'arbitrary and capricious'" standard of Administrative Procedure Act, 5 U.S.C. § 706(2)(A), to review of a bid protest) (citing <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332); <u>Veterans Contracting Grp., Inc. v. United States</u>, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting <u>Palladian Partners, Inc. v. United States</u>, 783 F.3d 1243, 1252 (Fed. Cir. 2015))); <u>Tinton Falls Lodging Realty, LLC v. United States</u>, 800 F.3d 1353, 1358 (Fed. Cir. 2015); <u>Orion Tech., Inc. v. United States</u>, 704 F.3d 1344, 1347 (Fed. Cir. 2013); <u>COMINT Sys. Corp. v. United States</u>, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary,

---

[49] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>     (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>     (B) contrary to constitutional right, power, privilege, or immunity;
>     (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>     (D) without observance of procedure required by law;
>     (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>     (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs., Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co., Inc. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86) ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (alteration added); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law."), subsequent determination, 96 Fed. Cl. 119 (2010).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

[W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible

that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (alteration added) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007), abrogated in part on other grounds, Sys. Studies & Simulation, Inc. v. United States, 22 F.4th 994, 998 (Fed. Cir. 2021) (rejecting Textron to the extent that it relied on "a presumption of prejudice for cases of irrationality"). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Ben. Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d at 990; Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also Mitchco Int'l, Inc. v. United States, 26 F.4th at 1384; U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017).

As indicated above, protestor's complaint alleged that the inclusion of the challenged criteria in sections L-2 and L-5(D)(3)(b)(ii)-(iii) of Solicitation No. FA2523-21-R-0001, and the exclusion of protestor from competition under the Solicitation pursuant to those criteria, violate the Competition in Contracting Act. In its motion for judgment on the Administrative Record, protestor argued that the United States "violated CICA and its implementing regulations at FAR Part 6 because no international agreement requires excluding American-owned firms from competing for the re-award of the Thule BMC." (alteration added). As described above, the Competition in Contracting Act provides at 10 U.S.C.A. § 3204(a):

> The head of an agency may use procedures other than competitive procedures only when
>
>       . . .
>
> **(4)** the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures[.]

10 U.S.C.A. § 3204(a)(4) (ellipsis and alteration added). The Solicitation at issue in the case before the court includes criteria at section "**L-2. OFFEROR ELIGIBILITY**," that require each offeror to certify, for the duration of performance, that:

    a) it is, and shall remain, registered as a Danish or Greenlandic company in the Danish Central Business Register; and

    b) more than 50 percent of the offeror's equity, defined as the entire capital of the company, is, and shall continue to be, owned by Danish and/or Greenlandic individuals or legal entities; and

    c) a non-Danish or non-Greenlandic individual or legal entity does not, and shall not, have a "decisive influence" (in Danish: "bestemmende indflydelse") over the offeror.

(capitalization and emphasis in original). The three challenged requirements of the eligibility criteria at Section L-2 also are found at Section L-5(D)(3)(b)(ii) of the Solicitation as quoted above. Protestor's failure to comply with the criteria as set forth at Section L-5(D)(3)(b)(ii) of the Solicitation is cited by Contracting Officer King in the May 24, 2022 Ineligible to Award Determination as the reason for Vectrus' exclusion from the competition under the Solicitation.

The parties offered differing interpretations of the Competition in Contracting Act for the court to apply to the above captioned bid protest. Protestor argued that "CICA allows agencies to restrict competition only to the extent required by the terms of an international agreement," although "parties [to an international agreement] may adopt a more restrictive interpretation by executing a new international agreement or an amendment to an existing agreement." (alteration added). Protestor argued, however, that "the United States and the KoD did not do so here." Protestor further argued that

    [e]ven assuming the term "Danish/Greenlandic sources" in the amended [in 2009] MOU is subject to two interpretations (either excluding American-owned companies or not), CICA **requires** the Agency to adopt the less restrictive interpretation because the "terms" (Danish/Greenlandic sources) of the "international agreement" (the amended MOU) do not "have the effect of requiring" the more restrictive interpretation (limiting competition to only Danish or Greenlandic-owned, rather than Danish-registered, companies).

(emphasis in original; alterations added). According to protestor, "CICA requires the United States to interpret the words 'Danish/Greenlandic sources' [from the 2009 Agreement] to provide for as much competition as is practicable," and "[t]o do otherwise would result in restricting competition where 'the terms' of an 'international agreement' do not, in fact, 'have the effect of requiring' the restriction." (alterations added) (quoting 10 U.S.C.A. § 3204(a)(4)). Defendant, in response, argued that "[t]he Court must consider whether the decision" to include the challenged eligibility criteria in the Solicitation pursuant to its exchange of documents and discussion with the Kingdom of Denmark "was based upon consideration of the relevant factors and whether there has been a clear

error in judgment." (citing <u>Citizens To Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. at 416). Defendant further argued regarding inclusion of the eligibility criteria in the Solicitation, that "the decision [by the United States] is entitled to a 'presumption of regularity,'" (alteration added) (quoting <u>Citizens To Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. at 415) such "that the Court should not substitute its judgment for that of the agency." (citing <u>Cincom Sys., Inc. v. United States</u>, 37 Fed. Cl. 663, 672 (1997)).

Regarding the international agreement exception to the Competition in Contract Act, and the interpretation of treaties and international agreements thereunder, the court in the above captioned bid protest ordered supplemental briefing from the parties after their initial briefings. The court has reviewed numerous cases which address the treaty interpretation issues presented by this bid protest, however, none have been identified as directly dispositive in the case before this court.[50] The language of the international agreement exception, however, calls for the court to interpret "the terms of an international agreement" cited by defendant, the 2009 Agreement, and the others raised by the parties in this case, the 1951 Agreement, the 1991 Memorandum of Understanding, and the 2004 Agreement, in order to determine whether or not the agreements "have the effect of requiring" the challenged eligibility criteria. <u>See</u> 10 U.S.C.A. § 3204(a)(4).

The historical sequence of international agreements relevant to the Solicitation at issue in the above captioned bid protest are the 1951 Agreement, the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement, all four of which the protestor and defendant agreed are binding agreements between the United States and Denmark. As described above, the 1951 Agreement is the foundational agreement for United States military operations in Greenland, and states that the United States "agrees to cooperate to the fullest degree with" Denmark "in carrying out operations under this Agreement," and provides for "[q]uestions of interpretation" to be "submitted to the Minister for Foreign Affairs of the Kingdom of Denmark and to the United States Ambassador to Denmark." <u>See</u> 1951 Agreement, art. VI at 9, art. XIII at 13 (alteration added). The 2004 Agreement, which amends the 1951 Agreement, provides that, for disputes related to the United States' military presence in Greenland, "the Parties shall consult with each other either in the Permanent Committee or through diplomatic channels, as appropriate." <u>See</u> 2004 Agreement, art. 3, ¶ 2.b. The 1991 Memorandum of Understanding provided for the establishment of the Permanent Committee for the

---

[50] There are two decisions issued by Judges of the United States Court of Federal Claims interpreting a different provision of the international agreement exception to the requirement of full and open competition, which applies when "the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures," 10 U.S.C.A. § 3204(a)(4), but the statutory provision interpreted in the two cases is not the same as in the above captioned bid protest. <u>See</u> <u>Hyperion, Inc. v. United States</u>, 120 Fed. Cl. 504, 511-14 (2015) (discussing 10 U.S.C. § 2304(c)(4) (2012)); <u>L-3 Comm'ns Corp. v. United States</u>, 99 Fed. Cl. 283, 289-91 (2011) (discussing 10 U.S.C. § 2304(c)(4) (2006)).

resolution of disputes as well as for the referral of "problem[s] which cannot be resolved by the Permanent Committee" to "diplomatic channels." (alteration added). See 1991 Memorandum of Understanding, art. VII. The 1991 Memorandum of Understanding also originally provided that the United States and Denmark "may procure directly from any US or Danish/Greenlandic source and may use its own military or civilian personnel to perform services or construction projects." See id. art. IV. The 2009 Agreement amended the 1991 Memorandum of Understanding to replace this provision with the requirement that the United States and Denmark "shall procure directly from Danish/Greenlandic sources." The 2009 Agreement is the most recent of the bilateral diplomatic agreements between the United States and Denmark, which both parties agreed is dispositive.

Additionally, the United States and Denmark have continued to engage in frequent diplomatic correspondence and discussions since the 2009 Agreement regarding how to conduct competition for the Base Maintenance Contract at Thule Air Base in Greenland. As described above, the relevant highlights include that in December 2013, the United States and Denmark exchanged letters in which the governments interpreted the term "Danish/Greenlandic sources" from the 2009 Agreement and agreed upon offeror eligibility criteria to use in the procurement of the earlier contract awarded to Exelis, as protestor Vectrus was previously known. In 2020, the United States and Denmark once again exchanged diplomatic correspondence, and the United States sent Diplomatic Note No. 127, dated October 27, 2020, to establish new offeror eligibility criteria for contracting for the Thule Base Maintenance Contract in the Solicitation at issue in the above captioned bid protest, which the Danish government accepted the same day, October 27, 2020.

Protestor argued that the court's interpretation should focus on the plain text of the 2009 Agreement and states that "'[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text.'" (alteration added) (quoting Medellin v. Texas, 552 U.S. 491, 506 (2008)). Protestor argued that "the plain language of" the phrase "Danish/Greenlandic sources," "do [sic] not have 'the effect of requiring' the restrictions in Sections L-2 and L-5(D)(3)(b)(ii)-(iii) of the RFP." (alteration added) (quoting 10 U.S.C.A. § 3204(a)(4)). Protestor further argued that while "[t]he amended MOU does not define 'sources,'" in the context of procurement law, "it refers to entities which provide goods or services, not their corporate parents." (alteration added) (citing 10 U.S.C.A. §§ 3011(5), 3204(a)(3); FAR 2.101). Therefore, protestor argued, "[r]eading the text consistent with the context surrounding the word 'sources,' the term 'Danish/Greenlandic sources' refers to entities providing goods or services which are themselves Danish or Greenlandic. The term does not have the effect of requiring corporate parents or affiliates to be Danish or Greenlandic." (alteration added).

Protestor argued that "[b]y contrast, reference to sources 'beyond the written words' of the agreement such as 'the history of the treaty, the negotiations, and the practical construction adopted by the parties' are [sic] only appropriate where the text itself is indeterminate." (alterations added) (quoting E. Airlines, Inc. v. Floyd, 499 U.S. 530, 534-35 (1991); citing Xerox Corp. v. United States, 41 F.3d 647, 652 (Fed. Cir. 1994), cert. denied, 516 U.S. 817 (1995)). Moreover, protestor argued that "the Court must

determine the meaning of the amended MOU **as of the time it was executed**," (emphasis in original) (citing <u>Wash. St. Dep't of Licensing v. Cougar Den, Inc.</u>, 139 S. Ct. 1000, 1016 (2019) (Gorsuch, J., concurring)), because "[i]t is 'well established that parties' post-treaty actions are relevant only insofar as they reflect on the determinative issue, the parties' intent *at the time the treaty was signed*.'"[51] (emphasis in original; alteration added) (quoting <u>United States v. Smiskin</u>, 487 F.3d 1260, 1268 (9th Cir. 2007); citing <u>Choctaw Nation of Indians v. United States</u>, 318 U.S. at 432).

In its cross-motion for judgment on the Administrative Record, defendant argued that the "eligibility criteria are the result of many discussions and negotiations by the Departments of Defense and State on behalf of the United States executive branch's foreign relations role with the Kingdom of Denmark, including Greenland on what constitutes a Danish/Greenlandic source." According to defendant, "[c]onsistent with the bilateral framework developed over time, and most recently, culminating in Diplomatic Note 127, the countries developed a shared understanding on how to implement the definition of Danish/Greenlandic source and included it in the Thule BMC RFP." (alterations added). Therefore, defendant argued, the challenged criteria in the Solicitation currently under review "fall squarely within" the international agreement exception to the Competition in Contracting Act.

The parties disagreed as to the impact of diplomatic exchanges between the United States and Denmark which occurred after the execution of the 2009 Agreement, as well as after the earlier 1951 Agreement, the 1991 Memorandum of Understanding, and the 2004 Agreement. Protestor argued that "post-execution documents and actions are weak evidence of meaning **because of** their temporal relationship to the international agreement, and they grow weaker with age." (emphasis in original) (citing <u>GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC</u>, 140 S. Ct.

---

[51] In protestor's supplemental brief, Vectrus cited, and quoted from, various decisions by the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims for principles of contract interpretation to support its arguments that the court must be restricted to the 2009 Agreement's plain text or to "'the intent of the parties **at the time the agreement was made**." (emphasis original) (quoting <u>Allen v. United States</u>, 119 Fed. Cl. 461, 480 (2015) (internal quotation omitted). <u>See</u> <u>Phytelligence, Inc. v. Wash. St. Univ.</u>, 973 F.3d 1354, 1365 (Fed. Cir. 2020); <u>Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.</u>, 169 F.3d 747, 752 (Fed. Cir. 1999); <u>King v. Dep't of Navy</u>, 130 F.3d 1031, 1033 (Fed. Cir. 1997); <u>Greco v. Dep't of Army</u>, 852 F.2d 558, 560 (Fed. Cir. 1988); <u>Oasis Int'l Waters, Inc. v. United States</u>, 134 Fed. Cl. 155, 184 (2017)). Protestor further cited to a number of United States Supreme Court cases on treaty interpretation to argue "that the United States' interpretation of a treaty or international agreement cannot trump the text of the document itself." (citing <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557, 630 (2006); <u>El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng</u>, 525 U.S. 155, 168 (1999); <u>Chan v. Korean Air Lines, Ltd.</u>, 490 U.S. 122, 133-34 (1989); <u>Sumitomo Shoji Am., Inc. v. Avagliano</u>, 457 U.S. 176, 185 (1982); <u>Choctaw Nation of Indians v. United States</u>, 318 U.S. 423, 432 (1943); <u>Perkins v. Elg</u>, 307 U.S. 325, 337-39 (1939)).

1637, 1646-47 (2020); Monasky v. Taglieri, 140 S. Ct. 719, 733 (2020) (Thomas, J., concurring in part); Nat'l Westminster Bank, PLC v. United States, 512 F.3d 1347, 1358-59 (Fed. Cir. 2008)). Protestor argued that Diplomatic Note No. 127 is "far removed temporally from the 2009 amendment," and such removal "degrad[es] its evidentiary value" with respect to the meaning of the phrase "Danish/Greenlandic sources" in the 2009 Agreement. (alteration added). Further, protestor emphasized that in interpreting the 2009 Agreement, "the Court must determine whether the '***terms***' of the relevant 'international agreement' had '***the effect of requiring***' insertion of the eligibility criteria in the RFP." (emphasis in original) (quoting 10 U.S.C.A. § 3204(a)(4)). According to protestor, "[f]or the United States to prevail," under the Competition in Contracting Act, "the AR [Administrative Record] must establish that the plain text of the amended MOU was susceptible to one, ***and only one***, interpretation in 2009—that American-***owned*** companies are not Danish or Greenlandic sources." (emphasis in original; alterations added). Protestor argued that if the text of the 2009 Agreement is susceptible to multiple interpretations, then the 2009 Agreement cannot be read to "have the effect of requiring" the eligibility criteria at issue in the above captioned bid protest.

Defendant in its cross-motion for judgment on the Administrative Record characterized "Danish/Greenlandic sources" as "an undefined term in an international agreement," and argued that although the 2009 Agreement and the 1991 Memorandum of Understanding are "silent on the definition of 'Danish/Greenlandic sources,' the countries have subsequently defined the term." According to defendant, Diplomatic Note No. 127 "memorialized a shared understanding of the term's [Danish/Greenlandic source'] definition," a shared understanding which is the result of "several years of discussions and negotiations," and which "made clear that subsidiaries of foreign companies were not Danish/Greenlandic sources under the 1991 MOU." (alteration added). According to defendant, "[t]o argue that because the clarified definition does not have the same legal formality as an international agreement is simply putting form over substance." (alteration added). Defendant cited to the Vienna Convention on the Law of Treaties to argue that "[i]t is common practice for parties to an international agreement [to] revisit and refine their interpretation and application of an international agreement's terms," as with the 2013 diplomatic correspondence and Diplomatic Note No. 127. (alterations added) (citing Vienna Convention on the Law of Treaties, art. 31, May 23, 1969, 1155 U.N.T.S. 331).[52] According to defendant, therefore, the United States and Denmark "were free to meet and discuss clarifying the definitions so long as the countries acted in good faith,[[53]] and the resulting understanding of the term is not inconsistent with

---

[52] Although defendant admitted that "the United States has not ratified" the Vienna Convention, defendant also stated that "the United States has acknowledged that Article 31 of the VCLT [Vienna Convention] is customary international law." (alteration added) (citing RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 306, cmt. a (2018)).

[53] Defendant's statement that "the countries acted in good faith" appears to be a reference to the Restatement of Foreign Relations Law, which states: "A treaty is to be interpreted in good faith in accordance with the ordinary meaning to be given to its terms in their

the 1991 MOU." (alteration added) (citing RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 306). Defendant further argued "that not only does the interpretation include a treaty's text, but also includes, the 'postratification understanding of signatory nations,'" (quoting Medellin v. Texas, 552 U.S. at 506) and that "when a term of an international agreement is undefined, the courts have looked to the plain meaning and the purpose of the treaty of [sic] agreement." (alteration added) (citing Fernandez v. Bailey, 909 F.3d 353 (11th Cir. 2018)). Moreover, defendant argued, relying upon National Westminster Bank, PLC v. United States, 512 F.3d 1347, that "the United States and Denmark, with Greenland, memorialized their shared understanding of the meaning [sic] 'Danish/Greenlandic source' to be used in this procurement," and that "[b]ecause the countries' understanding is permitted, and indeed the United States' engagement with Denmark and Greenland is squarely within the role of the Executive Branch, it should not be disturbed by this bid protest." (alterations added).

Defendant also argued that the eligibility criteria established in Diplomatic Note No. 127 were "designed to maximize competition" and "the procuring agency balanced its obligations under the bilateral framework with the competition preference in the government procurement statutory and regulatory framework by 'soliciting as many offers from as many potential sources as is practicable under the circumstances.'" (quoting FAR 6.301(d)); see FAR 6.301(d) ("When not providing for full and open competition, the contracting officer shall solicit offers from as many potential sources as is practicable under the circumstances.").[54] Defendant referred to multiple rejected offeror eligibility criteria proposed by the Danish government, which would have required, for example, that the awardee be partially owned by the Greenlandic government or that the Greenlandic government receive a mandatory "share of the awarded contract."

Precedential cases of the United States Supreme Court and the United States Court of Appeals for the Federal Circuit have established general standards by which interpretation of treaties and international agreements occurs. The United States Supreme Court stated in Medellin v. Texas that "[t]he interpretation of a treaty, like the interpretation of a statute, begins with its text," Medellin v. Texas, 552 U.S. at 506-07 (citing Air France v. Saks, 470 U.S. 392, 396–397 (1985)), but that "[b]ecause a treaty ratified by the United States is 'an agreement among sovereign powers,' we have also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations." Id. (alteration added) (quoting Zicherman v. Korean Air Lines Co, Ltd., 516 U.S. 217, 226 (1996), and citing United States v. Stuart, 489 U.S. 353, 365–366 (1989); Choctaw Nation v. United States, 318 U.S. at 431–432); see also BG Grp., PLC v. Republic of Argentina, 572 U.S. 25, 37 (2014) ("As a general matter, a treaty is a contract, though between nations. Its

---

context and in light of its object and purpose." RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 306(1).

[54] Defendant's quotation from FAR 6.301(d) misquoted the FAR provision, replacing the phrase "shall solicit offers" in the original with defendant's phrase "soliciting as many offers." See FAR 6.301(d).

interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent." (citing Air France v. Saks, 470 U.S. at 399; Sullivan v. Kidd, 254 U.S. 433, 439 (1921); Wright v. Henkel, 190 U.S. 40, 57 (1903)); Lozano v. Montoya Alvarez, 572 U.S. 1, 11 (2014) (citing Medellin v. Texas, 552 U.S. at 505; United States v. Choctaw Nation, 179 U.S. 494, 535 (1900)); United States v. Alvarez-Machain, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." (citing Air France v. Saks, 470 U.S. at 397; Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 11 (1936))). In the case of Air France v. Saks, the United States Supreme Court stated that interpretation of an international agreement "must begin, however, with the text of the treaty and the context in which the written words are used." Air France v. Saks, 470 U.S. at 397 (citing Maximov v. United States, 373 U.S. 49, 53–54 (1963)). Moreover, the Supreme Court explained that "[i]t is a familiar rule that the obligations of treaties should be liberally construed so as to give effect to the apparent intention of the parties." Valentine v. United States ex rel. Neidecker, 299 U.S. at 10 (alteration added) (citing Factor v. Laubenheimer, 290 U.S. 276, 293 (1933); Jordan v. Tashiro, 278 U.S. 123, 127 (1928); Tucker v. Alexandroff, 183 U.S. 424, 437 (1902)); see also Factor v. Laubenheimer, 290 U.S. at 294-95 ("In ascertaining the meaning of a treaty we may look beyond its written words to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter, and to their own practical construction of it."); Cook v. United States, 288 U.S. 102, 112 (1933) ("In construing the Treaty its history should be consulted."); Jordan v. Tashiro, 278 U.S. 123, 127 (1928); Tucker v. Alexandroff, 183 U.S. 424, 437 (1902); In re Ross, 140 U.S. 453, 475 (1891) ("It is a canon of interpretation to so construe a law or treaty as to give effect to the object designed, and for that purpose all of its provisions must be examined in the light of attendant and surrounding circumstances."). Similarly, the Supreme Court in Eastern Airlines, Inc. v. Floyd stated that "'[w]hen interpreting a treaty, we "begin 'with the text of the treaty and the context in which the written words are used,'"'" E. Airlines, Inc. v. Floyd, 499 U.S. at 534 (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699 (1988) (quoting Société Nationale Industrielle Aérospatiale v. United States Dist. Ct. for the S. Dist. of Iowa, 482 U.S. 522, 534 (1987) (quoting Air France v. Saks, 470 U.S. at 397))), but also that "'[o]ther general rules of construction may be brought to bear on difficult or ambiguous passages.'" Id. at 535 (alteration added) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. at 700); see also Water Splash, Inc. v. Menon, 137 S. Ct. 1504, 1508-09 (2017) (quoting Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. at 699); Chan v. Korean Air Lines, Ltd., 490 U.S. at 133-35 (explaining that "[w]e must thus be governed by the text," although "intricate drafting history" might "be consulted to elucidate a text that is ambiguous" (citing Air France v. Saks, 470 U.S. 392 (1985)); Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 180 ("The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" (quoting Maximov v. United States, 373 U.S. at 54)); Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1353 (holding that "[w]hen construing a treaty, '[t]he clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories,'" (second alteration in original) (quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 180 (internal quotation omitted)), and "effect must be

given to the intent of both signatories" (citing <u>Xerox Corp. v. United States</u>, 41 F.3d at 656)); <u>United Techs. Corp. v. United States</u>, 315 F.3d 1320, 1322 (Fed. Cir. 2003) ("The terms of a treaty are to be given their ordinary meaning in the context of the treaty, and are to be interpreted to best fulfill the purpose of the treaty," citing <u>Xerox Corp. v. United States</u>, 41 F.3d at 652, but "when the language of a treaty provision 'only imperfectly manifests its purpose,' we are required to give effect to its underlying purpose," and "[t]o this end, we must 'examine not only the language, but the entire context of agreement.'" (alteration added) (quoting <u>Great-West Life Assur. Co. v. United States</u>, 230 Ct. Cl. 477, 481, 678 F.2d 180, 183 (1982) (internal quotations omitted))); <u>Great-West Life Assur. Co. v. United States</u>, 230 Ct. Cl. at 481 (citing <u>Factor v. Laubenheimer</u>, 290 U.S. at 294-95, and <u>In re Ross</u>, 140 U.S. at 475, as "requir[ing] that the underlying purpose [of the treaty] be given effect" (alterations added)). In particular, "[t]he course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning." <u>O'Connor v. United States</u>, 479 U.S. 27, 33 (1986) (alteration added) (citing <u>Trans World Airlines, Inc. v. Franklin Mint Corp.</u>, 466 U.S. 243, 259-60 (1984); <u>Pigeon River Imp., Slide & Bloom Co. v. Charles W. Cox, Ltd.</u>, 291 U.S. 138, 158-61 (1934)). Moreover, the Supreme Court has emphasized that "[i]t is our 'responsibility to read the treaty in a manner consistent with the *shared* expectations of the contracting parties.'" <u>Lozano v. Montoya Alvarez</u>, 572 U.S. at 12 (emphasis in original; alteration added) (quoting <u>Olympic Airways v. Husain</u>, 540 U.S. 644, 650 (2004) (internal quotations omitted)).

The United States Court of Appeals for the Federal Circuit succinctly summarized the Supreme Court's approach to treaty interpretation in <u>Xerox Corp. v. United States</u>:

> In construing a treaty, the terms thereof are given their ordinary meaning in the context of the treaty and are interpreted, in accordance with that meaning, in the way that best fulfills the purposes of the treaty. <u>See</u> <u>United States v. Stuart</u>, 489 U.S. 353, 365–66, 109 S. Ct. 1183, 1190–91, 103 L. Ed. 2d 388 (1989) (interpreting a treaty to carry out the intent or expectations of the signatories); <u>Kolovrat v. Oregon</u>, 366 U.S. 187, 193–94, 81 S. Ct. 922, 925–26, 6 L. Ed. 2d 218 (1961) (a treaty should be interpreted to carry out its purpose). As discussed in <u>Sumitomo Shoji America, Inc. v. Avagliano</u>, 457 U.S. 176, 185, 102 S. Ct. 2374, 2379, 72 L. Ed. 2d 765 (1982), the court's role is "limited to giving effect to the intent of the Treaty parties." <u>See</u> <u>generally</u> Restatement (Third) of Foreign Relations Law of the United States, Part III, Introductory Note at 144–145 (1987). The judicial obligation is to satisfy the intention of both of the signatory parties, in construing the terms of a treaty. <u>Valentine v. United States</u>, 299 U.S. 5, 11, 57 S. Ct. 100, 103, 81 L. Ed. 5 (1936) ("it is our duty to interpret [the treaty] according to its terms. These must be fairly construed, but we cannot add or detract from them.").

> Unless the treaty terms are unclear on their face, or unclear as applied to the situation that has arisen, it should rarely be necessary to rely on extrinsic evidence in order to construe a treaty, for it is rarely possible to reconstruct all of the considerations and compromises that led the signatories to the

> final document. However, extrinsic material is often helpful in understanding the treaty and its purposes, thus providing an enlightened framework for reviewing its terms. See Air France v. Saks, 470 U.S. 392, 400, 105 S. Ct. 1338, 1343, 84 L. Ed. 2d 289 (1985) ("In interpreting a treaty it is proper, of course, to refer to the records of its drafting and negotiation.") However, "the ultimate question remains what was intended when the language actually employed . . . was chosen, imperfect as that language may be." Great–West Life Assurance Co. v. United States, 678 F.2d 180, 188, 230 Ct. Cl. 477 (1982).

Xerox Corp. v. United States, 41 F.3d at 652 (alteration and ellipsis in original).

When interpreting a treaty or international agreement to give effect to the intent or purpose thereof, the United States Supreme Court has historically consulted the diplomatic correspondence of the signatory governments as well as other evidence of those governments' practical construction of the treaty or international agreement's language. See, e.g., David J. Bederman, Medellín's New Paradigm for Treaty Interpretation, 102 Am. J. Int'l L. 529, 536 (2008) (discussing a "broad set of materials that the Supreme Court has now consistently endorsed as a legitimate source for the extrinsic interpretation of treaties" which "revolve around the expectations of the U.S. treaty partners, as reflected both in 'the negotiation and drafting history of the treaty' and in 'the postratification understanding of signatory nations'" (footnotes omitted) (quoting Medellin v. Texas, 552 U.S. at 507 (internal quotations omitted))); id. at 537 (explaining with respect to "postratification understandings" that "[w]hen the Court has found a treaty to be unclear, it has had 'recourse . . . [to the contracting parties'] . . . own practical construction of it,'" (second alteration and ellipses in original; footnote omitted) (quoting Nielsen v. Johnson, 279 U.S. 47, 52 (1929))), which "has led the Court to consider materials as diverse as treaties containing language identical to that of the instrument under review, diplomatic correspondence between two treaty parties, [and] subsequent amendatory protocols" (alteration added; footnotes omitted) (citing United States v. Stuart, 489 U.S. at 369; O'Connor v. United States, 479 U.S. at 33 n.2; Trans World Airlines v. Franklin Mint Corp., 466 U.S. at 257-58; Factor v. Laubenheimer, 290 U.S. at 295-96; Tucker v. Alexandroff, 183 U.S. at 430; United States v. Reynes, 50 U.S. (9 How.) 127, 147-48 (1850))); Robert M. Chesney, Disaggregating Deference: The Judicial Power and Executive Treaty Interpretations, 92 Iowa L. Rev. 1723, 1743-44 (2007) (discussing the Supreme Court's reliance on diplomatic correspondence in Nielsen in the context of the evolution of deference to executive interpretations of treaties). Research reveals a line of cases in which the Supreme Court specifically has relied on diplomatic correspondence or the public acts of signatory governments to a treaty to aid the Supreme Court's interpretation of the treaty's language, as early as in the United States Supreme Court's opinion in United States v. Reynes, 50 U.S. (9 How.) 127 (1850), in which the public acts of a signatory government were considered. The Reynes decision concerned the interpretation of two treaties, the Treaty of St. Ildefonso of 1800, between the Kingdom of Spain and the French Republic, and the Treaty of Paris of 1803, between the French Republic and the United States, regarding the grant of certain land within territory which had passed first from Spain to France, and later from France to the United States in the

Louisiana Purchase. See id. at 144-45. When considering the validity of a land grant by a Spanish official, the Supreme Court phrased the "inquiry" in the case as "whether the grant in question was protected either by the treaty of retrocession from Spain to the French Republic, or by the treaty of Paris, by which the Territory of Louisiana was ceded to the United States." Id. at 147. The Supreme Court explained:

> The treaties above mentioned, the public acts and proclamations of the Spanish and French governments, and those of their publicly recognized agents, in carrying into effect those treaties, though not made exhibits in this cause, are historical and notorious facts, of which the court can take regular judicial notice; and reference to which is implied in the investigation before us.

Id. at 147-48. The Supreme Court further explained that "[i]n the construction of treaties, the same rules which govern other compacts properly apply." Id. at 148 (alteration added). The Supreme Court noted, with respect to the transfer from Spain to France, "that there is not in this treaty a single stipulation or guarantee in favor of the lives or the property of the subjects or inhabitants of the ceded country, much less a reservation of power to grant or invest new rights within that territory." Id. at 149. The Supreme Court further observed that "[t]he same characteristic is observable in the royal order announcing the cession, and also in the formal act of delivery of the territory." Id. (alteration added). The Supreme Court proceeded to examine the order issued by the King of Spain as a means to interpret the Treaty of St. Ildefonso. The Supreme Court noted that

> the language of his Catholic Majesty may correctly be understood as conveying an acknowledgment that he had made no condition or stipulation whatever in behalf of his late subjects, and had no power to insist on any thing of the kind; but had handed them over to the justice or the liberality of the new government to whom he had transferred them.

Id. Moreover, the Supreme Court characterized the King of Spain's order as

> an explicit admission of what the treaty itself exposes; namely, that no special stipulation had been made for the protection either of persons or property; that he regarded his own authority and the dominion of Spain over the territory as at an end, and that his sole reliance for the protection and welfare of his late subjects, and even for enforcing the grants he himself, through his officials, had made to them, was on the justice and benevolence of the new government.

Id. at 150. The Supreme Court was ultimately unable to determine whether the grant claimed by the petitioner in Reynes had remained valid, because after consideration of the later Treaty of Paris, the Supreme Court determined that the question at issue was whether "the territory south of the thirty degree [sic] of north latitude, and lying between the Mississippi and Perdido, was ceded to the United States," and with respect to that question the Supreme Court acknowledged "[t]he legislative and executive departments

of the government had determined that the entire territory was so ceded," as well as "that the propriety of their determination it was not within the province of the judiciary to contravene or question." Id. at 153-54 (alterations added).

The United States Supreme Court expressly discussed the impact of diplomatic correspondence in United States v. Texas, 162 U.S. 1 (1896), a case which concerned the interpretation "of the treaty between the United States and Spain made February 22, 1819," as well as a subsequent "treaty of 1828 betwee [sic] the United States of America and the United Mexican States," which reaffirmed the boundaries set by the 1819 treaty, to determine whether Texas or the federal government held title to certain lands. See id. at 23, 29 (alteration added). The Supreme Court explained: "Before examining those articles [of the treaty of 1819], it will be useful to refer to the diplomatic correspondence that preceded the making of the treaty." Id. at 23 (alteration added). The Supreme Court considered diplomatic exchanges between the governments of the United States and Spain, reflecting the two governments' efforts to agree on which rivers, parallels, and meridians would form the boundary of the anticipated territorial cession to the United States. See id. at 23-27. The Supreme Court stated:

> We have alluded to this diplomatic correspondence to show the circumstances under which the treaty of 1819 was made, and to bring out distinctly two facts that are of some importance in the present discussion: (1) That the negotiators had access to the map of Melish, improved to 1818, and published at Philadelphia. (2) That the river referred to in the correspondence as "Red River" was believed by the negotiators to have its source near Santa Fé and the Snow Mountains.

Id. at 27 (alteration added). In relevant part, the United States and Texas disputed whether the 100th meridian, as it incorrectly appeared on a map, referred to as the Melish map, consulted by the United States and Spain during negotiations leading to the 1819 treaty, or whether the 100th meridian, as it was in actuality, formed a portion of the applicable boundary of the territory at issue. See id. at 34-36. Moreover, the Melish map was referenced in the text of the 1819 treaty, following a description of metes and bounds of territory to be ceded by Spain: "The whole being as laid down in Melish's map of the United States, published at Philadelphia, improved to the first of January, 1818." See id. at 27-28. The Supreme Court explained:

> Undoubtedly, the intention of the two governments, as gathered from the words of the treaty, must control, and the entire instrument must be examined in order that the real intention of the contracting parties may be ascertained. 1 Kent, Comm. 174. For that purpose the map to which the contracting parties referred is to be given the same effect as if it had been expressly made a part of the treaty.

United States v. Texas, 162 U.S. at 36-37 (citing Jefferis v. E. Omaha Land Co., 134 U.S. 178, 194 (1890); Cragin v. Powell, 128 U.S. 691, 696 (1888); Noonan v. Lee, 67 U.S. (2 Black) 499 (1862), overruled by Hornbuckle v. Toombs, 85 U.S. (18 Wall.) 648 (1873);

McIver's Lessee v. Walker, 17 U.S (4 Wheat.) 444 (1819)). The Supreme Court in United States v. Texas further asked,

> are we justified, upon any fair interpretation of the treaty, in assuming that the parties regarded that map as absolutely correct in all respects, and not to be departed from in any particular, or under any circumstances? Did the contracting parties intend the words of the treaty should be literally followed, if by so doing the real object they had in mind would be defeated?

Id. at 37. Moreover, the Supreme Court explained, "[s]o far as is disclosed by the diplomatic correspondence that preceded the treaty, the negotiators assumed, for the purposes of a settlement of their controversy, that Melish's map was, in the main, correct. But they did not and could not know that it was accurate in all respects." Id. at 38 (alteration added). Therefore, according to the Supreme Court, "[w]hile the line agreed upon was, speaking generally, to be as laid down on Melish's map, it was to be fixed with more precision, and designated with more exactness, by representatives of the two nations." Id. (alteration added). The Supreme Court concluded "that the treaty itself, upon a reasonable interpretation of its provisions, left it open to the contracting parties, through commissioners and surveyors, to fix the lines with precision, and therefore to show by competent evidence where the true 100th meridian was located." Id. at 42.

The United States Supreme Court, in the case of Terrace v. Thompson, 263 U.S. 197 (1923), considered diplomatic correspondence when determining whether a Washington state statute restricting foreign ownership of land conflicted with a "treaty between the United States and Japan," which indicated "that it was entered into for the purpose of establishing the rules to govern commercial intercourse between the countries." See id. at 211, 222. While the Supreme Court stated that "[a] careful reading of the treaty suffices in our opinion to negative the claim asserted by appellant that it conflicts with the state act," the Supreme Court also explained that "if the language left the meaning of its provisions doubtful or obscure, the circumstances of the making of the treaty," including diplomatic correspondence, "would resolve all doubts against the appellants' contention." Id. at 223 (alteration added). In particular, the Supreme Court observed, "[t]he letter of Secretary of State Bryan to Viscount Chinda, July 16, 1913, shows that, in accordance with the desire of Japan, the right to own land [in the United States] was not conferred." Id. (alterations added).

The United States Supreme Court also made use of diplomatic correspondence to interpret a treaty in the case of Nielsen v. Johnson, 279 U.S. 47. The Nielsen case concerned a potential conflict between Iowa inheritance taxes, which imposed a higher tax on "alien nonresidents of the United States," and "article 7 of the Treaty of April 26, 1826, between the United States and Denmark," which forbade the imposition of "higher or other duties, charges, or taxes" on citizens of one signatory country by the other. See id. at 49-50. The Supreme Court explained that "[w]hen their [treaties'] meaning is uncertain, recourse may be had to the negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter and to their own practical construction of it." Id. at 52 (alterations added) (citing Terrace v. Thompson, 263 U.S. at 223; United

States v. Texas, 162 U.S. at 23; Kinkead v. United States, 150 U.S. 483, 486 (1893); In re Ross, 140 U.S. at 467). The Supreme Court in Nielsen surveyed the diplomatic "note[s]" and "communication[s]" between the United States and Denmark from 1824 to 1826 relating to the 1826 treaty, including a "communication" sent after the treaty had been ratified. See id. at 52-57 (alterations added). The Supreme Court determined that

> The history of article 7 and references to its provisions in displomatic [sic] exchanges between the United States and Denmark leave little doubt that its purpose was both to relieve the citizens of each country from onerous taxes upon their property within the other and to enable them to dispose of such property, paying only such duties as are exacted of the inhabitants of the place of its situs, as suggested by this court in Petersen v. Iowa, supra, 245 U. S. 174, 38 S. Ct. 109, 62 L. Ed. 225 [(1917)], and also to extend like protection to alien heirs of the noncitizen.

Nielsen v. Johnson, 279 U.S. at 52 (alterations added). The Supreme Court in Nielsen held "[t]hat it was the purpose of the high contracting parties to prohibit discriminatory taxes of this nature clearly appears from the diplomatic correspondence preceding and subsequent to the execution of the treaty," and that, while the 1826 treaty did not refer specifically to inheritance taxes, "the language of article 7, interpreted with that liberality demanded for treaty provisions, sufficiently expresses this purpose." Id. at 57 (alteration added). Therefore, the Supreme Court explained, "[i]n the light of the avowed purpose of the Treaty to forbid discriminatory taxes of this character, and its use of language historically deemed to embrace them, such effect should be given to its provisions," and the Supreme Court invalidated the tax at issue for violating the treaty. Id. at 58 (alteration added).

In the case of Todok v. Union State Bank of Harvard, Nebraska, 281 U.S. 449 (1930), the United States Supreme Court considered "article 6 of the treaty with Sweden of April 3, 1783," which was applicable because it had been "revived by the treaty with Sweden and Norway of Sept. 4, 1816," then later "replaced by the treaty with Sweden and Norway of July 4, 1827," which was "now in force with Norway," to determine if the treaty's provision for free disposition of "goods and effects" overrode Nebraska law with respect to the conveyance of land as a homestead to a Norwegian citizen. See id. at 452-53. The Supreme Court explained that, as the original text of the treaty was in French, "the French text is therefore controlling" and that "[t]he phrase 'goods and effects' is a translation of the French expression 'fonds et biens.' The French word 'biens' has a wider significance than the English word 'goods' (used by the American translator) and embraces real property." Id. at 454 (alteration added). The Supreme Court further explained that

> [i]n a note addressed by the Swedish Minister at Washington to the Department of State under date of December 12, 1910, in response to an inquiry by the Secretary of State of the United States, the Swedish Minister stated his understanding that the authorities in Sweden had always held

that the words 'goods and effects' in article 6 of the treaty of 1783 include real estate.

Id. (alteration added). According to the Supreme Court, the understanding of the Swedish Minister "is the correct construction of the article of the treaty, applying the fundamental principle that treaties should receive a liberal interpretation to give effect to their apparent purpose." Id. The Supreme Court held, however, that while the treaty provided for free disposition of real property, "the treaty did not invalidate the provisions of the Nebraska statute," because the Nebraska statute concerned only the special rules regarding holding property as a homestead and was not a restriction on the transfer of property generally. See id. at 456.

In Cook v. United States, 288 U.S. 102, which concerned "the Treaty between the United States and Great Britain proclaimed May 22, 1924," relating to the seizure of British ships by the United States Coast Guard, id. at 109, the United States Supreme Court explained that "[i]n construing the Treaty its history should be consulted." Id. at 110 (alteration added) (citing Nielsen v. Johnson, 279 U.S. at 52; Oklahoma v. Texas, 260 U.S. 606 (1923); United States v. Texas, 162 U.S. 1). The Supreme Court in Cook held that

> [t]he history reveals that serious differences had arisenbetween [sic] the two governments in that connection [with laws enforcing Prohibition]; and that, for the purpose of resolving them, the parties determined to deal completely with the subject of search and seizure, beyond our territorial limits, of British vessels suspected of smuggling liquors.

Id. (alterations added). The Supreme Court considered the history of the seizure of British vessels carrying alcohol in American territorial waters during the first years of Prohibition and the British government's communicated objections to such seizures. See id. at 112-18 (collecting cases and statements with respect to seizures). The Supreme Court referred to "note[s]" between diplomatic officials, to "repl[ies]" to "question[s]" from the opposite government, to "statement[s] of the American position," and to "letter[s]" and other communications from the British government, which documented the British government's objections and diplomatic efforts to address them. See id. at 112-15 n.6-7, n.10-15 (alterations added). In light of this history, the Supreme Court interpreted the 1924 treaty along with the federal statutes in effect at the time, and determined that, consistent with the intent to resolve diplomatic tensions with the British government, the 1924 treaty had deprived the United States government of jurisdiction to seize the ship at issue in Cook. See id. at 118-21.

The United States Supreme Court's decision in Factor v. Laubenheimer, 290 U.S. 276 (1933), concerned the interpretation of "[t]he extradition provisions of the treaty with Great Britain of 1842," which were consulted in order to interpret a later "supplemental convention of 1889." Id. at 287, 288 (alteration added). The Supreme Court explained, following the example of Nielsen, that "[i]n ascertaining the meaning of a treaty we may look beyond its written words to the negotiations and diplomatic correspondence of the

contracting parties relating to the subject-matter, and to their own practical construction of it." Id. at 294-95 (alteration added) (citing Nielsen v. Johnson, 279 U.S. at 52; Terrace v. Thompson, 263 U.S. at 223; United States v. Texas, 162 U.S. at 23; Kinkead v. United States, 150 U.S. at 486; In re Ross, 140 U.S. at 467). The Supreme Court in Factor observed that "[f]rom the ensuing diplomatic correspondence [after the treaty of 1842] it clearly appears that this government [the United States] then asserted that the Treaty of 1842 obligated both parties to surrender fugitives duly charged," and that the United States

> government does not appear to have receded from that position, and while the British government has never definitely yielded to it, except in so far as the arguments addressed to us in behalf of the respondent may be taken to have that effect, that fact or even the failure of Great Britain to comply with the obligations of the treaty would not be ground for refusal by this government to honor them or by this Court to apply them.

Id. at 295-98 (alterations added). Subsequently, in Choctaw Nation of Indians v. United States, 318 U.S. 423, the United States Supreme Court, relying on the Factor and Cook cases, wrote, "[o]f course treaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." Id. at 431-32 (citing Factor v. Laubenheimer, 290 U.S. at 294-95; Cook v. United States, 288 U.S. at 112)); see also Medellin v. Texas, 552 U.S. at 507 (citing Choctaw Nation of Indians v. United States, 318 U.S. at 431-32, in the context of an international treaty); Air France v. Saks, 470 U.S. at 396 (same).

The United States Supreme Court's guidance that the signatory countries' diplomatic correspondence, subsequent understanding, and "practical construction" of the intent of the language of treaties may be used to determine the treaty's meaning has continued to be applied by the Supreme Court. See Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. at 259-60 ("In determining whether the Executive Branch's domestic implementation of the Convention is consistent with the Convention's terms, our task is to construe a 'contract' among nations. The conduct of the contracting parties in implementing that contract in the first 50 years of its operation cannot be ignored."). In the case of Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, for example, the United States Supreme Court interpreted "the Friendship, Commerce and Navigation Treaty between Japan and the United States," to determine whether Sumitomo Shoji America, a subsidiary of a Japanese company operating in America, was itself a Japanese company under the terms of the treaty. See id. at 180. The Supreme Court first considered "the literal language" of the treaty to hold that Sumitomo Shoji America was "a company of the United States operating in the United States," and not a Japanese company. See id. at 182-83. The Supreme Court further explained:

> The Governments of Japan and the United States support this interpretation of the Treaty. Both the Ministry of Foreign Affairs of Japan and the United States Department of State agree that a United States corporation, even

when wholly owned by a Japanese company, is not a company of Japan under the Treaty and is therefore not covered by Article VIII(1). The Ministry of Foreign Affairs stated its position to the American Embassy in Tokyo with reference to this case:

> "The Ministry of Foreign Affairs, as the Office of [the Government of Japan] responsible for the interpretation of the [Friendship, Commerce and Navigation] Treaty, reiterates its view concerning the application of Article 8, Paragraph 1 of the Treaty: For the purpose of the Treaty, companies constituted under the applicable laws . . . of either Party shall be deemed companies thereof and, therefore, a subsidiary of a Japanese company which is incorporated under the laws of New York is not covered by Article 8 Paragraph 1 when it operates in the United States."

The United States Department of State also maintains that Article VIII(1) rights do not apply to locally incorporated subsidiaries.

Id. at 183-84 (alterations and ellipsis in original; footnotes omitted). In a footnote, the Supreme Court in Sumitomo attributed the Japanese Ministry of Foreign Affairs' quoted interpretation of the treaty to a "cable from the United States Embassy in Tokyo to the Secretary of State relaying the position of the Ministry of Foreign Affairs of Japan," dated February 26, 1982, and the Supreme Court explained that "[t]he Government of Japan reconfirms its view" of the proper interpretation of the treaty in another diplomatic communication, dated April 21, 1982. See id. at 184 n.9.

More recently, courts have continued to rely upon diplomatic correspondence and other indications by the signatory governments of how to approach the interpretation of treaties. See Coplin v. United States, 6 Cl. Ct. 115 (1984), rev'd, 761 F.2d 688 (Fed. Cir. 1985) (reversing the United States Claims Court's decision interpreting an agreement between the United States and Panama on the basis of a newly-produced diplomatic note from Panama), aff'd on other grounds sub nom., O'Connor v. United States, 479 U.S. 27 (1986). The Coplin cases concerned the Panama Canal Treaty, between the Republic of Panama and the United States, signed in 1977 and ratified by the United States Senate, as well as the associated Agreement in Implementation of Article III of the Panama Canal Treaty, referred to by the court as the "Implementation Agreement," see Coplin v. United States, 6 Cl. Ct. at 119, which had been negotiated simultaneously with Panama Canal Treaty and signed by the President of the United States, but not referred for ratification by the Senate. See Coplin v. United States, 761 F.2d at 689-90, aff'd on other grounds sub nom., O'Connor v. United States, 479 U.S. 27 (1986). In particular, as the United States Claims Court's decision explained, at issue was whether United States government employees of the Panama Canal Commission were exempted from United States income taxes by virtue of language in the Implementation Agreement which read: "*United States citizen employees and dependents shall be exempt from any taxes, fees, or other charges on income received as a result of their work for the Commission.*" Coplin v. United States, 6 Cl. Ct. at 120 (emphasis in original). The Claims Court in Coplin interpreted the Implementation Agreement's language, noting "that Article XV, according

to its heading, purports to deal with the general subject of taxation, that two of its paragraphs specifically refer to the imposition of taxes by Panama only, and that the parties were careful elsewhere in the treaty to specify the taxing authority being addressed" by the Implementation Agreement. Id. at 127. The Claims Court in Coplin held that "a fair reading of the language in question leads to the conclusion that it [the Implementation Agreement language] unambiguously exempts U.S. citizens who are Commission employees from taxation by Panama as well as the United States." Id.

The Claims Court decision in Coplin further noted, when considering the negotiation history of the Implementation Agreement, that "there is *no evidence whatsoever* as to the interpretation given this language by Panama." See id. at 128 (emphasis in original). The Claims Court focused its analysis on the intentions of the governments as represented by the language of the Implementation Agreement, stating that "[t]he language finally adopted reflected the position of neither party" with respect to "the sensitive sovereignty issue" of which government would tax the Panama Canal Commission's employees, but also that "[w]ithout a statement from Panama, it is of course difficult to be certain as to what its motivations might have been in accepting this language." Id. at 133 (alterations added). The Claims Court in Coplin held that the language of the Implementation Agreement was unambiguous, and, further, that even if the language were ambiguous, that deference was not due to what the Claims Court understood as the United States', but not Panama's, interpretation of the language. See id. at 149.

A panel of five judges of the United States Court of Appeals for the Federal Circuit heard the appeal from the Claims Court's Coplin decision and other consolidated cases raising the same issue of treaty interpretation to seek a "refund of federal income taxes." Coplin v. United States, 761 F.2d at 689. The Federal Circuit, recounting that the Claims Court had based its decision on the fact that there was "'*no evidence whatsoever* as to the interpretation given this language by Panama,'" id. at 691 (quoting Coplin v. United States, 6 Cl. Ct. at 128, 145-47, 149 (emphasis in original)), reversed the Claims Court's holding on the basis of a "diplomatic note" which postdated the Implementation Agreement by eight years, "'from the Panamanian Foreign Minister in which he confirmed that the Panamanian Foreign Ministry shared the United States' view that the Implementing Agreement was not intended to affect United States taxation of Commission employees.'" Id. The Panamanian diplomatic note was provided to the Federal Circuit panel on the day of oral argument on appeal, and, moreover, the Panamanian diplomatic note had not existed when the Claims Court had heard the case. See id. The diplomatic note from the Panamanian government "enclosed letters from the Panamanian team that negotiated the Implementation Agreement," which stated "that the 'provisions resulted from negotiations that did not deal with the United States['] authority to tax the individuals mentioned therein.'" Id. (alteration in original). When discussing whether to consider the diplomatic note from the Panamanian government, the Federal Circuit in Coplin recognized an "exception" to "[t]he general rule" against "supplementing the record with new evidence" on appeal. See id. at 691. The Federal Circuit reviewed relevant precedent and explained:

Reversing the judgment of a lower court on the question whether the validity of a grant of land was protected by certain treaties, the Supreme Court examined diplomatic records outside the record and held that "the public acts and proclamations of [foreign] governments, and those of their publicly recognized agents, in carrying into effect those treaties, though not made exhibits in this cause, are historical and notorious facts, of which the court can take regular judicial notice." United States v. Reynes, 50 U.S. (9 How.) 127, 147–48, 13 L. Ed. 74 (1850); see generally Jones v. United States, 137 U.S. 202, 214–16, 11 S. Ct. 80, 84–85, 34 L. Ed. 691 (1890). In construing an extradition treaty the Court directed counsel's attention to matter outside the record and invited counsel to conduct a further search through "available diplomatic records and correspondence" in preparation for reargument of the case. Factor v. Laubenheimer, 290 U.S. 276, 295, 54 S. Ct. 191, 196, 78 L. Ed. 315 (1933). Nor is our consideration of the cable barred because it was not "available" when the record closed in the lower court. In determining the proper interpretation of a treaty provision, the Supreme Court relied on expressions of intent in diplomatic correspondence dated more than a year after the appellate court decision and within a few days of argument before the Court itself. Sumitomo Shoji America, Inc. v. Avagliano, 457 U.S. 176, 184 n. 9, 102 S. Ct. 2374, 2379 n. 9, 72 L. Ed. 2d 765 (1982).

Coplin v. United States, 761 F.2d at 691 (alteration in original). On the basis of the newly produced diplomatic note in the Coplin case, the Federal Circuit held, because "[t]he court's 'role is limited to giving effect to the intent of the treaty parties,'" id. (quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 185), that "the record now reveals the intent of each government" such that "both treaty parties agree that paragraph 2 was not intended to create an exemption from United States domestic taxation," and for this reason the Federal Circuit in Coplin reversed the decision of the Claims Court. Id. at 692.

Three of the five members of the Federal Circuit panel in Coplin signed onto a brief concurring opinion[55] which agreed with "the result of the majority decision" and stated that "[a] complete reading of the record, the treaty and the Implementation Agreement leads me to conclude that Article XV had no relevance to taxation by the United States of its own citizens." Id. (Nies, J., concurring) (alteration added). Regarding the diplomatic note relied on by the majority, the concurrence stated: "With respect to the late filed concurrence by the Panamanian government with the interpretation by the U.S. State

---

[55] The author of the majority opinion in the Federal Circuit's Coplin decision also filed a separate opinion expressing "Additional Views," in which the author, joined by the remaining circuit judge who was not in the three judge concurrence, stated that "[w]hile it is proper for this court to take judicial notice of the new evidence, introducing it hours before oral argument is certainly not something I want to encourage," and that "[u]nder these circumstances, to require the taxpayers to bear even their own costs borders on the unconscionable. Therefore, I would have the government pay the taxpayers' costs." Coplin v. United States, 761 F.2d at 692 (Bissell, J.) (alterations added).

Department, that evidence was not necessary to the above decisions and is not necessary here. It merely confirms the most reasonable interpretation of the Article." Id. (Nies, J., concurring). The concurrence provided no further analysis of the Panamanian diplomatic note.

Protestor in the above captioned bid protest argued that "a majority (three of the five judges) on the panel [of the Federal Circuit in Coplin] expressly limited their concurrence with reversing the lower court's ruling to their interpretation of the plain text," and protestor claimed that "the majority's concurrence rejected consideration of 'the late filed concurrence by the Panamanian government with the interpretation by the U.S. State Department' as 'not necessary' to the ruling because it 'merely confirms the most reasonable interpretation of the Article.'" (alteration added) (quoting Coplin v. United States, 761 F.2d at 692 (Nies, J., concurring)).

The United States Supreme Court granted certiorari to the Federal Circuit's decision in Coplin and affirmed the Federal Circuit on other grounds under the name O'Connor v. United States, 479 U.S. 27 (1986), but did not challenge the language and conclusion of the Federal Circuit on the issues relevant to the case now before this court. The Supreme Court's opinion in O'Connor analyzed the text of the Agreement in Implementation of Article III of the Panama Canal Treaty, comparing the language of different articles and sections of the Implementation Agreement. See id. at 30. The Supreme Court held in O'Connor, while "[t]here is some purely textual evidence, albeit subtle, of the understanding that Article XV applies only to Panamanian taxes," that "[m]ore persuasive than the textual evidence, and in our view overwhelmingly convincing, is the contextual case for limiting Article XV to Panamanian taxes." Id. at 31 (alterations added). The Supreme Court in O'Connor further held that a reading of the Implementation Agreement which exempted the employees from United States taxation "is utterly implausible and has no foundation in the negotiations leading to the Agreement." See id. The Supreme Court acknowledged that "limitation of Article XV to Panamanian taxes" was "in accord with the consistent application of the Agreement by the Executive Branch—a factor which alone is entitled to great weight," id. at 33 (citing Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 184-85), and "that application has gone unchallenged by Panama," such that "the Panama Canal Commission consistently withheld United States income taxes from petitioners and others similarly situated," while "Panama, which had four of its own nationals on the Board of the Commission, did not object." Id. The Supreme Court in O'Connor explained that "[t]he course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning." Id. (alteration added) (citing Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. at 259-60; Pigeon River Imp., Slide & Boom Co. v. Charles W. Cox, Ltd., 291 U.S. at 158-61). Moreover, the Supreme Court in O'Connor stated that the petitioner employees "point to no Panamanian negotiating proposal supporting" the employees' interpretation that they were exempt from United States income tax, "which seems to us not inordinately credible on its face." Id. at 35. In a footnote to its decision in O'Connor, the Supreme Court addressed the Panamanian diplomatic note and described the parties' views of the note, but the Supreme Court concluded, "[s]ince we would sustain the

Government's position without reference to the note, we need not resolve these disputes." See id. at 33 n.2 (alteration added).

In its supplemental brief in the protest currently before this court, Vectrus argued, citing O'Connor v. United States, 479 U.S. at 31, that the Supreme Court "refused to treat the diplomatic note from the Government of Panama as dispositive," and instead "agreed with the concurrence of three of the five panel members of the Federal Circuit that it need not consider the diplomatic note," which protestor characterizes as a "refusal to discuss the recent diplomatic note," in favor of addressing "the perspective of the parties' purposes as they *initially* negotiated the agreement." (emphasis in original) (citing O'Connor v. United States, 479 U.S at 31, 33 n.2). Defendant responded that in O'Connor, "the United States Supreme Court found persuasive the conduct of the nations," citing O'Connor v. United States, 479 U.S. at 33-34, which defendant argued the court should do in the above captioned bid protest.

While protestor characterized the Federal Circuit's concurring opinion in Coplin as having "expressly rejected consideration of the Panamanian note," the concurrence did not do so, only stating that the Panamanian diplomatic note was "not necessary" and that the diplomatic note "merely confirms the most reasonable interpretation of the Article" of the Implementation Agreement under consideration. See Coplin v. United States, 761 F.2d at 692 (Nies, J., concurring). Moreover, the Supreme Court in O'Connor did not disapprove of the Federal Circuit's consideration of the diplomatic note or indicate that the consideration of recent diplomatic correspondence to interpret the Implementation Agreement would be improper. See O'Connor v. United States, 479 U.S. at 33 n.2. In fact, contrary to protestor's overstatement, the Supreme Court in O'Connor indicated it "would sustain the Government's position without reference to the note" from the Panamanian government. See id. (capitalization in original).

In considering the cases discussed above, there appears to be a willingness and pattern in complex cases to refer to relevant diplomatic correspondence of signatory governments to treaties and international agreements, as well as to both practical constructions and later courses of conduct of the signatory parties to understand treaties and interpret the original intent. Cf. Sumitomo Shoji Am., Inc. v. United States, 457 U.S. at 183-85; Factor v. Laubenheimer, 290 U.S. at 294-95; Nielsen v. Johnson, 279 U.S. at 52. Moreover, the Federal Circuit's decision in Coplin relied for its consideration of the diplomatic note on United States v. Reynes, the oldest case cited above in which the Supreme Court relied on the public acts of a signatory government to interpret a treaty, as well as Factor v. Laubenheimer and Sumitomo Shoji America, Inc. v. Avagliano. See Coplin v. United States, 761 F.2d at 691 (citing Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 184 n.9; Factor v. Laubenheimer, 290 U.S. at 295; United States v. Reynes, 50 U.S. (9 How.) at 147-48).

The Federal Circuit's majority opinion in Coplin was later cited by a Judge of the Court of Federal Claims in McManus v. United States, 130 Fed. Cl. 613, 620-21 (2017), in which the Judge considered a refund sought for United States taxes withheld on the gambling winnings of a citizen of Ireland residing in Switzerland. See id. at 615. The

plaintiff in McManus argued that his taxation violates a treaty between the United States and Ireland on the grounds that the plaintiff "was a 'resident' of Ireland," or because "the United States tax on gambling winnings violates the Tax Treaty's nondiscrimination provisions, which Mr. McManus argues apply to nationals of the United States and Ireland regardless of residence status under the Tax Treaty." See id. The Judge in McManus interpreted the Tax Treaty and cited the Federal Circuit's majority opinion in Coplin for the proposition that "[t]he Supreme Court and the Federal Circuit have also 'relied on expressions of intent in diplomatic correspondence' that reveal the intent of the treaty parties." Id. at 620-21 (alteration added) (quoting Coplin v. United States, 761 F.2d at 691-92). The Judge in McManus explained that the Tax Treaty's terms "must be read in context and 'consistent with the shared expectations' and intent of the treaty parties." Id. at 623 (quoting Lozano v. Montoya Alvarez, 572 U.S. at 10-12; citing Coplin v. United States, 761 F.2d at 691-92). The Judge in McManus further explained that "[t]he court must look to the shared understanding of the treaty parties when construing a tax treaty." See id. at 624 (alteration added) (citing Lozano v. Montoya Alvarez, 572 U.S. at 10-12; Coplin v. United States, 761 F.2d at 691-92). With respect to the question of whether the plaintiff in McManus qualified as an Irish resident under the terms of the Tax Treaty, the Judge of the Court of Federal Claims observed that "the IRS [Internal Revenue Service] requested assistance from Ireland Revenue" after the treaty had been executed, and the IRS relied on Ireland Revenue's response that the plaintiff could not "receive treaty benefits in accordance with the provisions in the Ireland–USA Double Taxation Convention,'" the Tax Treaty. See id. (alteration added). The Court of Federal Claims in McManus held "that Ireland Revenue's response to the IRS is expressly contemplated by Articles 26 and 27 of the Tax Treaty," and, therefore, that both the IRS's request and Ireland Revenue's response could be used to interpret the Tax Treaty. See id. at 624-25.

Protestor asserted that "in McManus, the Court started its interpretation with the language of the Tax Treaty," and argued that the McManus decision "sought to uphold the original intent of the parties as they negotiated the relevant treaty." (citing McManus v. United States, 130 Fed. Cl. at 616-23). Defendant responded that in McManus, "this Court looked to the entire context of a treaty to interpret its terms," including "the bilateral framework between Ireland and the United States" as well as "the exchange of information between Ireland and the United States" in that "framework which was described in the treaty," (citing McManus v. United States, 130 Fed. Cl. at 621, 624-25), and defendant argued by analogy for the court to consider the "diplomatic exchanges" in the above captioned bid protest.

In its supplemental brief, defendant cited to the Federal Circuit decision in Barsebäck Kraft AB v. United States, 121 F.3d 1475 (Fed. Cir. 1997), which concerned treaties with Sweden and Spain regarding nuclear energy that one Swedish contractor and one Spanish contractor providing uranium enrichment services to the United States argued had been violated by the United States' "offering lower prices to utilities entering new contracts" with the United States Enrichment Corporation. See id. at 1482. The Federal Circuit in Barsebäck held that the treaties at issue did not speak to the pricing of uranium enrichment services, and, therefore, the treaties had not been violated by the offering of lower prices to newer contractors. See id. The Federal Circuit found that "there

is nothing in the treaty or in the diplomatic correspondence that guarantees Barsebäck the lowest price. The treaty is silent on pricing. The diplomatic correspondence says only that charges for enrichment services will be those in effect for users in the United States at the time of delivery." Id. Defendant cited to this language from the Federal Circuit's decision in Barsebäck to argue that "[t]he Federal Circuit has also looked to diplomatic correspondence where an international agreement left a term undefined." (alteration added) (citing Barsebäck Kraft AB v. United States, 121 F.3d at 1482). Moreover, with respect to diplomatic correspondence, the Federal Circuit in Barsebäck also wrote: "Diplomatic correspondence, however, provides that with respect to any contract that Sweden, or authorized persons, execute with the government, charges for enrichment services will be those in effect for users in the United States at the time of delivery." Barsebäck Kraft AB v. United States, 121 F.3d at 1482.

As the precedential decisions of the United States Supreme Court and the Court of Appeals for the Federal Circuit, as well as the decisions of the Court of Federal Claims and its predecessor courts demonstrate, this court's interpretation of the agreements between the United States and Denmark, including the 1951 Agreement, 1991 Memorandum of Understanding, 2004 Agreement, and 2009 Agreement, is not necessarily limited to the plain text of these agreements, as protestor claims. Rather, "when the language of a treaty provision 'only imperfectly manifests its purpose,'" the court "must 'examine not only the language, but the entire context of [the] agreement.'" Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1353 (alteration added) (quoting Great-West Life Assur. Co. v. United States, 230 Ct. Cl. at 481). Because the court should "read the treaty in a manner consistent with the *shared* expectations of the contracting parties," Lozano v. Montoya Alvarez, 572 U.S. at 12 (emphasis in original) (internal quotations omitted), the court looks to "[t]he course of conduct of parties to an international agreement" as "evidence of its meaning." O'Connor v. United States, 479 U.S. at 33 (alteration added). Consistent with historical practice, when assessing the signatory governments' course of conduct, the court may consider diplomatic notes or other "diplomatic correspondence" containing "expressions of intent," including diplomatic correspondence from after the execution of an international agreement, Coplin v. United States, 761 F.2d at 691; see also McManus v. United States, 130 Fed. Cl. at 620, as evidence of the signatory governments' "practical construction" of the agreement's terms. See Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 183-85; Factor v. Laubenheimer, 290 U.S. at 294-95; Nielsen v. Johnson, 279 U.S. at 52; United States v. Texas, 162 U.S. at 23.

In addition to general guidance, supported by the above-discussed cases, that the court may consider the diplomatic correspondence by the signatory governments to interpret an international agreement, in certain cases, courts also have referred to diplomatic correspondence which postdated the formation and ratification of the treaty or international agreement under consideration to discern the intent of the participating governments. The earliest example identified of the consideration of post-ratification correspondence to determine the signatory governments' intent is found in the Supreme Court's decision in Nielsen v. Johnson. As discussed above, the Supreme Court in Nielsen interpreted a treaty ratified in 1826 and considered messages between the United

States and Denmark from March 1824 to April 1826 which predated the treaty, as well as a pair of correspondences from after the treaty's ratification, albeit, in <u>Nielsen</u>, shortly thereafter in November 1826. <u>See</u> <u>Nielsen v. Johnson</u>, 279 U.S. at 54. In the first such postdated correspondence, dated November 10, 1826, the United States Secretary of State sought to clarify the United States government's intent regarding a certain treaty provision:

> "The object which the government of the United States had in view in that stipulation, was to secure the right of their citizens to bring their money and movable property home from the Danish islands, free from charges or duties and especially from the onerous law, known in those islands, under the denominations of sixths and tenths. This object was distinctly known to Mr. Pedersen, throughout the whole of the negotiation, and was expressly communicated by me to him in writing."

<u>Id.</u> According to the Supreme Court, the representative of the Danish government sent a response the next day confirming that Denmark would act with respect to the relevant treaty provision "'conformably to the intent and meaning thereof as by you stated.'" <u>See</u> <u>id.</u> While the post-ratification correspondence in <u>Nielsen</u>, dated November 10-11, 1826, postdated the treaty at issue, dated April 26, 1826, by only a few months, <u>see</u> <u>id.</u>, the United States Supreme Court also has considered diplomatic correspondence further removed in time from the treaty being interpreted. For example, in <u>Todok v. Union State Bank of Harvard, Nebraska</u>, as noted above, the Supreme Court interpreted

> article 6 of the treaty with Sweden of April 3, 1783 (8 Stat. 6064), revived by the treaty with Sweden and Norway of Sept. 4, 1816 (8 Stat. 232, 240) which was replaced by the treaty with Sweden and Norway of July 4, 1827 (8 Stat. 346, 354) now in force with Norway (Sen. Doc., 61st Cong., 2d Sess., No. 357, vol. 48 (2 Malloy), p. 1300).

<u>Todok v. Union St. Bank of Harvard, Neb.</u>, 281 U.S. at 452-53. When determining the proper meaning of the term "goods and effects" under the treaty, which had originally been written in French, the Supreme Court in <u>Todok</u> referred to the diplomatic note of the Swedish Minister to the United States, dated December 12, 1910, in which "the Swedish Minister stated his understanding that the authorities in Sweden had always held that the words 'goods and effects' in article 6 of the treaty of 1783 include real estate." <u>See</u> <u>id.</u> at 454. The Supreme Court in <u>Todok</u> did not comment upon, let alone disapprove of, the evidentiary value of the Swedish Minister's note, despite the note postdating the treaty at issue by at least 83 years.

The Supreme Court's decision in <u>Sumitomo</u> presents a more recent reference to the use of post-ratification diplomatic correspondence for interpretation of the intent of the words of a treaty. The Supreme Court in <u>Sumitomo</u> interpreted a treaty dated April 2, 1953, <u>see</u> <u>Sumitomo Shoji Am., Inc. v. Avagliano</u>, 457 U.S. at 179, and referred to two pieces of diplomatic correspondence from the Japanese government, dated February 26, 1982, and April 21, 1982, to support its conclusion that "[t]he Governments of Japan and

the United States support this interpretation of the Treaty." Id. at 183-84 (alteration added). The Supreme Court in Sumitomo did not remark on an approximately 29-year difference between the treaty under consideration and the diplomatic correspondence stating the Japanese government's interpretation, nor did the Supreme Court remark upon the diplomatic notes being provided after litigation had already commenced and a few months before the Supreme Court decided the case. See id.

As discussed above, similar to the Supreme Court's holdings in Nielsen, Todok, and Sumitomo, the Federal Circuit in Coplin relied upon a diplomatic note sent by the government of Panama in 1985 to interpret a 1977 Implementation Agreement of the 1977 Panama Canal Treaty between the United States and Panama. See Coplin v. United States, 761 F.2d at 689-90. The Federal Circuit in Coplin did not object to the Panamanian diplomatic note postdating the Implementation Agreement between the United States and Panama by approximately eight years, nor did the fact that the Panamanian diplomatic note had been produced while the Coplin case was on appeal, and supplied to the Federal Circuit the morning of oral argument in that case, prevent the Panamanian note's consideration in the Federal Circuit's majority opinion. See id. at 691.[56] Moreover, the Supreme Court in O'Connor affirmed the Federal Circuit's Coplin decision and did not challenge the Federal Circuit's reliance on the Panamanian diplomatic note. See O'Connor v. United States, 479 U.S. at 33 n.2.

As indicated above, protestor argued that Diplomatic Note No. 127 and other post-ratification diplomatic correspondence have lesser evidentiary value, if even relevant, as to the signatory governments' intent with respect to the international agreements between the United States and Denmark because the diplomatic correspondences postdate the 2009 Agreement, in particular Diplomatic Note No. 127, written in 2020, which postdates the 2009 Agreement by approximately 11 years. The examined precedent reveals no explicit prohibition against consideration of post-ratification diplomatic correspondence in order to interpret a treaty or international agreement. In fact, in the decisions examined above which considered post-ratification diplomatic correspondence, neither the United States Supreme Court, nor the United States Court of Appeals for the Federal Circuit, have rejected the possible evidentiary value of postdated diplomatic correspondence as to the signatory governments' intent regarding the meaning of treaty words in the proper case. Rather, the Supreme Court and the Federal Circuit both have considered post-ratification diplomatic correspondence of varying temporal distances from the relevant international agreements as able to assist to reach an understanding regarding the intent of the signatories to the relevant treaty documents. See Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 183-84 (29 years); Todok v. Union St. Bank of Harvard, Neb., 281 U.S. at 454 (83 to 127 years); Nielsen v. Johnson, 279 U.S. at 54 (a few months); Coplin v. United States, 761 F.2d at 691 (eight years). Therefore, the court may consider the

---

[56] The concurrence by three members of the Federal Circuit panel in Coplin referred to the Panamanian diplomatic note as "the late filed concurrence by the Panamanian government," although the concurrence only declined to consider the Panamanian diplomatic note because "that evidence was not necessary to the above decisions and is not necessary here." See Coplin v. United States, 761 F.2d at 692 (Nies, J., concurring).

postdated Diplomatic Note No. 127, as well as the 2013 diplomatic correspondence, to determine the meaning of the 2009 Agreement, which protestor agrees is binding on the parties, to assist the court's interpretation of the words "Danish/Greenlandic sources" within the 2009 Agreement.

In its supplemental brief, protestor cited to the United States Supreme Court's recent decision in GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. 1637, to argue against reliance upon post-ratification materials to interpret the agreements between the United States and Denmark. The GE Energy Power Conversion France case, however, is distinguished from the bid protest currently before this court. The United States Supreme Court in GE Energy Power Conversion France addressed the question of "whether the Convention on the Recognition and Enforcement of Foreign Arbitral Awards," a "multilateral treaty" also called the "New York Convention," "conflicts with domestic equitable estoppel doctrines that permit the enforcement of arbitration agreements by nonsignatories." GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. at 1642, 1644. In order to "determine whether the equitable estoppel doctrines permitted under Chapter 1 of the FAA [Federal Arbitration Act] 'conflict with . . . the [New York] Convention,'" the Supreme Court employed "familiar tools of treaty interpretation" to analyze the New York Convention. Id. at 1644-45 (ellipsis in original; alterations added) (quoting 9 U.S.C. § 208 (2018)). The Supreme Court in GE Energy Power Conversion France SAS held that "[t]he [New York] Convention is simply silent on the issue of nonsignatory enforcement," and that "[t]his silence is dispositive here because nothing in the text of the [New York] Convention could be read to otherwise prohibit the application of domestic equitable estoppel doctrines." Id. at 1645 (alterations added). The Supreme Court further explained: "'Because a treaty ratified by the United States is "an agreement among sovereign powers," we have also considered as "aids to its interpretation" the negotiation and drafting history of the treaty as well as "the postratification understanding" of signatory nations.'" Id. at 1645-46 (quoting Medellin v. Texas, 552 U.S. at 507 (quoting Zicherman v. Korean Air Lines Co., 516 U.S. at 226)). In relevant part, the Supreme Court in GE Energy Power Conversion France SAS stated:

> "[T]he postratification understanding" of other contracting states may also serve as an aid to our interpretation of a treaty's meaning. Medellín, 552 U.S. at 507, 128 S. Ct. 1346 (internal quotation marks omitted). To discern this understanding, we have looked to the "[d]ecisions of the courts of other Convention signatories," El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 175, 119 S. Ct. 662, 142 L. Ed. 2d 576 (1999), as well as the "postratification conduct" of the governments of contracting states, Zicherman, 516 U.S. at 227, 116 S. Ct. 629.

GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. at 1646 (alterations in original). Accordingly, the Supreme Court considered decisions by "[t]he courts of numerous contracting states" and the "domestic legislation" from other signatory countries, as well as "a recommendation issued by the United Nations Commission on International Trade Law" which "adopts a nonexclusive

interpretation of Article II(1) and (2)," and the Supreme Court held that "the weight of authority from contracting states indicates that the New York Convention does not prohibit the application of domestic law addressing the enforcement of arbitration agreements." See id. at 1646-47 (alteration added). The Supreme Court further explained, however, that

> [t]he court decisions, domestic legislation, and UN recommendation relied on by the parties occurred decades after the finalization of the New York Convention's text in 1958. This diminishes the value of these sources as evidence of the original shared understanding of the treaty's meaning. Moreover, unlike the actions and decisions of signatory nations, we have not previously relied on UN recommendations to discern the meaning of treaties. See also Yang v. Majestic Blue Fisheries, LLC, 876 F.3d 996, 1000-1001 (CA9 2017) (declining to give weight to the 2006 UN recommendation). But to the extent this evidence is given any weight, it confirms our interpretation of the Convention's text.

Id. at 1647 (alteration added).

While the Supreme Court in GE Energy Power Conversion France indicated that the fact that the post-ratification materials "occurred decades after" the New York Convention "diminishes the value of these sources as evidence of the original shared understanding of the treaty's meaning," the Supreme Court did not wholly discount the post-ratification materials, and explained that "to the extent this evidence is given any weight, it confirms our interpretation of the Convention's text." Id. Moreover, the Supreme Court in GE Energy Power Conversion France considered "court decisions, domestic legislation," and a "UN recommendation." See id. In the above captioned protest before this court, diplomatic correspondence like Diplomatic Note No. 127, expressing the United States' and Denmark's shared understanding of the language of the binding international agreements, are both bilateral and developed consistent with the existing consultative framework established by the 1951 Agreement, the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement. The diplomatic correspondences which this court consults in the current protest to interpret the phrase "Danish/Greenlandic sources," therefore, bear no resemblance to the post-ratification-materials addressed by the Supreme Court in GE Energy Power Conversion France SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. at 1645-46. For these reasons, the Supreme Court's decision in GE Energy Power Conversion France does not prevent this court in the current bid protest from using post-ratification diplomatic correspondences, including Diplomatic Note No. 127, to interpret the international agreements between the United States and Denmark.

In the above captioned bid protest, this court is presented with diplomatic correspondence during which the United States and Denmark conferred and reached agreements as to the proper interpretation of the terms of the 2009 Agreement, consistent with the consultative process contemplated by the foundational 1951 Agreement, the 1991 Memorandum of Understanding, and the 2004 Agreement. During the 11 years

between the 2009 Agreement and Diplomatic Note No. 127, the United States and Denmark continued to engage in consultation and negotiation, including the exchange of diplomatic notes, to find a mutually-agreeable way in which to continue the relationship between the United States, Denmark, and Greenland, including their interpretation of the term "Danish/Greenlandic sources" which was written for the first time into the 2009 Agreement. Taking into account the facts of this case and the relevant cases, this court begins its analysis by examining the texts of the international agreements at issue. See Medelin v. Texas, 552 U.S. at 506-07. The Administrative Record in the current protest includes four documents which both protestor and defendant agree represent binding agreements between the United States and Denmark: the 1951 Agreement, the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement. The 1951 Agreement, which, as described above, is the foundational document of the international relationship between the United States and Denmark with respect to American military operations in Greenland and Thule Air Base, includes provisions which contemplate continuing cooperation and consultation between the signatory governments to the benefit of all the governments, for the United States, its continued military presence in Greenland, for Denmark and Greenland, the continuing security, economic, and other benefits of the United States' presence. Article I of the 1951 Agreement provides that the United States and Denmark will cooperate "in order to promote stability and well-being in the North Atlantic Treaty area by uniting their efforts for collective defense and for the preservation of peace and security and for the development of their collective capacity to resist armed attack," and "will each take such measures as are necessary to carry out expeditiously their respective and joint responsibilities in Greenland." 1951 Agreement, art. I, at 2. The 1951 Agreement further provides, at Article VI, that the United States government "agrees to cooperate to the fullest degree with the Government of the Kingdom of Denmark and its authorities in Greenland in carrying out operations under this Agreement." 1951 Agreement, art. VI at 9. The 1951 Agreement additionally provides, at Article X, in the event of "the coming into force of a NATO agreement," that "[i]f it should appear that any of the provisions of such NATO agreement may be inappropriate to the conditions in Greenland, the two Governments will consult with a view to making mutually acceptable adjustments." (capitalization in original; alteration added). Moreover, the 1951 Agreement provides, at Article XIII, that "[q]uestions of interpretation which may arise in the application of this Agreement shall be submitted to the Minister for Foreign Affairs of the Kingdom of Denmark and to the United States Ambassador to Denmark." 1951 Agreement, art. XIII at 13 (alteration added).

The 1991 Memorandum of Understanding includes language which augments the continuing and cooperative relationship between the United States and Denmark with respect to military operations in Greenland. In Article VII, titled "*Permanent Committee*," the 1991 Memorandum of Understanding provides for the establishment of "a United States-Danish Permanent Committee," and, further:

> 3.  The Permanent Committee shall consult and exchange information on all matters pertaining to the US military presence in Greenland in general and to the present MOU in particular. The US representative will provide the Danish representative with timely information concerning any plans

for significant changes to US military operations or facilities which could have an impact on the economy or environment in Greenland. Matters falling under the scope of the United States-Danish Committee on Greenland Projects will not be dealt with by the Permanent Committee.

4. In the event that disagreement arises over a problem which cannot be resolved by the Permanent Committee, the issue shall be referred for resolution through diplomatic channels.

1991 Memorandum of Understanding, art. VII (capitalization and emphasis in original).

The 2004 Agreement, which amended the 1951 Agreement, expands on the United States and Denmark's commitments to cooperation and consultation. The 2004 Agreement provides, in "**Article 3: Local Cooperation**," in relevant part, that "[c]onsistent with the Defense Agreement [of 1951], as amended herein, and the Memorandum of Understanding of March 13, 1991," the United States shall "consult with and inform the Government of the Kingdom of Denmark, including the Home Rule Government of Greenland, prior to the implementation of any significant changes to United States military operations or facilities in Greenland." 2004 Agreement, art. 3, ¶ 1.c. (emphasis in original; alterations added). The 2004 Agreement further provides, in the same article, Article 3, that the United States and Denmark "agree that to enhance local cooperation," and that the signatory governments

shall consult without undue delay regarding any question which one of the Parties may raise concerning matters pertaining to the U.S. military presence in Greenland and covered by the Defense Agreement and this agreement. To the extent that such matters cannot be resolved through local consultation, the Parties shall consult with each other either in the Permanent Committee or through diplomatic channels, as appropriate.

2004 Agreement, art. 3, ¶ 2.b.

The terms of the 1951 Agreement, the 1991 Memorandum of Understanding, and the 2004 Agreement, when considered together, make clear and establish that the United States and Denmark intended from the outset that the relationship between the two countries would be characterized by consultation on concerns either government might express and mutual resolution of disputes, and that such intention should carry through the subsequent agreements regarding the relationship between the United States and Denmark. Further, the 1951 Agreement, the 1991 Memorandum of Understanding, and the 2004 Agreement set forth a tiered system to resolve disputes, through different organizations of the United States and Denmark, first through "local consultation," then as to which issues should be elevated to the established Permanent Committee as described in the 1991 Memorandum of Understanding for consideration, or ultimately "as appropriate," questions can be referred "through diplomatic channels" initially with "[q]uestions of interpretation" to be "submitted to the Minister for Foreign Affairs for the Kingdom of Denmark and to the United States Ambassador to Denmark." (alteration added).

The 2009 Agreement, which both protestor and defendant also agree is a binding agreement between the United States and Denmark, contains the relevant "Danish/Greenlandic sources" language at issue in the above captioned bid protest. The 2009 Agreement includes a requirement that the United States and Denmark "shall procure directly from Danish/Greenlandic sources," indicates by its text that it is a product of the consultative framework established by the United States and Denmark's prior agreements. The 2009 Agreement "refer[s] to recent discussions between representatives of the two governments regarding procedures for procurement of services for the U.S. Air Base at Thule," and states that "[a]s a result of the discussions," it sets forth what would become the amendatory language. (alterations added). Importantly, while the 2009 Agreement became a binding agreement upon acceptance by the Danish government, prior to such acceptance, the 2009 Agreement was incorporated in a piece of diplomatic correspondence, Diplomatic Note No. 053, dated July 16, 2008. As a diplomatic note it represents the operation and consummation of the consultation process between the United States and Denmark established by the prior agreements. Following "discussions," Diplomatic Note No. 053 was sent by the United States Embassy in Copenhagen to the Danish Ministry of Foreign Affairs, which are the offices of the two officials noted as having responsibilities for "[q]uestions of interpretation" in the 1951 Agreement, see 1951 Agreement, art. XIII at 13 (alteration added), and involving the "diplomatic channels" contemplated by the 2004 Agreement. See 2004 Agreement, art. 3, ¶ 2.b.

Similar to the 2009 Agreement, the notes of the 2013 diplomatic correspondence, setting forth the eligibility criteria for the earlier contract, the 2015 Joint Statement, and Diplomatic Note No. 127 from 2020, setting forth the eligibility criteria at issue in the above captioned bid protest, by their plain language were part of the continuous, consultative framework established by the United States and Denmark in multiple agreements. The 2013 diplomatic correspondence between the United States Embassy and the Danish Ministry of Foreign Affairs contains references to discussions between United States and Danish officials "regarding the Thule Air Base Maintenance Contract criteria" and sets forth "a solution" to the issue of "what constitutes a company eligible to participate in the procurement," while also "maintaining the spirit of the agreements underlying the recent procurement procedure." The responsive note from the United States dated December 13, 2013 agrees that the "criteria will allow the United States to fulfill our obligations" and expresses appreciation for "your ministry's collaboration on this issue."

The 2015 Joint Statement by the United States and Denmark expressly refers to the consultative process established by the international agreements. The 2015 Joint Statement provides that the United States and Denmark had collaborated "to discuss concerns relating to the interpretation of international agreements between the two governments pertaining to the definition of a Danish/Greenlandic enterprise," and "high-level consultations between the Kingdom of Denmark and the United States began in Washington, DC, regarding the international agreements applicable to the Thule Air Base Maintenance Contract solicitation." The 2015 Joint Statement concludes by explaining that the countries would continue to engage "expeditiously and through diplomatic

channels," to resolve "all issues between the two governments relating to the interpretation of those international agreements in accordance with Article XIII(2) of the 1951 Defense of Greenland Agreement (as amended)," a reference to the 1951 Agreement's and subsequent agreements' establishment of the cooperative framework between the United States and Greenland.

Diplomatic Note No. 127, from the United States Embassy, and its acceptance in reply correspondence by the Danish Ministry of Foreign Affairs, contain similar language to the 2013 diplomatic correspondence. Diplomatic Note No. 127 refers to a recent "Joint Statement" and to "ongoing discussions between the United States and the Kingdom of Denmark" concerning eligibility criteria for Thule Air Base procurement, and offers, as the solutions to those discussions, in order "to ensure that the Thule Base Maintenance Contract is awarded to a 'Danish/Greenlandic source' as required by the [1991] Memorandum of Understanding," (alteration added), the eligibility criteria at issue in the above captioned bid protest. By all the references to cooperation and discussion in the 2013 diplomatic correspondence and in Diplomatic Note No. 127, and by the involvement of the United States Embassy and the Danish Ministry of Foreign Affairs, the 2013 diplomatic correspondence and Diplomatic Note No. 127 fit squarely within the consultative process contemplated by the agreed-to binding international agreements between the United States and Denmark starting with the 1951 Agreement through the 2009 Agreement and present relationship, and are consistent with the subsequent consultative and written communications between the parties. In particular, because both the 2013 diplomatic correspondence and Diplomatic Note No. 127 address the implementation of the phrase "Danish/Greenlandic sources" for subsequent procurements, the diplomatic notes and the discussions preceding them constitute the "submi[ssion]" of a "[q]uestion[] of interpretation" "to the Minister for Foreign Affairs of the Kingdom of Denmark and to the United States Ambassador to Denmark" and to their governments, see 1951 Agreement, art. XIII at 13 (alterations added), and the referral of disputes "through diplomatic channels, as appropriate." See 2004 Agreement, art. 3, ¶ 2.b. Diplomatic Note No. 127 and the 2013 diplomatic correspondence, along with the 2015 Joint Statement, are within the terms contemplated and established in the 1951 Agreement, as well as in the later agreements which also contemplate that consultation and cooperation will take place between the United States and Denmark to further the joint purpose of cooperation regarding the Thule Air Base to the mutual benefit of all the countries involved. Although the court recognizes the credibility questions which can be raised regarding the use of post-ratification documents to interpret the words in international agreements, the use of "diplomatic channels" to continue to address a question of treaty interpretation, see 1951 Agreement, art. XIII at 13 (alterations added), was "expressly contemplated" by the text of the 1951 Agreement, the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement. See McManus v. United States, 130 Fed. Cl. at 624-25. In Vectrus' protest at issue in this Opinion, the court concludes, given the importance of the continuing relationships, security concerns, and practical considerations at issue in the relationship between the United States and the Kingdom of Denmark, it is appropriate in this protest to consider the evolving interpretations which were set forth in the diplomatic correspondences by the United

States and Denmark to sustain and further develop the non-static, mutually beneficial relationship between the two governments regarding Thule Air Base.

In addition to the broader textual context of the four binding agreements, the specific text of the 2009 Agreement, in which the term "Danish/Greenlandic sources" was included by bilateral agreement, is particularly relevant. Protestor argued that the term "Danish/Greenlandic sources" in the 2009 Agreement "does not define the word 'sources' in terms of the nationality of an offeror's corporate affiliates." Because the phrase "Danish/Greenlandic sources" is accompanied in the 2009 Agreement by a mention of "commercial enterprises for goods and services," protestor argued in its motion for judgment on the Administrative Record that "the term 'Danish/Greenlandic sources' refers to entities providing goods or services which are themselves Danish or Greenlandic. The term does not have the effect of requiring corporate parents or affiliates to be Danish or Greenlandic." Defendant responded that the 1991 Memorandum of Understanding, as amended by the 2009 Agreement, "did not define 'Danish/Greenlandic source,'" that the United States and Denmark "were free to meet" and the process to do so had been established to clarify the meaning of the term "Danish/Greenlandic sources" by diplomatic correspondence and continued consultation, and that there were relevant subsequent exchanges between the United States and the Kingdom of Denmark to clarify the ongoing relationship between the nations involved.

Although the 2009 Agreement and the 1991 Memorandum of Understanding do not provide a definition of what makes a "source" "Danish/Greenlandic," in the diplomatic exchanges between the United States and Denmark, including the 2013 diplomatic correspondence and Diplomatic Note No. 127, are further expressions of the signatory governments' intent as to the meaning of "Danish/Greenlandic sources" within their relationship. Credibility should be given with respect "to the intent of both signatories" when interpreting the underlying treaties and international agreements, see Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1353, especially in the case currently under review in which the consistency of the relationship and concerns of both parties to the relationship have been clearly expressed. Therefore, to interpret the term "Danish/Greenlandic sources," the court considers the subsequent diplomatic correspondence and agreement between the United States and the Kingdom of Denmark in which the signatory parties have expressed their intent through a mutually beneficial process of cooperation.

The Administrative Record before the court reflects that it was the United States and Denmark's shared expectation that discussions between the parties would continue to develop the diplomatic relationship which includes that the phrase "Danish/Greenlandic sources" could be considered a dynamic phrase based on future discussions. The 1991 Memorandum of Understanding provided that the United States and Denmark "may procure directly from any US or Danish/Greenlandic source." The 2009 Agreement amended the 1991 Memorandum of Understanding's language with the requirement that the United States and Denmark "shall procure directly from Danish/Greenlandic sources." (emphasis added). While not dispositive, the court finds the decision to remove the words "US or" from the agreement between the United States and Denmark, leaving only a

reference to "Danish/Greenlandic sources," indicative that the United States agreed to Denmark's desire to establish a preference for Danish or Greenlandic companies in future contracting.[57]

The United States and Denmark engaged in diplomatic correspondence to define the term "Danish/Greenlandic sources" in the 2009 Agreement, consistent with the 1951 Agreement, the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement. The 2013 diplomatic correspondence, which established the eligibility criteria for the prior contract, provides that offerors would "[s]ubmit corporation certification (Selskabscertifikat m. oblat) verifying that the company is registered in the Kingdom of Denmark," and that "THE REGISTERED OFFICE OF THE ENTERPRISE SHALL BE IN THE KINGDOM OF DENMARK AND SHALL NOT BE REGISTERED AS A SUBSIDIARY OF FOREIGN COMPANY." (capitalization in original; alteration added). The Danish State Secretary for Foreign Policy in the December 9, 2013 letter referred to the 2013 criteria set forth in the diplomatic correspondence as requiring an offeror "to prove that they qualify as a Danish or Greenlandic company," which would have the effect of "maintaining the spirit of the agreement underlying the recent procurement procedure," i.e., in the 2014 Solicitation, and consistent with the Danish government's belief that "the purpose of restricting participation in the procurement to Danish/Greenlandic companies is to ensure Greenland and Greenlandic society greatest possible benefits from the agreement." The United States Ambassador in response to the Danish government, similarly, expressed the sentiment that "our use of these criteria will allow the United States to fulfill our obligations under our bilateral agreements related to Thule while streamlining the process for determining the eligibility of potential bidders."

The eligibility of contractors to compete for the Thule Base Maintenance Contract was at issue in the Per Aarsleff bid protest litigation, discussed above, concerning the prior contract award to Exelis, now Vectrus. The Judge of the United States Court of Federal Claims in Per Aarsleff "excise[d]" a portion of the eligibility criteria in the 2014 Solicitation of the earlier contract. See Per Aarsleff A/S v. United States, 121 Fed. Cl. at 625 (alteration added). Because of this "excis[ion]" of the 2014 Solicitation's language the Judge held that Exelis should have been ineligible for award as the subsidiary of a United States company. See id. at 630 (alteration added). The Federal Circuit on appeal reversed the Judge of the Court of Federal Claims and the Federal Circuit concluded that Exelis was eligible for award of the earlier contract because the criterion at issue "refers to whether the CVR [Central Business Register] facially indicates the company is a subsidiary of a foreign company," although "as the three unsuccessful bidders concede,

---

[57] The "Agreed Record" attached to the July 13, 1956 letter provides that in the 1956 Agreement the United States and Denmark had agreed that "Construction, Operation and Maintenance contracts for works in the defense areas in Greenland will in future only be awarded to Danish and American enterprises." Although neither protestor nor defendant cites to the 1956 Agreement in the above captioned protest, the contractual eligibility limitation to "Danish and American enterprises" as early as 1956 indicates that the desire to establish a preference for Danish contractors has been evident since the first years after the 1951 Agreement.

it was impossible for the CVR to facially indicate such status," because no such status existed on the Central Business Register. See Per Aarsleff A/S v. United States, 829 F.3d at 1311-12 (alteration added). The Federal Circuit's Per Aarsleff opinion includes the following description of the development of the incumbent contract's eligibility criteria:

> During the course of this effort, [[name redacted]], a State Department employee stationed at the U.S. Embassy in Denmark, informed the Air Force contracting officer by email that "[i]n the searchable part of the CVR [Det Central Virksomhedsregister, i.e., the Danish central business register] there is an information point called 'type of company/virksomhedsform' that [has] 'subsidiary of foreign company' as a possibility, so there is a way to see if the company is fully registered as Danish or acting as a foreign subsidiary in Denmark." J.A. 25, 128251. As a result, the Air Force was under the belief, later shown to be mistaken, that the CVR provided a ready means for determining whether a company was a subsidiary of a foreign company. According to Copenhagen Arctic A/S ("Copenhagen Arctic"), one of the three unsuccessful bidders, the CVR contained an option to indicate whether a firm was registering as "[f]ilialer af udenlandske aktieselskaber (in English: [b]ranch of a foreign owned public limited company)." Per Aarsleff, 121 Fed. Cl. at 610 n. 8 (emphasis added). Greenland Contractors asserts the State Department employee, [[name redacted]], "appears to have mistranslated the word 'filial' in Danish to mean 'subsidiary,' when that word in fact means 'branch' or 'branch office.'"

Per Aarsleff A/S v. United States, 829 F.3d at 1306-07 (capitalization, emphasis, and alterations in original). The documents referred to in the Federal Circuit's Per Aarsleff decision, as quoted above, do not appear to be included in the Administrative Record in the above captioned bid protest. The factual information contained in the Federal Circuit's Per Aarsleff decision, however, when considered in conjunction with the 2013 diplomatic correspondence in the Administrative Record in the above captioned bid protest, indicates that the eligibility criteria in the prior contract were suggested in 2013, and accepted, with the intention of excluding subsidiaries of foreign companies from contract award. While the United States and Denmark did not ultimately exclude foreign subsidiaries from competing for the prior contract discussed in Per Aarsleff, that was due, as the Federal Circuit noted, to an apparent "mistranslat[ion]" of terms in the Danish Central Business Register, not necessarily to a lack of intent to exclude subsidiaries of foreign companies. See id. at 1307 (alteration added).

Following the award of the incumbent contract to Exelis, now Vectrus, and the unsuccessful attempt to protest that award, Exelis did perform the incumbent contract. The United States and Denmark continued to engage in further negotiations, including the resultant Diplomatic Note No. 127, to produce eligibility criteria which are incorporated in the Solicitation No. FA2523-21-R-0001 at issue in the protest currently before this court which involves the definition of the term "Danish/Greenlandic sources." Consistent with the cooperative framework established by the 1951 Agreement, the 1991 Memorandum

of Understanding, the 2004 Agreement, and the 2009 Agreement,[58] the diplomatic correspondences of 2013 and Diplomatic Note No. 127 express the United States and Denmark's negotiated, mutually understood intent as to how to continue to implement the relationship between the United States, Denmark, and Greenlandic, now including for Thule Air Base, established originally in the 1951 Agreement and subsequent agreements. In accord with the two countries' expectations, the court gives effect to the intent of the United States and Denmark, as expressed in each of the agreements and diplomatic correspondence, including Diplomatic Note No. 127, to interpret "Danish/Greenlandic sources" as expressing an intent to exclude subsidiaries of non-Danish or non-Greenlandic companies from competing for the Thule Base Maintenance Contract under the current considered Solicitation No. FA2523-21-R-0001. See Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 183-85; Factor v. Laubenheimer, 290 U.S. at 294-95; Todok v. Union St. Bank of Harvard, Neb., 281 U.S. at 454; Nielsen v. Johnson, 279 U.S. at 52; Coplin v. United States, 761 F.2d at 691.[59]

Defendant also asked the court to consider when interpreting the term "Danish/Greenlandic sources" the deference which courts should afford to the interpretations of treaties and international agreements and the role in international relations of the Executive Branch. (citing RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW § 306(6)). Protestor, however, responded, relying on National Westminster Bank, PLC v. United States, 512 F.3d at 1358-59, to argue for a lack of deference on the

---

[58] The 2009 Agreement, as described above, effects an amendment to the 1991 Memorandum of Understanding, and is more limited in scope than the 1951 Agreement, the 1991 Memorandum of Understanding, or the 2004 Agreement. Nevertheless, the 2009 Agreement represents a continuation of the cooperative framework between the United States and Denmark due to the 2009 Agreement's origin in an exchange of diplomatic notes in July 2008 and January 2009.

[59] The court's conclusion that Diplomatic Note No. 127 gives effect to the United States and the Kingdom of Denmark's shared interpretation of the term "Danish/Greenlandic sources" in the 2009 Agreement is bolstered by the statement of Contracting Officer King, in the February 16, 2022 IACR (International Agreement Competitive Restrictions) document that Diplomatic Note No. 127 is one of "numerous administrative Arrangements and supplemental agreements pertaining to the very specific issues" of the United States' military presence in Greenland. While the Administrative Record in the above captioned bid protest indicates that the IACR was dated after protestor Vectrus had filed its protest of Solicitation No. FA2523-21-R-0001 at the GAO, the Contracting Officer stated that Diplomatic Note No. 127 is one of "numerous administrative Arrangements" which reflects a mutual understanding, including by the United States, that engagement between the United States and the Kingdom of Denmark to settle issues such as eligibility criteria for contracts to be performed at Thule Air Base, rather than necessitating a new international agreement or treaty, and that such developments and changes would be routine or "administrative," consistent with the collaborative framework established by the 1951 Agreement and expanded upon by the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement.

reiterated grounds of inconsistency, "the amended MOU's plain text," and the temporal relationship between the 2009 Agreement and Diplomatic Note No. 127. The United States Supreme Court has held that "[a]lthough not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. at 184-85 (alteration added). The Federal Circuit, however, has explained that "an agency's position merits less deference 'where an agency and another country disagree on the meaning of a treaty.'" Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1358 (quoting Iceland S. S. Co., Ltd.-Eimskip v. United States Dep't of Army, 201 F.3d 451, 458 (D.C. Cir. 2000)). In the protest currently before the court, there does not appear to be any disagreement between the United States and the Kingdom of Denmark regarding the interpretation of "Danish/Greenlandic sources," and the interpretation "has gone unchallenged by" both signatory countries. See O'Connor v. United States, 479 U.S. at 33. As explained above, the documents contained in the Administrative Record indicate that the interpretation of "Danish/Greenlandic sources" to establish which entities are eligible to bid on contracts to be performed at Thule Air Base, and to restrict the presence of foreign-owned companies or their subsidiaries, was expressly agreed to by the United States in deference to the specifically expressed requirements indicated in correspondence with the Kingdom of Denmark. Accordingly, the interpretation of "Danish/Greenlandic sources" on which the United States and Denmark clearly agree based on the record should be afforded great weight in the case currently before this court. See Nat'l Westminster Bank, PLC v. United States, 512 F.3d at 1358.

In addition to the court's holding that "Danish/Greenlandic sources" in the 2009 Agreement can reliably be understood to allow for the exclusion of subsidiaries of foreign companies from the Solicitation currently at issue before the this court, according to the intent of the United States and the Kingdom of Denmark, the court notes that domestic preference statutes and regulations also exist in the United States public procurement sphere. Among numerous examples, the Buy American Act, 41 U.S.C. § 8301 et seq. (2018), has been described by the United States Court of Appeals for the Federal Circuit in the context of construction contracting as having "long required in express terms that every construction contract for public buildings and works 'shall contain a provision that in the performance of the work' only American materials will be used." S.J. Amoroso Constr. Co., Inc. v. United States, 12 F.3d 1072, 1075 (Fed. Cir. 1993) (quoting 41 U.S.C. § 10b (1988)); see also John C. Grimberg Co., Inc. v. United States, 869 F.2d 1475, 1477 (Fed. Cir. 1989) ("The BAA [Buy American Act] primarily provides a competitive preference to domestic materials in awarding government contracts." (alteration added) (citing Linda Louis Watkins, Effects of the Buy American Act on Federal Procurement, 31 Fed. B.J. 191, 194 (1972))); Acetris Health, LLC v. United States, 138 Fed. Cl. 43, 48 (2018) (explaining that "the Buy American Act restricts the goods that can be acquired by the federal government," citing 41 U.S.C. § 8302(a), but that "[t]he Trade Agreements Act allows the federal government to waive the Buy American statute," citing 19 U.S.C. § 2511(a)). Similarly, the Jones Act also provides an example of domestic preference which may impact public procurement, and which the United States Court of Federal Claims has described as requiring that ships "must be owned and crewed by United States citizens and built in the United States," and "[c]itizens must own at least seventy-five percent of

the corporation" when the Jones Act applies. See OSG Product Tankers LLC v. United States, 82 Fed. Cl. 570, 572 (2008) (alteration added) (citing 46 U.S.C. §§ 50501, 55102 (2006)). Moreover, the United States and the Kingdom of Denmark have agreed to the Danish terms for contracting to support Thule Air Base, in accordance with the evolving relationship between the United States and Denmark, founded upon the 1951 Agreement.

In addition to contesting the interplay of the international agreements discussed above and the relationship between the United States and the Kingdom Denmark in the above captioned bid protest, the parties offered a number of other arguments in support of their positions. To support its arguments that the challenged eligibility criteria are not required by the phrase "Danish/Greenlandic sources" in the 2009 Agreement, protestor also made three inter-related arguments which focus on the government's conduct prior to the issuance of the Solicitation at issue in the above captioned bid protest. First, protestor quoted at length from the United States' cross-motion for judgment on the Administrative Record and from an exchange during oral argument in the 2015 Per Aarsleff bid protest litigation also before the Court of Federal Claims to defend the previous award of the earlier contract to protestor, then operating as Exelis. These quotes in the filings before this court in the earlier Per Aarsleff litigation include language such as that "'[t]*here is nothing in the plain language of the 1991 MOU, as amended, that prohibits Exelis from being considered a "Danish/Greenlandic source*,"'" and that "'[n]*othing in the language of the 1991 MOU, as amended, indicates that Danish limited companies that are owned by United States companies are not 'Danish/Greenlandic sources.*'"[60] (emphasis in original; alterations added). Although a possible inconsistency in the position of the defendant United States between its statements in the Per Aarsleff case and the current protest was offered in support by protestor to undermine defendant's position in the current litigation, not only do circumstances change, but so too can the analysis of successive courts, especially when new information and considerations are at issue.

Second, protestor argued that "Vectrus would not have won the incumbent Thule BMC," and "the United States' multiple representations to this Court and the Federal Circuit in 2015 and 2016 would have been inaccurate," if the challenged eligibility criteria were required by the term "Danish/Greenlandic sources." According to protestor, its incumbency, along with the strong performance reviews it has received, "reflect that no legal impediment has existed to prohibit Vectrus from performing the incumbent contract's requirements, which are materially the same as those being recompeted in this procurement." Protestor also argued that defendant "fails to explain" the change in the definition of "Danish/Greenlandic sources" which led to the eligibility criteria in the

---

[60] Protestor claimed that "the Federal Circuit rejected arguments that award to Exelis was improper under the terms of the Predecessor Solicitation merely because Exelis was a Danish-registered, wholly-owned subsidiary of a United States-based company." The Federal Circuit in Per Aarsleff in its 2016 opinion, however, did not interpret the language of the 2009 Agreement or Exelis' qualification thereunder, despite protestor's repeated attempts to characterize the Federal Circuit's opinion as having done so. See Per Aarsleff A/S v. United States, 829 F.3d at 1311-12.

Solicitation which exclude non-Danish and non-Greenlandic owned and controlled companies from competing for the Solicitation, and protestor argued that "[t]he failure to acknowledge any change in course violated the APA's procedural requirements." (alteration added). Protestor alleged in its complaint that the current eligibility criteria "contradict the United States' previous interpretation of the 1991 MOU, as amended in 2009, that the Thule BMC service provider could be a Danish-registered and United States-owned corporation." Moreover, protestor alleged, without support in the Administrative Record before the court and in an attempt to rely on evidence from outside the Administrative Record, that the United States, in the time since Diplomatic Note No. 127, "has repeatedly solicited from and awarded to companies that are neither Danish nor Greenlandic owned to provide goods and services in Greenland." Protestor claims to have obtained documentation of these claims from "the System for Award Management ('SAM') at www.sam.gov and the Federal Procurement Data System ('FPDS') at www.fpds.gov." (emphasis in original). Although certain of the contract documents upon which defendant attempts to rely concern work to be performed at Thule Air Base, these contract solicitation and award documents are unrelated to the Solicitation currently at issue in this bid protest, and, therefore, are not in the Administrative Record before the court and are not dispositive in this protest concerning the Base Maintenance Contract at Thule Air Base.

Third, protestor argued that both of the Air Force's October 2016 legal analyses, in which the Air Force attempted to explain why draft eligibility criteria proposed by Denmark was rejected by the Air Force, are evidence that the challenged eligibility criteria in the Solicitation are not a required interpretation of the phrase "Danish/Greenlandic source." Protestor argued that the Competition in Contracting Act and the Air Force's legal analyses "foreclose[]" the argument "that the 2020 diplomatic correspondence 'refined' their [the United States and Denmark's] interpretation of the amended MOU." (alterations added). Defendant responded that protestor's focus on the government's prior arguments in the Per Aarsleff litigation "ignores the recent negotiations that led to the interpretation at issue" embodied in Diplomatic Note No. 127, and defendant argued that "[i]t defies logic" to consider the United States' arguments in the 2015 Per Aarsleff litigation as an admission "regarding the 2020 bilateral discussions interpreting the [1991] MOU." (emphasis in original; alterations added). Defendant further responded that there is no "merit to Vectrus's assertion that its incumbent status indicates that CICA's international agreement exception is inapplicable." Moreover, defendant argued that the October 2016 Air Force legal analyses, responding to draft eligibility criteria proposed by Denmark, cited by protestor, rejected different eligibility criteria than the criteria at issue in the above captioned bid protest, which would have been more restrictive than the criteria at issue in the case before this court, and this rejection, according to defendant, reflects the United States government's commitment to maximizing competition. Additionally, the legal analyses which protestor attempted to use in support of its position are only the offered opinions of the Deputy General Counsel, Acquisition of the Air Force Office of the General Counsel, and is not automatically the position of the Department of Justice, which has the authority to litigate on behalf of the United States.

The court has determined that the phrase "Danish/Greenlandic sources" in the 2009 Agreement can be read to exclude subsidiaries of foreign companies, consistent with the United States and Denmark's intent based on the 1951 Agreement and subsequent agreements, including the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement, and based on further and ongoing diplomatic consultations between the United States and Denmark, including Diplomatic Note No. 127. As discussed above, the court's role is to interpret "the terms of an international agreement," 10 U.S.C.A. § 3204(a)(4), "in a manner consistent with the *shared* expectations of the contracting parties." <u>Lozano v. Montoya Alvarez</u>, 572 U.S. at 12 (emphasis in original) (internal quotations omitted). Protestor's arguments on these points could suggest that the United States may have taken an inconsistent approach to the implementation of the terms "Danish/Greenlandic sources" in the earlier Thule Air Base procurement in which the Base Maintenance Contract was awarded to Exelis, now Vectrus, and that an attorney in the Air Force Office of the General Counsel expressed a particular opinion with respect to a different set of potential eligibility criteria proposed by the Danish government, but not accepted by the United States. The executive branch decision makers responsible for international relationships considered and appear to have chosen a different path based on the ongoing and continuous diplomatic consultations which started in the Administrative Record before the court with the 1951 Agreement and resulted in Diplomatic Note No. 127 prior to the Solicitation at issue in the current protest under review.

For the above stated reasons, the court concludes that the language of the 1951 Agreement, the 1991 Memorandum of Understanding, the 2004 Agreement, and the 2009 Agreement expressed the intent of both nations that the United States and the Kingdom of Denmark would engage in a consultative process regarding their relationship throughout the United States' military presence in Greenland, including at Thule Air Base. Consistent with this mutual intent, the United States and the Kingdom of Denmark continued to engage in ongoing communications to reach agreement on issues arising during their relationship, including the meaning of the 2009 Agreement's terms directing the United States and Denmark to "procure directly from Danish/Greenlandic sources," which the United States and Denmark defined in Diplomatic Note No. 127 to exclude subsidiaries of foreign companies from competition for the Thule Air Base Maintenance Contract. Accordingly, defendant's inclusion of the challenged eligibility criteria in the currently protested Solicitation, resulting in the exclusion of protestor Vectrus from competition under the Solicitation, was lawful and not arbitrary or capricious.

## CONCLUSION

In sum, the court finds it has subject matter jurisdiction to consider the above captioned bid protest, and as discussed above, defendant's motion to dismiss protestor's complaint is **DENIED**. Also for the reasons discussed above, protestor's motion for judgment on the Administrative Record is **DENIED**, and defendant's cross-motion for

judgment on the Administrative Record is **GRANTED**. The Clerk of the Court is directed to enter **JUDGMENT** consistent with this Opinion.

   **IT IS SO ORDERED.**

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**
